

### SUFFOLK COUNTY CIVIL
### Docket Report

**2384CV02406 President and Fellows of Harvard College vs. Marsh USA Inc**

| | |
|---|---|
| **CASE TYPE:** Business Litigation | **FILE DATE:** 10/25/2023 |
| **ACTION CODE:** BL1 | **CASE TRACK:** B - Special Track (BLS) |
| **DESCRIPTION:** Malpractice Claims by Business Enterprise Against Professionals | |
| **CASE DISPOSITION DATE:** 12/15/2023 | **CASE STATUS:** Closed |
| **CASE DISPOSITION:** Transferred to another Court | **STATUS DATE:** 12/15/2023 |
| **CASE JUDGE:** | **CASE SESSION:** Business Litigation 1 |

## PARTIES

| | | |
|---|---|---|
| **Plaintiff** <br> President and Fellows of Harvard College | **Attorney** <br> Robert J Gilbert <br> Latham and Watkiins <br> Latham and Watkiins <br> 200 Clarendon St <br> Boston, MA 02116 <br> Work Phone (617) 948-6059 <br> Added Date: 10/25/2023 | 565466 |
| | **Attorney** <br> Daniel Sack <br> Latham and Watkins LLP <br> Latham and Watkins LLP <br> 200 Clarendon St <br> Boston, MA 02116 <br> Work Phone (161) 788-0474 <br> Added Date: 10/25/2023 | 699290 |
| | **Attorney** <br> Haley P Denler <br> Latham and Watkins LLP <br> Latham and Watkins LLP <br> 200 Clarendon St <br> Boston, MA 02116 <br> Work Phone (617) 880-4500 <br> Added Date: 10/25/2023 | 710906 |
| **Defendant** <br> Marsh USA Inc | **Attorney** <br> Candace J Hensley <br> Day Pitney LLP <br> Day Pitney LLP <br> 1 Federal St <br> Floor 29 <br> Boston, MA 02110 <br> Work Phone (617) 345-4676 <br> Added Date: 12/08/2023 | 706150 |



**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | FINANCIAL DETAILS | | | | |
|---|---|---|---|---|---|
| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
| 10/25/2023 | Civil Filing Fee (per Plaintiff) Receipt: 41313 Date: 10/25/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 10/25/2023 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 41313 Date: 10/25/2023 | 20.00 | 20.00 | 0.00 | 0.00 |
| 10/25/2023 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 41313 Date: 10/25/2023 | 15.00 | 15.00 | 0.00 | 0.00 |
| 10/25/2023 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b Receipt: 41313 Date: 10/25/2023 | 5.00 | 5.00 | 0.00 | 0.00 |
| | **Total** | **280.00** | **280.00** | **0.00** | **0.00** |

I HEREBY ATTEST AND CERTIFY ON
December 15, 2023, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Acting Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:

Asst. Clerk



**COMMONWEALTH OF MASSACHUSETTS**
SUFFOLK COUNTY CIVIL
Docket Report

| | | INFORMATIONAL DOCKET ENTRIES | |
|---|---|---|---|
| **Date** | **Ref** | **Description** | **Judge** |
| 10/25/2023 | 1 | Original civil complaint filed. | |
| 10/25/2023 | 2 | Civil action cover sheet filed. | |
| 10/25/2023 | | EDocument sent:<br>A Tracking Order was generated and sent to:<br>Plaintiff, Attorney: Robert J Gilbert, Esq. robert.gilbert@lw.com<br>Plaintiff, Attorney: Daniel Sack, Esq. ds3354@columbia.edu<br>Plaintiff, Attorney: Haley P Denler, Esq. haleydenler@gmail.com | |
| 10/25/2023 | | Docket Note: One summon in hand | |
| 10/25/2023 | 3 | General correspondence regarding Notice of Acceptance into Business Litigation Session<br>Accepted into BLS1<br>(Dated 10/25/2023) Notice sent 10/25/2023 | Salinger |
| 11/06/2023 | 4 | Plaintiff President and Fellows of Harvard College's Motion to Appoint Special Process Server | |
| 11/06/2023 | 5 | Plaintiff President and Fellows of Harvard College's Submission of Corporate Disclosure Statement | |
| 11/09/2023 | | Endorsement on Motion to Appoint Special Process Server (#4.0): ALLOWED<br>(Dated: 11/8/23)<br>Notice sent 11/15/23 | Kazanjian |
| 11/16/2023 | 6 | Affidavit Of Service<br><br>Applies To: Marsh USA Inc (Defendant) | |
| 11/30/2023 | 7 | Plaintiff, Defendant President and Fellows of Harvard College, Marsh USA Inc's Stipulation of<br>Extension of Time | |
| 12/08/2023 | 8 | Defendant Marsh USA Inc's Notice of<br>Filing a Notice of Removal (Certified)<br>(US Dist.# 23cv13017-ADB) | |
| 12/08/2023 | | Attorney appearance<br>On this date Candace J Hensley, Esq. added for Defendant Marsh USA Inc | |
| 12/15/2023 | | REMOVED to the U.S. District Court<br>Of Massachusetts | |
| 12/15/2023 | | Case transferred to another court. | |

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

       Plaintiff,

v.

MARSH USA INC.,

       Defendant.

Civil Action No. 23 – 2406

2023 OCT 25 A 8: 30

## COMPLAINT

Plaintiff President and Fellows of Harvard College ("Harvard"), as and for its Complaint against Defendant Marsh USA Inc. ("Marsh"), alleges as follows:

## NATURE OF THE ACTION

1.    Harvard engaged Marsh to serve as its insurance broker and to provide insurance claims-related services.  Harvard brings this professional malpractice action against Marsh for its breach of both contractual duties and the professional standard of care that it owed to Harvard.

2.    Marsh undertook the contractual obligation to "prepare loss notices to insurers and notify insurers of claims."  Further, Marsh, as a licensed insurance brokerage, owed a duty to perform its duties in a professional manner that accorded with the applicable standard of care.

3.    Notwithstanding Marsh's contractual and professional obligation to "prepare loss notices to insurers and notify insurers of claims," Marsh failed to provide notice of a major claim to certain of Harvard's excess E&O insurers.  The result was the denial of coverage of a major

claim by Harvard's excess E&O insurers, based on failure to provide notice as required under that policy.

4.     Specifically, Marsh breached its obligations to Harvard by failing to timely report an underlying lawsuit, *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College (Harvard Corporation) et al.*, No. 1:14-cv-14176-ADB (the "SFFA Action"), to Zurich American Insurance Company ("Zurich") and other excess insurers under the excess errors and omissions ("E&O") program that Marsh had placed with these insurers.

5.     The essential facts are straightforward.  Marsh served as the broker with respect to the placement of Harvard's E&O program, including a $25 million prior policy issued by National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union" or "AIG") (above a $2.5 million self-insured retention), Zurich's first-layer excess E&O insurance policy providing $15 million in coverage excess of AIG's $25 million primary policy, and additional higher-level coverage.

6.     When the SFFA Action was filed on November 17, 2014, Harvard informed Marsh of the SFFA Action and asked that it be reported to AIG.  This instruction triggered Marsh's contractual and professional obligation to exercise and act upon its independent judgment as to which insurers should be placed on immediate notice and to then place those insurers on notice.

7.     Marsh reported the SFFA Action to the primary insurer, AIG, who accepted coverage of the claim and has been paying the defense costs, fees, and expenses incurred by Harvard with respect to the SFFA claim.  It is expected that the limits of the AIG Primary Policy will soon be exhausted, if they have not already been exhausted.

8.     Unbeknownst to Harvard and contrary to its contractual and professional obligations, Marsh did not report the SFFA Action to Zurich in November 2014 or at any time

prior to the expiration of the required period for providing notice under the Zurich policy and possibly other excess policies.

9.      Harvard did not discover Marsh's failure to place Zurich on notice of the SFFA claim until May 2017. Upon Harvard's discovery of Marsh's failure to report the SFFA Action to Zurich, Marsh formally reported it to Zurich and Harvard's other excess E&O insurers.

10.     On October 25, 2017, Zurich denied coverage to Harvard, based solely on the failure to provide timely notice under the terms of the Zurich policy. In subsequent litigation between Harvard and Zurich, the United States District Court for Massachusetts and the United States Court of Appeals for the First Circuit upheld Zurich's denial of coverage based on late notice.

11.     Harvard has incurred and continues to incur SFFA Action-related defense costs, fees, and expenses, and those amounts have already or will soon exceed the Zurich policy's $27.5 million attachment point. As a result of Zurich's successful denial of coverage, Harvard has now lost the ability to access the Zurich policy's $15 million policy limits for payment of SFFA Action-related costs in excess of the AIG Primary Policy. Zurich's denial of coverage also caused Harvard to incur foreseeable legal expenses to assess options and ultimately to pursue Zurich for coverage, beginning in April 2020 when Harvard first expended sums on outside counsel to determine the propriety of Zurich's denial of coverage.

12.     These losses are the proximate result of Marsh's failure to exercise its contractual and professional obligations to exercise independent professional judgment and to provide notice to the entire E&O tower at the outset of the claim as well as during the progression of the claim, when Marsh received additional information indicating the substantial scope, seriousness, and costliness of the SFFA Action.

3

13.     Harvard accordingly seeks damages from Marsh for breach of contract and for tortious violation of the professional standard of care that has resulted in Harvard's loss of access to its excess insurance coverage for the defense costs and other SFFA Action-related expenses incurred in excess of the $27.5 million attachment point of Zurich's first-layer excess policy (including amounts, if any, that reach into higher-layer policies that may be subject to late-notice defenses similar to that raised by Zurich).

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this Complaint pursuant to Mass. Gen. Laws c. 231A § 1, c. 212 § 4, and c. 223A § 3, because there is an actual controversy within the Court's jurisdiction that merits relief.

15.     Venue is proper in this County under Mass. Gen. Law c. 223 § 1 because Marsh is a non-resident party with a place of business in this County, and because Harvard's usual place of business is located in both Middlesex County and Suffolk County.

## PARTIES

16.     Plaintiff President and Fellows of Harvard College is the legal entity comprising Harvard University, the nation's oldest institute of higher learning, with its campus and facilities located in Cambridge and Boston, Massachusetts. Plaintiff is a Massachusetts not-for-profit corporation. Harvard College is the undergraduate college of Harvard University.

17.     Upon information and belief, Defendant Marsh USA Inc. is a Delaware corporation with its principal place of business in the State of New York. Upon information and belief, Marsh maintains an office at 99 High Street, Boston, Massachusetts, and the personnel working on Harvard's account worked out of that Boston office. Upon information and belief, the contract to provide insurance brokerage and risk management consulting services to Harvard was created and

signed by Marsh at its Boston office, and the parties expected that contract to be performed primarily and substantially in Massachusetts.

<div align="center">

**FACTUAL BACKGROUND**

</div>

**A.    Harvard's Relationship and Contract with Marsh**

18.    Marsh has served as an insurance broker and risk management consultant for Harvard for over a decade.

19.    Marsh provided specific assurances that Marsh would bring their decades of experience to bear with respect to exercising independent professional judgment, advising Harvard, and acting upon its independent professional judgment with respect to matters within the scope of its engagement with Harvard, including Marsh's duty to ensure that adequate and timely notice was provided with respect to matters triggering claims-made coverages such as the E&O and D&O coverages procured by Marsh.

20.    Marsh and Harvard entered into a series of written broker agreements, including an agreement effective for the period July 1, 2014 through June 30, 2015 (the "Broker Agreement"). A true and correct copy of the Broker Agreement is annexed hereto as Exhibit A.

21.    On July 18, 2014, Marsh provided Harvard with the Broker Agreement setting forth Marsh's obligations as Harvard's insurance broker and risk management consultant for the several lines of coverage, including the so-called "Blended Program / Package" that included the E&O insurance program placed by Marsh and including the above-referenced AIG Primary Policy and the above-referenced Zurich first-layer excess E&O policy.

22.    Pursuant to the terms of the Broker Agreement, Marsh agreed to provide certain services for a one-year period, effective as of July 1, 2014, and subject to extension in writing. Ex. A (Broker Agreement) at 1, § 3.

23.    The Broker Agreement states that "Marsh will act as [Harvard's] insurance broker and/or risk management consultant with respect to the lines of insurance listed in the attached letter," and it further states that Marsh will provide certain services for Harvard in those roles.  Ex. A (Broker Agreement) at § 1.

24.    The services that Harvard engaged Marsh to provide encompassed, *inter alia*, "Claims-Related Services," which includes timely and adequate notification of claims to the insurers, including AIG and Zurich, from whom Marsh procured coverage for Harvard.

25.    More specifically, the Broker Agreement states that Marsh will provide the following "Claims-Related Services" ("you" refers to Harvard):

- Evaluate coverage applicability on all Marsh placed business
- Assist you in the development of settlement strategies
- Assist you with insurer negotiations
- Assist you with litigation management issues that impact claim settlements
- Excluding Workers Compensation, Primary Auto Liability / Physical Damage and non-complex Primary General Liability claims, **prepare loss notices to insurers and notify insurers of claims; provided that your Marsh claims advocate is informed in writing by you of the claim, with details of the claim, and Marsh has placed the applicable policies** or the Marsh claims advocate has been provided written notice by you of the applicable carrier and policies.

Ex. A (Broker Agreement) at § 1(p) (emphasis added).

**B.    Harvard's E&O Insurance Program**

26.    Marsh was the broker responsible for the placement of Harvard's E&O insurance program, including the policies purchased from AIG and Zurich.

27.    Marsh brokered AIG's sale to Harvard of a primary-layer Educational Institution Risk Protector liability insurance policy, Policy No. 01-817-25-28, with the policy period of November 1, 2014 to November 1, 2015 (the "AIG Primary Policy").  A true and correct copy of the AIG Primary Policy is annexed hereto as Exhibit B.

28.     The AIG Primary Policy includes a $25 million aggregate Limit of Liability, subject

to a $2.5 million self-insured retention.   The AIG Primary Policy also provides coverage for

defense costs within the Policy's aggregate limits, which means that the payment of defense costs

erodes the aggregate limits of the AIG Primary Policy.

29.     The AIG Primary Policy's notice / reporting section states, *inter alia*:

> The Insureds shall, as a condition precedent to the obligations of the Insurer
> under this policy, give written notice to the Insurer of any Claim made
> against an Insured, a Crisis Management Event or Privacy Event or Security
> Failure or Security Threat as soon as practicable after: (i) the Named
> Entity's Risk Manager or General Counsel (or equivalent position) first
> receives notice of the Claim; (ii) the Crisis Management Event commences,
> or (iii) solely for the purposes of the Event Management Insuring
> Agreement and Cyber Extortion Insuring Agreement, the Privacy Event,
> Security Failure or Security Threat commences.
>
> Notwithstanding the foregoing, the Insured shall not be required to give
> written notice of a Claim until the earliest occurrence of the following:
>
> (i) the Claim is or is sought to be certified as a class action; or
>
> (ii) total Loss (including Defense Costs) of the Claim is reasonably
> estimated by the Organization's General Counsel or Risk Manager (or
> equivalent position) to exceed 50% of the applicable retention amount for
> such Claim;
>
> *provided, however*, that in all events, all Claims, including Claims described
> in (i) - (ii) above, must be reported to the Insurer no later than ninety (90)
> days after the end of the Policy Period or the Discovery Period (if
> applicable).

Ex. B (AIG Primary Policy) at 58 (emphasis in original).

30.     Marsh also procured from Zurich an Excess Select Insurance Policy, Policy

Number IPR 3792308-03, with the policy period of November 1, 2014 to November 1, 2015 (the

"Zurich Policy").   A true and correct copy of the Zurich Policy is annexed hereto as Exhibit C.

31.     The Zurich Policy includes an aggregate limit of liability of $15,000,000 for

defense and indemnity costs.

32.     The Zurich Policy "follows form" to the AIG Primary Policy, meaning that claims covered by the AIG Primary Policy will also be covered under the Zurich Policy unless some unique term or condition of the Zurich Policy provides otherwise.  The Zurich Policy attaches once Harvard or AIG has paid $27.5 million on a covered claim, including satisfaction of the AIG Primary Policy's $2.5 million retention.

33.     The Zurich Policy's Insuring Clause states in pertinent part:

Coverage under this policy shall attach only after:

> A. all the Limits of Liability of the **Underlying Insurance** have been exhausted solely as a result of the actual payment of covered loss(es); or
>
> B. the **Policyholder** and/or any other insurer(s), entity, or individual on behalf of the **Policyholder** has paid up to the full limits of liability for such loss, and satisfied any deductible(s) or retention amount(s) of the **Underlying Insurance** on behalf of the insurer(s) of any **Underlying Insurance**, including coverage provided pursuant to a difference in conditions policy.
>
> Coverage under this policy shall then apply in conformance with and subject to the warranties, if permitted, limitations, conditions, provisions, and other terms of the Followed Policy, together with the warranties, if permitted, and limitations of any other Underlying Insurance. In no event shall coverage under this policy be broader than coverage under any Underlying Insurance.

Ex. C, Form U-FLXS-100-A CW, at ¶ I.

34.     The Zurich Policy contains conditions related to reporting and notice, specifically:

> Reporting and Notice—As a condition precedent to exercising any rights under this policy, the Policyholder shall give the Underwriter written notice of any claim or any potential claim under this policy or any Underlying Insurance in the same manner required by the terms and conditions of the Followed Policy. Notwithstanding the foregoing, notice to the insurer(s) of the Followed Policy or other Underlying Insurance does not constitute notice to the Underwriter. Written notice of any claim or potential claim shall be provided to the Underwriter at the address set forth in Item 5.A. of the Declarations.

Ex. C, Form U-FLXS-100-A CW at ¶III.A.

35.     The Zurich Policy specifies the AIG Primary Policy as the "Underlying Insurance" and the "Followed Policy."

**C.     The SFFA Claim**

36.     Upon information and belief, non-party Students for Fair Admissions, Inc. ("SFFA") is an organization with a stated mission to support and participate in litigation concerning the use of race in college admissions programs.

37.     On November 17, 2014, SFFA filed a complaint against Harvard in the United States District Court for the District of Massachusetts.

38.     SFFA's complaint generally alleged that Harvard College administered its student admissions plan and process in violation of Title VI.

39.     The SFFA complaint asserted the following causes of action: (1) Violation of 42 U.S.C. § 2000 (Intentional Discrimination Against Asian Americans); (2) Violation of 42 U.S.C. § 2000 (Racial Balancing); (3) Violation of 42 U.S.C. § 2000 (Failure To Use Race Merely as a "Plus" Factor in Admissions Decisions); (4) Violation of 42 U.S.C. § 2000 (Failure to Use Race to Merely Fill the Last "Few Places" in the Incoming Freshman Class); (5) Violation of 42 U.S.C. § 2000 (Race-Neutral Alternatives); and (6) Violation of 42 U.S.C. § 2000 (Any Use of Race as a Factor in Admissions).

40.     The SFFA Action required Harvard to engage in extensive pre-trial discovery and motion practice.  Trial of the case was conducted over a three-week period in the United States District Court for the District of Massachusetts.  Judgment was entered in favor of Harvard on all counts, and SFFA appealed the judgment to the United States Court of Appeals for the First Circuit. On November 12, 2020, the First Circuit ruled in favor of Harvard and upheld the District Court's decision.

41.     On February 25, 2021, SFFA filed a petition for *certiorari* to the Supreme Court of the United States. The Supreme Court granted SFFA's petition for *certiorari* and held oral argument on October 31, 2022.  The Supreme Court issued its ruling on June 29, 2023.  *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023).

42.     In September 2017, the Department of Justice informed Harvard that it was opening an investigation of Harvard College's admissions practices.

43.     In connection with that investigation, Harvard produced to DOJ more than 100,000 pages of documents.  That investigation is still pending.

44.     AIG covered the SFFA Action and the DOJ Investigation as a single claim (the "SFFA Claim").

45.     Harvard's defense costs associated with the SFFA Claim consist of legal fees and expenses, costs associated with electronic discovery vendors, expert witness and associated fees and court costs.

46.     It is expected that the Zurich layer will soon be reached (if it has not already been reached), and the amounts ultimately incurred by Harvard in connection with the SFFA Action may potentially exceed the limits of the Zurich Policy and reach higher excess layers.

**D.     Initial Notice of the SFFA Action to the Primary E&O Insurer**

47.     Harvard advised its insurance brokers about the SFFA Action shortly after it was filed and asked them to notify Harvard's primary insurers about the suit so that an insurer-funded defense could be put in place.

48.     As it relates to the E&O coverage, on or about November 18, 2014, Harvard sent an email to Marsh regarding the SFFA Action.

49.     In that November 18, 2014 email, which attached a copy of the complaint in the SFFA Action, Harvard requested that Marsh report the matter to AIG and for Marsh to provide an analysis as to coverage for the claim.

50.     One of the Marsh account representatives with principal responsibility for the Harvard account responded to Harvard stating: "I thought I might be seeing this Complaint from you. I read about it in the paper this morning."

51.     AIG accepted coverage for the SFFA Claim under Harvard's primary E&O policy.

52.     The receipt of Harvard's instruction to provide notice to even a single insurer triggered Marsh's contractual and professional duties, both as set forth in the broker contract and as inherent in a broker's standard of care generally, to determine which insurers should receive notice of the claim and to then proceed with providing timely and adequate notice to all such insurers.

53.     This expectation was born out by the actions of Risk Strategies Company, which at this time served as the broker on Harvard's general liability insurance program. Unlike Marsh, Risk Strategies Company complied with the applicable standard of care by addressing the need to place the entire tower of primary and excess CGL carriers on notice of the SFFA Action, despite the absence of an initial explicit request from Harvard that it do so.

**E.      Harvard Discovers Marsh's Failure to Report the SFFA Action to Zurich**

54.     After asking Marsh to report the SFFA Action in November of 2014, Harvard and Marsh exchanged numerous communications regarding the SFFA Claim.

55.     Although Marsh continued to provide its broker and risk-management consultant services for Harvard, including in connection with the SFFA Action in 2014 and 2015, Marsh did not inform Harvard that it had not reported the SFFA Action to Zurich, nor did Marsh ever advise Harvard that notice should be provided to Zurich or other excess insurers.

56.     Marsh did not give any indication that it had not reported the SFFA Action to Zurich, despite receiving new information as the claim proceeded indicating that the SFFA action would be expensive and long-lasting (and, therefore, much more likely to potentially reach the excess layer). For example, in the spring of 2015—well before the deadline for providing notice to Zurich—Harvard informed Marsh that the claim was complex and expensive and would rapidly erode the $2.5 million self-insured retention below the AIG Primary Policy. Yet at no time prior to the expiration of the Zurich notice period did Marsh revisit its notice decisions or advise Harvard that notice should be provided to the excess E&O.

57.     In May 2017, Harvard contacted Marsh out of an abundance of caution, to inquire if an update should be given to Zurich about the SFFA Action.

58.     It was only then that Marsh disclosed that it had not yet reported the SFFA Action to Zurich.

59.     Upon learning this, Harvard immediately demanded that Marsh formally report the matter to Zurich and all of Harvard's other excess E&O insurers, which Marsh did by letter dated May 23, 2017.

60.     By the time Harvard became aware of Marsh's error and omission, the deadline for providing timely notice to Zurich had long passed, and it was too late to cure the late notice.

**F.     Zurich's Denial on Late Notice Grounds**

61.     By letter dated May 25, 2017, Zurich acknowledged receipt from Marsh of the formal notice of the SFFA Action.

62.     In an August 30, 2017 letter, Zurich indicated that the SFFA Claim would otherwise be covered under the Zurich Policy, but Zurich reserved the right to deny coverage because "Zurich did not receive notice of it until May 2017." A true and correct copy of the letter is annexed as Exhibit D.

63.     By letter dated October 25, 2017, Zurich denied coverage for the SFFA Claim.  A true and correct copy of the letter is annexed as Exhibit E.

64.     The sole basis of Zurich's denial was that Zurich had received late notice of the SFFA Claim.

65.     In late May 2020, Harvard retained the legal services of Anderson Kill P.C. to evaluate the consequences of Marsh's failure to provide timely notice and Zurich's resulting denial of coverage.  This was Harvard's first expenditure of resources on outside counsel or advisers in response to Marsh's late notice to the excess D&O tower.

66.     In September 2021, Harvard initiated coverage litigation against Zurich in the United States District Court for the District of Massachusetts, seeking coverage for the SFFA Claim and a ruling that Zurich's late notice defense was invalid.

67.     On November 2, 2022, the District Court granted summary judgment in favor of Zurich based on Zurich's late notice defense, and it dismissed the coverage litigation.

68.     On November 29, 2022, Harvard timely filed its notice of appeal as to that decision to the United States Court of Appeals for the First Circuit.

69.     On August 9, 2023, the First Circuit affirmed the District Court's decision, on the basis of Zurich's late-notice defense. *See President & Fellows of Harvard Coll. v. Zurich Am. Ins. Co.*, 77 F.4th 33 (1st Cir. 2023).

**G.     Marsh's Subsequent Notice Position**

70.     Since the start of the Zurich coverage litigation, Marsh has taken the position that Marsh was allegedly instructed by Harvard not to notify excess insurers.

71.     Harvard expressly denies that it ever instructed Marsh not to notify excess insurers.

72.     The absence of any such instruction is corroborated by numerous actions that Marsh did *not* take.  Specifically, any such instruction by a policyholder *not* to provide notice would have

triggered a universal standard of care in the insurance industry (including without limitation the standard of care applicable to Marsh in this particular case) requiring the broker (i) to confirm in writing that the client did not want to notify excess insurers; (ii) to advise the client of the risks of not notifying the excess insurers; and (iii) to place a written note in the file that both tasks had been completed.  This standard of care is a reflection of the enormous risks inherent in a conscious decision to refrain from providing notice to excess insurers, particularly when such insurance is provided on a claims-made basis.

73.    If Marsh genuinely believed that it had been instructed not to provide notice to Harvard's excess E&O insurers, then Marsh breached its contractual obligation and professional standards of care by failing to take those steps.

74.    Further, the universal standard of care in the insurance industry (including without limitation the standard of care applicable to Marsh in this case, as well as Marsh's contractual duty in this case) required Marsh, upon an instruction to notify the primary insurer in a claims-made tower, (a) to advise the client in writing also to notify excess claims-made insurers; (b) to advise the client in writing of the risks of not providing immediate notice to excess claims-made insurers; (c) to note in writing in the broker's file that such advice had been given and that the policyholder had nevertheless instructed that such notice to excess claims-made insurers not be given; (d) to revisit the topic of notice to excess claims-made insurers whenever discussing the claim with the policyholder, particularly if new information was communicated to the broker indicating that the claim was more serious than initially believed; and (e) to revisit the topic of notice to the insurer in connection with renewal of (and prior to expiration of) the excess claims-made policies.  Marsh breached these contractual duties and standards of care in every respect.

14

75.     The above allegations are not intended to be a complete statement of the contractual duties or professional standards of care applicable to Marsh or breached by Marsh.

**H.     Tolling of this Action**

76.     All claims in Massachusetts were tolled 106 days due to the COVID-19 pandemic. *See Shaw's Super-markets, Inc. v. Melendez*, 488 Mass. 338, 342, 345 (2021) (holding that the SJC's COVID-19 Tolling Order applies to all cases, not just those cases where the statutes of limitation would have expired during the tolling period).

77.     On May 1, 2023, Marsh and Harvard entered into a Tolling Agreement, effective April 28, 2023, tolling "any and all claims [Harvard] may have against Marsh in connection with the SFFA Litigation" for 180 days.  A true and correct copy of the Tolling Agreement is annexed as Exhibit F.

78.     The Tolling Agreement lasted until (but not including) October 25, 2023.

79.     All claims asserted in this Complaint are timely.

## COUNT I
## BROKER MALPRACTICE (BREACH OF CONTRACT)

80.     Harvard repeats and realleges paragraphs 1 through 80 of the Complaint as if fully set forth herein.

81.     Harvard engaged Marsh, pursuant to the 2014–15 Broker Agreement, to act as its insurance broker and to provide professional insurance brokerage services to Harvard, including services relating to the 2014–15 E&O insurance tower.

82.     Harvard satisfied all obligations it owed under the Broker Agreement.

83.     Pursuant to the Broker Agreement's terms, Marsh was required to assess coverage, to timely and adequately notify all potentially implicated insurance companies of a claim, and to

render such professional advice and services as would be necessary to ensure that Harvard's insurers received timely and adequate notice of claims.

84.     Specifically, Marsh was obligated to act as Harvard's "broker and/or risk management consultant" and to "prepare loss notices to insurers and notify insurers of claims; provided that [Harvard's] Marsh claims advocate is informed in writing by [Harvard] of the claim, with details of the claim, and Marsh has placed the applicable policies . . . . ." Ex. A (Broker Agreement) § 1(p).

85.     Marsh was obligated to exercise due care in performing the services required by the Broker Agreement, including in preparing loss notices to insurers and notifying insurers of claims.

86.     Zurich has denied coverage to Harvard—and the First Circuit has sanctioned Zurich's denial of coverage (over Harvard's objection)—due solely to late notice of the SFFA Action.

87.     The late notice and the resulting lack of coverage under the Zurich excess policy and potentially other excess policies are the direct and proximate result of Marsh's breach of its contractual obligations under the Broker Agreement, as alleged in this Complaint and including without limitation Marsh's failure to timely report the SFFA Action to Zurich or Harvard's other excess E&O insurance companies in the 2014-15 E&O coverage tower.

88.     Harvard has incurred and continues to incur defense costs, fees, and expenses in connection with the SFFA Claim, and such amounts will shortly exceed or have already exceeded the policy limits of the underlying AIG Primary Policy.

89.     Any defense costs, fees, and expenses in excess of the limits of the AIG Primary Policy would be covered and paid under the Zurich Policy, but for Zurich's successful denial of coverage based on late notice.

90.     These insurance benefits were within direct contemplation of the claims-related services that Marsh promised to provide for Harvard under the terms of the Broker Agreement.

91.     As a result of Marsh's breach, Harvard also has incurred substantial attorneys' fees in the coverage litigation against Zurich.  Those attorneys' fees were within direct contemplation of the claims-related services that Marsh promised to provide for Harvard under the terms of the Broker Agreement.  The attorneys' fees and other costs are therefore reasonably foreseeable damages flowing from Marsh's breach of contract.

92.     By reason of Marsh's breach of contract, Harvard has suffered damages in an amount to be determined at trial.

### COUNT II
### DECLARATORY JUDGMENT—
### BROKER MALPRACTICE (BREACH OF CONTRACT)
### (Coverage and Payment of Defense Costs Under the Zurich Policy)

93.     Harvard repeats and realleges paragraphs 1 through 93 of the Complaint as if fully set forth herein.

94.     Harvard seeks a declaratory judgment to determine an actual controversy between the parties regarding a breach of Marsh's duties under the Broker Agreement.

95.     On information and belief, Marsh denies that it breached the 2014–15 Broker Agreement, denies that it violated applicable standards of care, and denies that it is liable to Harvard for amounts not paid by Zurich or other excess insurers by reason of the untimely notice of the SFFA action.

96.     By reason of the foregoing, an actual and justiciable controversy exists between Harvard and Marsh regarding Marsh's breach of its obligations under the Broker Agreement, the damages causally resulting from that breach, and Marsh's liability for those damages.

97.     Harvard is entitled to a judicial determination by this Court that Marsh is liable to Harvard for all damages causally resulting from the lack of coverage under the Zurich Policy (and potentially other excess policies) resulting from Marsh's failure to provide timely notice to Zurich (and potentially other excess insurers) and Zurich's resulting successful denial of coverage.  Such a judicial determination is necessary and appropriate at this time under the circumstances alleged.

## COUNT III
## BROKER MALPRACTICE (TORT)

98.     Harvard repeats and realleges paragraphs 1 through 98 of the Complaint as if fully set forth herein.

99.     As Harvard's insurance broker, Marsh assumed a duty to act in accordance with the standards of care applicable to professionals in the insurance brokerage industry, both nationally and in Massachusetts.

100.    As set forth in detail in this Complaint, Marsh violated the applicable standards of care in numerous respects.

101.    By violating the applicable standards of care, Marsh committed professional negligence.

102.    Marsh's professional negligence was the direct and proximate cause of Zurich's successful denial of coverage for the SFFA claim, the potential denial of coverage by other excess E&O carriers in the same 2014–15 tower, and all resulting damages flowing from Harvard's inability to recover under those excess policies for all past and future defense costs, fees, and expenses incurred in connection with the SFFA claim that are in excess of the limits of liability of the AIG Primary Policy.

103.    The insurance benefits available under the excess E&O policies were within direct contemplation of the parties when Marsh assumed the duties of acting as Harvard's professional insurance broker.

104.    As a result of Marsh's breach, Harvard incurred substantial attorneys' fees in the coverage litigation against Zurich.  Those attorneys' fees were within direct contemplation of the parties when Marsh assumed the duties of acting as Harvard's professional insurance broker.  The attorneys' fees are therefore reasonably foreseeable damages flowing from Marsh's breach of the appropriate standard of care.

105.    By reason of Marsh's professional negligence, Harvard has suffered damages in an amount to be determined at trial.

### COUNT IV
### DECLARATORY JUDGMENT—BROKER MALPRACTICE (TORT)
### (Coverage and Payment of Defense Costs Under the Zurich Policy)

106.    Harvard repeats and realleges paragraphs 1 through 106 of the Complaint as if fully set forth herein.

107.    Harvard seeks a declaratory judgment to determine an actual controversy between the parties regarding a breach of Marsh's professional negligence.

108.    On information and belief, Marsh has denied that it committed professional negligence, denies that it violated applicable standards of care, and denies that it is liable to Harvard for amounts not paid by Zurich or other excess insurers by reason of the untimely notice of the SFFA Action.

109.    By reason of the foregoing, an actual and justiciable controversy exists between Harvard and Marsh regarding Marsh's professional negligence, the damages causally resulting from that professional negligence, and Marsh's liability for those damages.

110.    Harvard is entitled to a judicial determination by this Court that Marsh is liable to Harvard for all damages causally resulting from the lack of coverage under the Zurich Policy (and potentially other excess policies) resulting from Marsh's professional negligence in failing to provide timely notice to Zurich (and potentially other excess insurers) and Zurich's resulting successful denial of coverage.  Such a judicial determination is necessary and appropriate at this time under the circumstances.

## Prayer for Relief

WHEREFORE, Harvard respectfully requests:

A.    Judgment in an amount equivalent to all defense costs, fees, and expenses paid or to be paid by Harvard in connection with the SFFA Claim in excess of $27.5 million;

B.    A declaration that Marsh breached the Broker Agreement;

C.    A declaration that Marsh committed professional negligence;

D.    A declaration that Marsh is liable to Harvard for all damages incurred by Harvard due to the lack of coverage under the Zurich Policy and possibly other excess E&O policies with respect to the defense costs, fees, and expenses incurred or to be incurred by Harvard in connection with the SFFA Claim and the attorneys' fees incurred in the coverage litigation with Zurich;

E.    Costs, attorneys' fees, and expenses incurred by Harvard for this action;

F.    Pre-judgment and post-judgment interest, as provided by law; and

G.    Such other and further relief as the Court may deem just and proper.

Dated: October 25, 2023

Respectfully submitted,

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

By its attorneys,


 /s/ *Robert J. Gilbert*
Robert J. Gilbert (BBO# 565466)
Daniel W. Sack (BBO# 699290)
Haley P. Denler (BBO# 710906)
LATHAM & WATKINS LLP
John Hancock Tower, 27th Floor
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6059
Facsimile: (617) 948-6001
robert.gilbert@lw.com
daniel.sack@lw.com
haley.denler@lw.com


I HEREBY ATTEST AND CERTIFY ON
December 15, 2023 , THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Acting Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:

Asst. Clerk

2

| CIVIL ACTION COVER SHEET | DOCKET NO(S) B.L.S. 23-2406 | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|

| PLAINTIFF(S) President & Fellows of Harvard College | DEFENDANT(S) Marsh USA Inc. |
|---|---|

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Board of Bar Overseers number<br>Robert J. Gilbert (BBO# 565466), Daniel W. Sack (BBO# 699290), Haley P. Denler (BBO# 710906)<br>LATHAM & WATKINS LLP<br>John Hancock Tower, 27th Floor<br>200 Clarendon Street  |  Boston, MA 02116<br>Telephone: (617) 948-6059 | ATTORNEY (if known) |
|---|---|

Origin Code Original Complaint

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS THIS A JURY CASE? * _____

BL.1 - Professional malpractice _____ (B) ☐Yes ☑No

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

1. This lawsuit concerns professional malpractice in the insurance brokerage space, as well as breach of contract. Accordingly, this lawsuit implicates several categories of litigation eligible for The Business Litigation Session, including BL.1 (professional malpractice), BE.1 (breach of contract), and BK.1 (insurance claims).

2. Specifically, Harvard engaged Marsh to serve as its insurance broker and to provide insurance claims related services.  Harvard brings this professional malpractice action against Marsh for its breach of both contractual duties and the professional standard of care that it owed to Harvard.

3. Marsh undertook the contractual obligation to "prepare loss notices to insurers and notify insurers of claims."  Further, Marsh, as a licensed insurance brokerage, owed a duty to perform its duties in a professional manner that accorded with the applicable standard of care.

4. Notwithstanding Marsh's contractual and professional obligation to "prepare loss notices to insurers and notify insurers of claims," unbeknownst to Harvard, Marsh failed to provide notice of a major claim to certain of Harvard's excess E&O insurers.  The result was the denial of coverage of a major claim by one or more of Harvard's excess E&O insurers, based on a failure to provide notice as required under one or more of those policies.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."     Signature of Attorney of Record

DATE: October 25, 2023

I HEREBY ATTEST AND CERTIFY ON
THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

John E. Powers, III
Acting Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: **2384CV02406-BLS1**

*Notice sent*
*10/25/23*
*S.R.*

Case:   President and Fellows of Harvard College v. Marsh USA, Inc.

## <u>NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION</u>

This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to **BLS1**.

<u>Hereafter, as shown above, all parties must include the initials "BLS1" at the end of the docket number on all filings.</u>

Counsel for the plaintiff(s) is hereby advised that within seven (7) days of the filing of an appearance, answer, motion or other response to the complaint by or on behalf of the defendant(s) which has been served with process within the time limitation of Mass. R. Civ. P. 4(j), or such other time as may be modified by the Court, he or she shall send notice thereof to the appropriate BLS Session Clerk at Suffolk Superior Court, Three Pemberton Square, Boston, MA 02108.

Upon receipt of such notice, the Court will issue a Notice of Initial Rule 16 Conference for purposes of meeting with all counsel.  Before the Rule 16 Conference, counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Project on Discovery (counsel are directed to www.mass.gov/superior-court-business-litigation-session for description of the Project).  Counsel may indicate their respective client's participation by completing, filing, and serving the attached form.  If by the date of the initial Rule 16 Conference, not all parties have given notice of their participation, counsel shall be prepared to discuss at that conference whether their clients will participate in the Project.

The Court requests that plaintiff's counsel serve on opposing parties a copy of this notice and the attached form.

Dated:  October 25, 2023

/s/ Kenneth W. Salinger
_____
Kenneth W. Salinger
Justice of the Superior Court &
Administrative Justice of the Business Litigation Session

I HEREBY ATTEST AND CERTIFY ON
December 15, 2023   , THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

John E. Powers, III
Acting Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____
Asst. Clerk

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: _____

Case: _____

     As you may know, the Business Litigation Session began implementing a Discovery Project in January, 2010. This project is available on a voluntary basis for all new cases accepted into the BLS and for cases which have not previously had an initial case management conference. Counsel should be prepared to discuss the project with the Court at the initial case management conference. For a detailed copy of the BLS Discovery Project, counsel are directed to the Trial Court home page at: www.mass.gov/superior-court-business-litigation-session)

     If a party is willing to participate in the project, that party's counsel should so indicate below and return this form to the appropriate session clerk.

     ____ (Check) **Yes,**_____ is willing to participate in the Discovery Project.
                     (Party's Name)

Case Name _____

Docket Number CIVIL DOCKET#: _____

Counsel For_____    Date_____

Firm Name and Address:

_____

_____

_____

Please complete this form and return it to:

    Assistant Clerk - BLS1    **OR**    Assistant Clerk - BLS2
    BLS1, Room 1309                    BLS2, Room 1017
    3 Pemberton Square               3 Pemberton Square
    Boston, MA 02108                  Boston, MA 02108

- 2 -

Date Filed 11/6/2023 3:58 PM
Superior Court - Suffolk
Docket Number 2384CV02406

COMMONWEALTH OF MASSACHUSETTS

**4**

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

        Plaintiff,

v.

MARSH USA INC.,

        Defendant.

Civil Action No. 2384CV02406-BLS1

## PLAINTIFF'S MOTION TO APPOINT SPECIAL PROCESS SERVER

Pursuant to Mass. R. Civ. P. 4(c), Plaintiff President and Fellows of Harvard College ("Plaintiff") respectfully moves the Court to appoint Dewsnap & Associates, LLC, 92 State Street, Boston, Massachusetts 02109, as special process server in the above-captioned action with authority to serve all process in this action on behalf of Plaintiff. Dewsnap & Associates, LLC is comprised of qualified persons who are 18 years of age or older, experienced in serving process, and disinterested in this action. The appointment of a special process server will assist with prompt service of the summons and complaint on Defendant.

WHEREFORE, Plaintiff respectfully requests that the Court appoint Dewsnap & Associates, LLC as special process server with the authority to serve all process in this action on behalf of Plaintiff, and order such other and further relief that the Court deems just and proper.

NOTICE SENT (1)
11.14.23

Dated: November 6, 2023

Respectfully submitted,

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

By its attorneys,

/s/ Robert J. Gilbert
Robert J. Gilbert (BBO# 565466)
Daniel W. Sack (BBO# 699290)
Haley P. Denler (BBO# 710906)
LATHAM & WATKINS LLP
John Hancock Tower, 27th Floor
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
robert.gilbert@lw.com
daniel.sack@lw.com
haley.denler@lw.com

I HEREBY ATTEST AND CERTIFY ON
December 15, 2023 , THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Acting Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____
Asst. Clerk

## CERTIFICATE OF SERVICE

I hereby certify that I will cause this document to be served on Defendant along with the commencement papers in this matter.

/s/ Robert J. Gilbert
Robert J. Gilbert

2

5

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

      Plaintiff,

v.

MARSH USA INC.,

      Defendant.

Civil Action No. 2384CV02406-BLS1

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Massachusetts Supreme Judicial Court Rule 1:21, Plaintiff President and Fellows of Harvard College, by and through its undersigned counsel, hereby discloses that it is a non-profit corporation with no parent corporation, and that no publicly held corporation owns 10% or more of its stock.

Dated: November 6, 2023

I HEREBY ATTEST AND CERTIFY ON
December 15, 2023, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

    John E. Powers, III
    Acting Clerk Magistrate
    SUFFOLK SUPERIOR CIVIL COURT
    DEPARTMENT OF THE TRIAL COURT

BY:

Asst. Clerk

Respectfully submitted,

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

By its attorneys,

*/s/ Robert J. Gilbert*
Robert J. Gilbert (BBO# 565466)
Daniel W. Sack (BBO# 699290)
Haley P. Denler (BBO# 710906)
LATHAM & WATKINS LLP
John Hancock Tower, 27th Floor
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
robert.gilbert@lw.com
daniel.sack@lw.com
haley.denler@lw.com

## CERTIFICATE OF SERVICE

I hereby certify that I will cause this document to be served on Defendant along with the commencement papers in this matter.

*/s/ Robert J. Gilbert*
Robert J. Gilbert

ML

**COMMONWEALTH OF MASSACHUSETTS**
**SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT**
**President and Fellows of Harvard College**

CIVIL DOCKET NO.:
2384CV02406

**VS**                                               *Plaintiff*

**Marsh USA Inc.**

                                                     *Defendant*

# AFFIDAVIT OF SERVICE

State of Massachusetts }
County of Suffolk } ss.:

The undersigned, being duly sworn, deposes and says;

Deponent is not a party herein, is over 18 years of age and resides in the state of Massachusetts.

That on **11/09/2023 at 2:39 PM** at **155 Federal Street, Suite 700, Boston, MA 02110**

deponent served a(n) **Summons, Complaint with Exhibit A-F, Civil Action Cover Sheet, Notice of Acceptance into Business Litigation Session, Tracking Order - B - Special Track (BLS), Corporate Disclosure Statement, Plaintiff's Motion to Appoint Special Process Server, and Order Allowing Special Process Server Dewsnap & Associates, LLC**

on **Marsh USA, Inc. c/o CT Corporation System**, Registered Agent,

by delivering thereat a true copy to **Tasha Mann** personally, authorized to accept service thereof.

Description of Person Served:
Gender: Female
Skin: White
Hair: Black
Age: 36 - 50 Yrs.
Height: 5' 4" - 5' 8"
Weight: 161-200 Lbs.
Other:

I HEREBY ATTEST AND CERTIFY ON
December 15, 2023   THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

John E. Powers, III
Acting Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:

Sworn to before me this
16th day of November, 2023

JOANN M. McBRIEN   NOTARY PUBLIC
MY COMMISSION EXPIRES
NOTARY
PUBLIC
02/06/2026
COMMONWEALTH OF MASSACHUSETTS

2/6/26

William H. Dewsnap, III

Serving By Irving, Inc. | 18 East 41st Street, Suite 1600 | New York, NY 10017
New York City Dept. of Consumer Affairs License No. 0761160

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                                 SUPERIOR COURT DEPARTMENT
                                                            OF THE TRIAL COURT

|                                                |   |                                        |
|------------------------------------------------|---|----------------------------------------|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE,      | ) |                                        |
|                                                | ) |                                        |
|                           Plaintiff,           | ) | Civil Action No. 2384CV02406-BLS1      |
| v.                                             | ) |                                        |
| MARSH USA INC.,                                | ) |                                        |
|                           Defendant.           | ) |                                        |

### NOTICE OF FILING OF A NOTICE OF REMOVAL

Pursuant to 28 U.S.C. § 1446(d), the Defendant, Marsh USA Inc., hereby files in Massachusetts Superior Court for Suffolk County a Notice of Removal of the above-captioned case to the United States District Court for the District of Massachusetts. A file-stamped copy of the Notice of Removal is attached hereto as Exhibit A.

The filing of the Notice of Removal effectively removes this case from the Superior Court. It will not proceed any further in this matter unless and until the case is remanded. The Plaintiff, the only adverse party, is hereby given a copy of this Notice of Filing of a Notice of Removal.

Dated: December 8, 2023.

Respectfully submitted,

**MARSH USA INC.,**

By its attorneys,

/s/ Candace J. Hensley
Jonathan I. Handler, BBO # 561475
Candace J. Hensley, BBO # 706150
DAY PITNEY LLP
One Federal Street, 29th Floor
Boston, MA 02110
Telephone: (617) 345-4600
Facsimile: (617) 345-4745
jihandler@daypitney.com
chensley@daypitney.com

I HEREBY ATTEST AND CERTIFY ON
December 15, 2023, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Acting Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:
Asst. Clerk

-2-

## CERTIFICATE OF SERVICE

I, Candace J. Hensley, hereby certify that on this 8th day of December, 2023, I served a copy of the foregoing *Notice of Filing of a Notice of Removal* via e-mail and first-class mail on counsel for the Plaintiff as follows:

Robert J. Gilbert, *robert.gilbert@lw.com*
Daniel W. Sack, *daniel.sack@lw.com*
Haley P. Denler, *haley.denler@lw.com*
LATHAM & WATKINS LLP
John Hancock Tower, 27th Floor
200 Clarendon Street
Boston, MA 02116

/s/ Candace J. Hensley
Candace J. Hensley

# EXHIBIT A

Date Filed 12/8/2023 12:40 PM
Superior Court - Suffolk
Docket Number 2384CV02406

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

        Plaintiff,

    v.

MARSH USA INC.,

        Defendant.



Certified to be a true and
correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts

By: _____
        **Deputy Clerk**

Date: 12/08/2023

## NOTICE OF REMOVAL

    Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant Marsh USA Inc.,[1] through its undersigned counsel, submits this Notice of Removal to the United States District Court for the District of Massachusetts from the Superior Court of the Commonwealth of Massachusetts, Suffolk County.  Marsh states the following in support of its Notice of Removal:

    1.    On October 25, 2023, Plaintiff President and Fellows of Harvard College ("Harvard"), through its counsel, filed a complaint (the "Complaint") against Marsh in the Superior Court of the Commonwealth of Massachusetts, Suffolk County, Case No. 2384CV02406-BLS1 (the "State Court Action").

    2.    On November 9, 2023, Marsh's registered agent received a summons and a copy of the Complaint via process server.

    3.    In accordance with 28 U.S.C. § 1446(a), a true and correct copy of the summons, civil action cover sheet, Complaint, notice of acceptance into business litigation session, tracking

---

[1]    Marsh USA Inc. is now known as "Marsh USA LLC."  *See infra* at ¶ 10.  Marsh USA Inc. and Marsh USA LLC will be referred to collectively herein as "Marsh."

Date Filed 12/8/2023 12:40 PM
Superior Court - Suffolk
Docket Number 2384CV02406

order, and order on Harvard's motion to appoint special process server are attached hereto as Exhibit A.

4.      This Notice of Removal is timely filed under 28 U.S.C. § 1446(b) because fewer than 30 days have passed since Marsh received the Complaint.

### A.      Diversity Jurisdiction Exists

5.      A district court has original jurisdiction over any action where the matter in controversy: (i) exceeds the sum or value of $75,000, exclusive of interest and costs, and (ii) is between citizens of different states.  28 U.S.C. § 1332(a).

##### i.      *The matter in controversy exceeds $75,000, exclusive of interest and costs*

6.      Harvard asserts four causes of action against Marsh.  Complaint ("Compl."), ¶¶ 80–110.

7.      Harvard alleges that Marsh is liable for certain defense costs, fees, and expenses incurred by Harvard in excess of $27.5 million, including: expenses incurred in defending against a lawsuit filed against Harvard by Students for Fair Admissions, Inc., including appeals; expenses incurred in a coverage dispute with Harvard's excess insurer Zurich American Insurance Company; and expenses incurred in a Department of Justice investigation of Harvard College's admissions practices.  Compl., ¶¶ 11–13, 42–45, 86–92, 97, 102–104.

8.      Harvard further alleges that it expects the amounts ultimately incurred by Harvard for which Marsh is allegedly liable may exceed $15 million.  Compl., ¶ 46.  Consequently, although Marsh denies liability for any damages, the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

>ii.   *Diversity of citizenship exists and*
>       *Marsh is not a citizen of Massachusetts*

9.     Harvard is a citizen of Massachusetts.  Compl., ¶ 16.

10.    Marsh USA Inc. was a Delaware corporation with a principal place of business in New York.  As of December 31, 2022, Marsh USA Inc. converted into a limited liability company known as Marsh USA LLC.  Marsh USA LLC is a single-member limited liability company with a principal place of business in New York and whose sole member is Marsh LLC.  Marsh LLC is a single-member limited liability company with a principal place of business in New York and whose sole member is Marsh & McLennan Companies, Inc. ("MMC").  MMC is a publicly held Delaware corporation with a principal place of business in New York.  Marsh USA LLC is therefore a citizen of Delaware and New York.  *See* 28 U.S.C. § 1332(c)(1); *see also Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc.*, 435 F.3d 51, 54 (1st Cir. 2006) ("[T]he citizenship of a limited liability company is determined by the citizenship of all of its members.").

>**B.   Marsh Will File This Notice of Removal in the State Court Action and Will Serve a Copy on Harvard's Counsel**

11.    In accordance with 28 U.S.C. § 1446(d), Marsh will file a file-stamped copy of this Notice of Removal with the Superior Court of the Commonwealth of Massachusetts for Suffolk County, and Marsh will serve a file-stamped copy of this Notice of Removal on Harvard's counsel.

>**C.   Venue Is Proper**

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 101 because it is "the district and division embracing the place where such action is pending." *See* 28 U.S.C. § 1441(a).

>**D.   Marsh Reserves Its Rights**

13.    Marsh expressly reserves all of its rights and defenses in this action.

14.     Marsh further reserves its right to amend this Notice of Removal.

WHEREFORE, Marsh removes this action from the Superior Court of the Commonwealth

of Massachusetts for Suffolk County to this Court.

Dated: December 8, 2023

Respectfully submitted,

**MARSH USA INC.,**

By its attorneys,

*/s/ Candace J. Hensley*
Jonathan I. Handler, BBO # 561475
Candace J. Hensley, BBO # 706150
DAY PITNEY LLP
One Federal Street, 29th Floor
Boston, MA 02110
Telephone: (617) 345-4600
Facsimile: (617) 345-4745
jihandler@daypitney.com
chensley@daypitney.com

## CERTIFICATE OF SERVICE

I, Candace J. Hensley, hereby certify that on this 8th day of December, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.  I further certify that I caused a true and correct copy of the foregoing to be served via email and first-class mail upon the following:

> Robert J. Gilbert
> Daniel W. Sack
> Haley P. Denler
> LATHAM & WATKINS LLP
> John Hancock Tower, 27th Floor
> 200 Clarendon Street
> Boston, MA 02116
> robert.gilbert@lw.com
> daniel.sack@lw.com
> haley.denler@lw.com
>
> *Counsel for Plaintiff President and*
> *Fellows of Harvard College*

<div align="right">

*/s/ Candace J. Hensley*_____
Candace J. Hensley

</div>

# Exhibit A

  **MARSH**

Robert J. Engel
Managing Director

Marsh USA Inc.
99 High Street
Boston, MA  02110-2320
+1 617 385 0343
robert.j.engel@marsh.com
www.marsh.com

July 18, 2014

Mr. Walter Pizzano
Director of Risk Strategy & Insurance
Harvard University
1033 Massachusetts Avenue
Cambridge, MA 02138

**Subject:** Engagement Letter

Dear Walter:

We are pleased that Harvard University ("you") has chosen Marsh USA Inc. ("Marsh" or "we") to act as your insurance broker for the following line(s) of coverage:
    (a) FI Bond Form 14
    (b) Special Risk
    (c) Blended Program / Package
    (d) International Casualty

We look forward to continuing a mutually rewarding and long-standing relationship with you. Attached to this letter is a list of the services that Marsh will provide to you and the Terms and Conditions under which those services will be provided. These Terms and Conditions and Marsh's engagement under this letter are effective for one year starting July 1, 2014.

We will update this letter as needed based on any changes to your program, the services provided by Marsh to you or the terms upon which such services will be provided.

We appreciate your business and look forward to working with you.

Unless you inform us in writing to the contrary, we will presume that this letter accurately reflects the services and the Terms and Conditions that apply to our engagement.

Should you have any questions, please contact me.

Sincerely,

**Marsh USA Inc.**

By: _____          Date: _7/18/14_
    Robert J. Engel
    Managing Director

LEADERSHIP. KNOWLEDGE. SOLUTIONS. WORLDWIDE.

**MARSH & McLENNAN**
COMPANIES

 **MARSH**

The following sets forth the terms upon which Marsh USA Inc. ("Marsh") will provide services to you:

## 1. Services.
Marsh will act as your insurance broker and/or risk management consultant with respect to the lines of insurance listed in the attached letter. Marsh shall provide to you the following services (the "Services"):

**Pre-Marketing Services**
(a) Conduct an initial strategy discussion in advance of each placement;
(b) Assist you in assessing your risks and in developing insurance specifications which Marsh will submit to insurers;
(c) Recommend potential insurers;

**Marketing and Placement Services**
(d) Solicit quotes from insurers that you select;
(e) Negotiate on your behalf with insurers;
(f) Assist you in evaluating the options received from insurers;
(g) Use best efforts to place insurance for you, but only after you have authorized Marsh to bind coverage for you;

**Services related to Marsh placements**
(h) Deliver confirmation of coverage once it is placed;
(i) Follow up with insurance carriers to obtain policies and/ or endorsements. Marsh may deliver your insurance policies and endorsements to you electronically;
(j) Review policies and endorsements for conformity with agreed terms and coverages;
(k) Provide coverage summaries;
(l) At your request, issue certificates or memoranda of insurance and/or auto identification cards;
(m) Review premium and exposure audits, rating adjustments, dividend calculations and loss data;
(n) Provide you with invoices, except in the case of direct billing by insurers. Remit premiums to insurers and, where applicable, remit taxes and fees to the relevant authorities, following receipt thereof from you;
(o) Monitor published financial information of your current insurers and alert you when one of those insurers falls below Marsh's minimum financial guidelines.

**Claims-Related Services**
(p) Provide the following claims-related services:
   - Evaluate coverage applicability on all Marsh placed business
   - Assist you in the development of settlement strategies
   - Assist you with insurer negotiations
   - Assist you with litigation management issues that impact claim settlements
   - Excluding Workers Compensation, Primary Auto Liability / Physical Damage and non-complex Primary General Liability claims, prepare loss notices to insurers and notify insurers of claims; provided that your Marsh claims advocate is informed in writing by you of the claim, with details of the claim, and Marsh has placed the applicable

policies or the Marsh claims advocate has been provided written notice by you of the applicable carrier and policies.

The total number of hours of property and casualty claims services described in this paragraph provided by Marsh to you in a calendar year shall not exceed 62.5. In the event such claims services exceed such hourly allotment, Marsh reserves the right to seek additional compensation.

Marsh may utilize the services of intermediaries to place your insurance, subject to your approval.

Marsh will not serve as your insurance broker, but only as your risk consultant, with respect to placements with ineligible insurers. In those circumstances, Marsh's non-U.S. affiliates shall provide the brokerage Services.

Marsh may retain your information in paper or imaged format and may destroy paper copies if Marsh retains digital images thereof.

## 2. Compensation.
Marsh shall be compensated for its Services through commissions from insurers. Prior to each placement by Marsh, Marsh shall disclose to you any commissions to be collected by Marsh or its affiliates, except when such affiliates are acting as an underwriting manager on behalf of insurers.

Marsh can provide additional services at an additional cost. The cost and scope of additional services (see Appendix A) will be agreed in advance and reflected in an amendment to this Agreement or a separate agreement.

In the case of local placements made by Marsh's non-U.S. affiliates on behalf of you or your non-U.S. subsidiaries, Marsh's non-U.S. affiliates may make disclosures to your local operating management.

Any commissions collected by Marsh or its affiliates shall be considered fully earned at the time of placement. If you terminate a policy before it expires, Marsh will retain the commission it has collected except that, if Marsh places the replacement policy, Marsh will return any unearned commission.

If you ask Marsh to access non-U.S. markets not anticipated at the Effective Date, you agree to negotiate in good faith the additional costs of Services relating to those placements.

If there is a significant change in your operations or risks that affects the nature and scope of your insurance program and/or service needs, both parties agree to renegotiate Marsh's compensation in good faith.

## 3. Term and Termination.
The term of Marsh's engagement hereunder is one year starting on the Effective Date and may be extended in writing.

2

 **MARSH**

Either party may terminate this Agreement upon 90 days' prior written notice.  If Marsh terminates this Agreement, Marsh's compensation will be adjusted pro-rata to reflect the duration of the Agreement.  If you terminate this Agreement, Marsh's compensation will be deemed fully earned.

The obligation of Marsh and its affiliates (including its UK affiliates) to provide Services to you will cease upon the effective date of termination, unless otherwise agreed in writing. Marsh will assist you in arranging a smooth transition process, subject to receipt by Marsh of all amounts due to Marsh from you.

### 4.  Taxes and Fees.
Marsh may place insurance for you that may require the payment of insurance premium taxes (including U.S. federal excise taxes), sales taxes, use taxes, surplus or excess lines and similar taxes and/or fees to federal, state or foreign regulators, boards or associations. You agree to pay such taxes and fees. Marsh will remit any taxes and fees that it collects from you to the appropriate authorities.

### 5.  Your Responsibilities.
You shall be solely responsible for the accuracy and completeness of all information that you furnish to Marsh and/or insurers, and you shall sign any required application for insurance.  Marsh shall not be responsible to verify the accuracy or completeness of any information that you provide, and Marsh shall be entitled to rely on that information.  Marsh shall have no liability for any errors, deficiencies or omissions in any Services provided to you, including the placement of insurance on your behalf, that are based on inaccurate or incomplete information provided to Marsh.   You understand that the failure to provide all necessary information to an insurer, whether intentional or by error, could result in the impairment or voiding of coverage.

You will review all policy documents provided to you by Marsh.

### 6.  Other Revenue.
If Marsh assists you with obtaining premium financing, Marsh may receive compensation from the finance company that provides the premium financing.  Marsh shall provide to you information relating to Marsh's and its affiliates' arrangements with and interests in the premium finance companies to be considered by you and the compensation that Marsh and its affiliates would receive from these companies for your placements.

Marsh earns and retains interest income on premium payments held by Marsh on behalf of insurers between the time Marsh receives these payments from you and the time Marsh remits these payments to the insurers, where permitted by applicable law.

### 7.  Disclaimers; Limitation of Liability.
Marsh does not speak for any insurer, is not bound to utilize any particular insurer and is not authorized to make binding commitments on behalf of any insurer, except under special circumstances which Marsh shall endeavor to make known to you.  Marsh shall not be responsible for the solvency of any insurer or its ability or willingness to

pay claims, return premiums or other financial obligations. Marsh does not guarantee or make any representation or warranty that insurance can be placed on terms acceptable to you. Marsh will not take any action to replace your insurers unless you instruct Marsh to do so. You acknowledge that, in performing Services, Marsh and its affiliates are not acting as a fiduciary for you, except to the extent required by applicable law.  Any reports or advice provided by Marsh should not be relied upon as accounting, legal, regulatory or tax advice.  In all instances, Marsh recommends that you seek your own advice on such matters from professional accounting, legal, regulatory and tax advisors.

Marsh will not be responsible for the adequacy or effectiveness of any insurance programs or policies implemented by another broker, or any acts or omissions occurring prior to Marsh's engagement.

In no event shall either party to this Agreement be liable for any indirect, special, incidental, consequential or punitive damages or for any lost profits arising out of or relating to any services provided by Marsh or its affiliates. The aggregate liability of Marsh, its affiliates and its and their employees to you or your affiliates arising out of or relating to the provision of services by Marsh or its affiliates shall not exceed $10,000,000.  This provision applies to the fullest extent permitted by applicable law.

Marsh may provide to you information and services related to insurance regulatory and insurance tax issues relating to your insurance program. Any reports or advice provided by Marsh will be based on publicly available information and Marsh's experience as an insurance broker and risk consultant in dealing with such matters for other clients and should not be relied upon as accounting, regulatory or tax advice. In all instances, Marsh recommends that you seek your own advice on accounting, regulatory and tax matters from professional legal and tax advisers.

Marsh may provide you with modeling and/or business analytics services, including hazard loss and catastrophe modeling, loss forecasting and triangles, adverse event simulation, scenario and portfolio risk analysis, decision mapping, risk bearing and risk retention tolerance analysis and insurance program evaluation analysis ("Modeling and Analytics"). Modeling and Analytics services will be based upon a number of assumptions, conditions and factors. If any of them or any information provided to Marsh are inaccurate or incomplete or should change, the Modeling and Analytics provided by Marsh could be materially affected. These services are subject to inherent uncertainty, and actual results may differ materially from that projected by Marsh. They are provided solely for your benefit, and do not constitute, and are not intended to be a substitute for, actuarial, accounting or legal advice. Marsh shall have no liability to any third party in connection with these services or to you with regard to any services performed or provided by a third party. Except to your insurers in connection with the placement of coverage by Marsh, you shall not share any of Marsh's Modeling and Analytics work product with a third party without Marsh's prior written consent.

 MARSH

**8. Confidentiality.**
You may provide Marsh with confidential information ("Confidential Information") in connection with this Agreement. Marsh will not disclose to any third party or use any Confidential Information except in furtherance of insurance brokerage, risk consulting, risk financing, risk transfer, employee benefits or other insurance-related services provided by Marsh to you. Marsh may release to insurers and other financial institutions Confidential Information relevant to the underwriting and/or evaluation of your risks and the processing of your claims, provided that the insurers and financial institutions are informed by Marsh of the confidential nature of the information. Marsh will take all steps reasonably required to maintain the confidentiality of Confidential Information in its possession. Marsh's transmission of Confidential Information via electronic data transmission networks that provide for the security of users' data will be deemed consistent with Marsh's obligations unless doing so is contrary to your express instructions.

Confidential Information does not include information: (i) that at the time obtained by Marsh is in the public domain; (ii) that after such time becomes part of the public domain through no fault of Marsh; (iii) that was or is developed independently by Marsh or received by Marsh from a third party which Marsh had no reason to believe had a confidentiality obligation to you with respect to the information; (iv) that is required to be disclosed by law, including pursuant to a subpoena or similar document; provided Marsh will, to the extent practical, inform you of the disclosure requirement in order to permit you to seek a protective order, and, if a protective order is not issued, Marsh will disclose only the Confidential Information that Marsh is advised by its counsel must be disclosed by law; or (v) following two years after disclosure of the information to Marsh.

If requested by you at any time, Marsh will return to you (or destroy) all documents in Marsh's possession that contain Confidential Information. Marsh may retain copies of documents that may contain Confidential Information in accordance with Marsh's standard record retention policy or as required by applicable law.

It is understood and agreed that money damages would not be a sufficient remedy for any breach of these confidentiality provisions and you will be entitled to injunctive relief as a remedy for any breach, without prejudice to any other rights or remedies available to you under applicable law.

**9. Miscellaneous.**
The laws of the State of New York govern this Agreement.

Each party, on behalf of itself and its affiliates, to the fullest extent permitted by law, knowingly, voluntarily, and intentionally waives its right to a trial by jury in any action or other legal proceeding arising out of or relating to this Agreement or any services provided by Marsh or its affiliates. The waiver applies to any action or legal proceeding, whether sounding in contract, tort or otherwise. Each party, on behalf of itself and its affiliates, also agrees not to include any employee, officer or director of the other party or its affiliates as a party in any such action or proceeding.

It is the intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permitted by applicable law. To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the party for whose benefit it was intended the fullest benefit commensurate with making this Agreement, as modified, enforceable, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

This Agreement and its written amendments and appendices constitute the entire understanding between Marsh and you, and supersede all other agreements or understandings, related to its subject matter. Marsh may modify this Agreement upon written notice to you.

Neither party will have any liability for any failure or delay in performing because of a force majeure event.

4

 **MARSH**

### Appendix A - Additional Services

Additional Services are available for separate compensation and shall be agreed upon in advance and addressed by amendment to this agreement or by separate agreement (in certain cases with affiliates of Marsh). Such additional services include, but are not limited to:

- Actuarial analysis of Workers' Compensation, General Liability, and Automobile Liability claims, or other lines of insurance;
- Consulting relating to workers' compensation cost containment, including behavioral risk management, absence management, cumulative injury management, lean ergonomics, financial diagnostics, claims inventory workout, vendor selection, return-to-work, PastPerformer diagnostics, managed care, claim audits and custom cost containment solutions;
- Business interruption and other claim valuation services offered by Marsh's Forensic Accounting practice;
- Environmental risk consulting services;
- Specialty consulting, including business continuity management, supply chain risk management, strategic risk assessments, and other MRC specialty practices;
- Specialized/customized property risk consulting solutions, including business interruption and natural hazards modeling/consulting, boiler and machinery specialized consulting, loss estimate studies, emergency response management solutions, fire protection engineering services, and property risk site evaluation and assessment services;
- Claims services other than those specified under Section 1, if any, including claims management services, claims reporting as to lines of coverage or claims not included under Section 1, and property and casualty catastrophic claim response;
- Mass tort claims consulting and insurance archaeology research;
- Services in connection with loss portfolio transfers and alternative risk financing, including placements made in connection with such services;
- Captive insurance company feasibility studies;
- Establishment and administration of captive insurers;
- Placement of non-recurring insurance, including, but not limited to:
  - "one-time" placements for construction projects,
  - "one-time" placements for marine/cargo risks,
  - "one-time" placements for surety,
  - Placements for specific financial risks, such as trade credit,
  - Placements involving significant quantitative or actuarial analysis or modeling,
  - Placement of risks with financial institutions other than insurance carriers, and
  - Placements of risks not customarily accepted by insurers;
- Provision of the following services:
  - Identification and assessment, in general terms, of potential insurance regulatory and insurance tax issues relating to your insurance program;
  - Recommendations concerning insurers in light of such regulatory and tax issues;
  - Obtaining from your current and proposed insurers their views regarding potential insurance regulatory and insurance tax issues relating to your insurance, and the collection and settlement of local premium taxes and claims payment;
  - Review of and commentary on your internal premium allocation methodology in light of insurance regulatory and tax issues;
  - Recommendations regarding a premium allocation model, taking into account factors relevant to your operations and in light of specific insurance regulatory and tax issues;
  - Recommendations concerning modifications to your insurance program in light of the insurance regulations of the countries in which your insurable risks are located;
  - Review of your past insurance arrangements for specified periods with respect to insurance regulatory and premium-related tax issues;
  - Information regarding premium-related taxes payable by you in the countries in which you have operations;
  - Where a captive is involved in your insurance program, information and advice regarding the insurance regulatory and premium-related tax issues impacting on the captive;
- Employee benefits services;
- Pension plan consulting;
- Compensation consulting;
- Executive deferred compensation services;
- Risk management claims information systems, including STARS and TrendTracker software programs, and related services;
- Enterprise Risk Management consulting;
- Strategic Risk Assessment;
- Provision of Marsh personnel on an out-sourced basis;
- Intellectual Property Consulting;
- Security Consulting;
- Insurance-related mergers and acquisition due diligence services and transactional solutions;
- Placement and servicing of owner controlled insurance programs; and
- Interactive on-line client services.

# Exhibit B

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producercompensation or by calling 1-800-706-3102.

*January 23, 2015*

Congratulations on purchasing your employment practices liability insurance policy from AIG, one of the premier writers of commercial insurance. Your policy offers many outstanding features, including coverage for claims arising from violations of Title VII of the Civil Rights Act of 1964; the Americans with Disabilities Act (ADA); the Age Discrimination in Employment Act (ADEA); the Equal Pay Act of 1963 (EPA); and the Rehabilitation Act of 1973 (REHAB ACT).

As a AIG policyholder, you have the confidence of knowing that your claims will be handled by experienced claims professionals. In addition, our panel counsel is comprised of leaders in employment practices law throughout the country. The services of these law firms are available to you at preferred AIG rates.

Additionally, our package includes loss-control services included automatically for all eligible insureds through **EPL Pak® Premier.** This insurance offering features access to our online EPL Risk Manager located at www.EPLriskmanager.com , designed exclusively for AIG EPL insureds by the attorneys at Littler Mendelson, the nation's largest labor and employment law firm. This web link is exclusive to AIG EPL insurance policyholders and is available at no additional cost. To register, you can log into the site with your policy number. The site offers tools and resources including:

- Human Resources Form Library
- Sample Employee Handbooks
- Employment Law Email Alerts
- Employment Law Policies
- Hire & Fire Manual

- Employment Law Reference Manuals (5000 + pages)
- 50 State Analysis of Key Employment Laws
- Preventing Unlawful Harassment Guide
- Preventing Employment Class Actions Manual
- Discounts on Employment Law Training

All forms and materials may be downloaded and customized. To view a short video tour of the risk management products and services available, please visit: **http://eplriskmanager.com/take_tour.php.** As a AIG policyholder, you also receive ten free seats to Littler Mendelson's monthly webinar series on preventing harassment in the workplace and discounts on over 40 employment law training courses. For additional information on these services you may contact Brian McMillan at Littler Mendelson at bmcmillan@littler.com or visit www.littler.com.

To complement these offerings, we continue to offer our risk management solutions provided by Jackson Lewis, LLP, a premier employment law firm with offices throughout the United States, including:

- Unlimited Access to the Jackson Lewis Toll Free Risk Management Hotline: (866) 614-0744
- One hour legal consultation with a Jackson Lewis attorney on any topic
- Seminars on topical issues of employment law, recent litigation development, and training
- Email subscription to The Jackson Lewis Newsletter, which highlights employment practices developments and trends
- Email updates regarding significant legislative actions, judicial decisions, and other changes which may impact your business
- Access to a self-audit checklist and a pre-termination checklist, which will assist companies in identifying potential vulnerability to employment claims
- Attendance at CAAB 1825 sexual harassment training in California

To learn more, please contact Paul Siegel at siegelp@jacksonlewis.com, Wendy Mellk at mellkw@jacksonlewis.com or view a free demonstration of training at www.jacksonlewis.com , or under the online training section or at www.workplaceanswers.com

Your decision to purchase coverage through AIG has provided your organization with powerful advantages in managing your business. We thank you for choosing AIG and look forward to a continuing successful relationship. If you have any questions or would like additional information, please contact your broker, a AIG representative or email us at executiveliability@AIG.com.

AIG is the marketing name for the worldwide property-casualty and general insurance operations of AIG Property Casualty Inc. For additional information, please visit our website at http://www.aig.com . All products are written by insurance company subsidiaries or affiliates of AIG Property Casualty Inc. Coverage may not be available in all jurisdictions and is subject to actual policy language. Non-insurance products and services may be provided by independent third parties. Certain coverage may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds.



Financial Lines

# EPL Pak™ Premier

## Employment Practices Training, Loss Prevention and Risk Management

Controlling employment practices liability exposures while keeping pace with employment litigation trends and regulatory changes is a major challenge for all employers. AIG gives its employment practices liability (EPL) policyholders a unique advantage with EPL Pak® Premier, industry-leading loss prevention offerings. The suite is a combination of training, loss control and risk management tools designed to help our clients manage employment practices risks. EPL Pak Premier's resources are exclusive to AIG, and provide our EPL policyholders with access to expertise and materials from two of the nation's foremost employment and labor law firms, Littler Mendelson, P.C. and Jackson Lewis LLP.

### Putting Experts By Your Side

EPL Pak Premier now includes instant access to www.eplriskmanager.com, which provides first-in-class risk management tools and resources from Littler Mendelson, a leading employment and labor law firm. Materials available include essentials to manage your workforce and reduce exposure to employment related liability including:

- **Handbooks and Policies:** Sample employee handbook and policies to help implement best employment practices, including supplemental information for all 50 states
- **Forms Library:** A library of commonly used human resource forms, which can be customized, to ease your administrative burden
- **Workforce Guides:** A hiring and firing guide to help employers mitigate the risks of these critical phases of the employment relationship and step-by-step guides to prevent harassment, including information to help address and resolve incidents and lessen potential liability
- **Legal Reference Materials:** Over 3,000 pages of employment law reference manuals providing insights on timely topics ranging from layoffs, downsizing, and furloughs, to workplace violence, discrimination, and employment class actions. Includes a state-by-state assessment of employment laws and regulations

EPL Pak Premier gives you access to expertise and resources from two of the nation's foremost employment and labor law firms, Littler Mendelson, P.C. and Jackson Lewis LLP.



Financial Lines

# EPL Pak  Premier

### State of the Art Enhancements

These state-of-the-art enhancements complement EPL Pak Premier's original package of risk management solutions from Jackson Lewis, LLP, which include:

- **Legal Consultation:** A one-hour legal consultation on human resources and employment law issues, such as how specific laws impact personnel decisions and potential exposure to liability
- **Liability Updates:** Access to the Jackson Lewis e-Newsletter and e-updates spotlighting important workplace law news and trends. Alerts on significant legislative actions, judicial decisions and other changes with potential impact on our insured's business
- **Checklists:** Self-audit and pre-termination checklists to help insureds identify vulnerabilities and safely navigate risky terrain
- **Special California State Training:** CA AB 1825 training, enabling companies with 50 or more employees in California to fulfill their mandate of providing sexual harassment training for supervisors every two years

EPL Pak Premier also includes Alternative Employment Dispute Resolution Programs from EDR Systems at preferred rates. EDR Systems will assist to resolve employee disputes internally and prevent time and money in litigation. The professionals at EDR Systems have more than 50 years of combined experience in human resource management, strategic planning, change management, and employee relations. They support a wide variety of businesses of all sizes, from national, multi-unit retail operations, to single-facility manufacturers, to professional firms.

---

To learn more about EPL Pak Premier services:

E mail:
**FinancialLines@aig.com**

Visit:
**www.aig.com**

Contact:
**Your insurance broker**

 Bring on tomorrow

American International Group, Inc. (AIG) is a leading international insurance organization serving customers in more than 130 countries. AIG companies serve commercial, institutional, and individual customers through one of the most extensive worldwide property- casualty networks of any insurer. In addition, AIG companies are leading providers of life insurance and retirement services in the United States. AIG common stock is listed on the New York Stock Exchange and the Tokyo Stock Exchange.

Additional information about AIG can be found at www.aig.com | YouTube: www.youtube.com/aig | Twitter: @AIG_LatestNews | LinkedIn: www.linkedin.com/company/aig

AIG is the marketing name for the worldwide property-casualty, life and retirement, and general insurance operations of American International Group, Inc. For additional information, please visit our website at www.aig.com. All products and services are written or provided by subsidiaries or affiliates of American International Group, Inc. Products or services may not be available in all countries, and coverage is subject to actual policy language. Non-insurance products and services may be provided by independent third parties. Certain property-casualty coverages may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds, and insureds are therefore not protected by such funds.



**National Union Fire Insurance Company of Pittsburgh, Pa.**

A capital stock company

POLICY NUMBER: 01-817-25-28          REPLACEMENT OF POLICY NUMBER: 01-569-87-28

## EDUCATIONAL INSTITUTION RISK PROTECTOR

[These notices are not applicable to the commercial Crime Coverage Part]

NOTICES: This policy provides claims-made coverage. Such coverage is generally limited to liability for (i) Claims first made against Insureds and (ii) Crises first occurring, in each case, during the Policy Period or, if applicable, the Discovery Period. Coverage under this policy is conditioned upon notice being timely provided to the Insurer as required (see the Notice clause for details). Covered Defense Costs shall reduce the Limits of Liability available to pay judgments or settlements, and shall be applied against the retention amount. The Insurer does not assume any duty to defend. Please read this policy carefully and review its coverage with your insurance agent or broker.

### DECLARATIONS

| 1. | **NAMED ENTITY:** | PRESIDENT AND FELLOWS OF HARVARD COLLEGE | | |
|---|---|---|---|---|
| | **Named Entity Address:** | 1033 MASSACHUSETTS AVE., SUITE 360 CAMBRIDGE, MA 02138-3846 | | |
| | **State of Formation:** | MASSACHUSETTS | | |
| 2. | **POLICY PERIOD:** | From: 11/01/2014 | To: | 11/01/2015 |
| | The **Policy Period** incepts and expires as of 12:01 A.M. at the **Named Entity Address**. | | | |
| 3. | **PREMIUM:** | | $1,667,866 | |

MNSCPT

© All rights reserved

| 4. | (a) LIMIT OF LIABILITY (For all Coverages Other Than Crime) : | | $25,000,000 |
|---|---|---|---|
| **DECLARATIONS ( Continued)** | | | |
| | (b) CRIME LIMIT OF LIABILITY | | $25,000,000 |
| | | | |
| 5. | RETENTION/DEDUCTIBLE: (For all Coverages) : | | $2,500,000 |
| 6. | INSURER | | |
| | (a) | INSURER ADDRESS: | 175 Water Street, 18th Floor<br>New York, NY 10038 |
| | (b) | CLAIMS ADDRESS: | By E-Mail:  *c-claim@AIG.com*<br><br>By Mail:   AIG<br>           Financial Lines Claims<br>           P.O. Box 25947<br>           Shawnee Mission, KS  66225<br><br>In either case, reference the Policy Number. |
| | | | |
| 7. | TRIA PREMIUM, TAXES AND SURCHARGES | | |
| | (a) | TRIA Premium: | $8,298 |
| | (b) | | $ |
| | (c) | | $ |
| | (d) | | $ |
| | | | |
| | " TRIA Premium" means the premium for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act  2002.  The **TRIA  Premium** amount indicated above  is included in **Premium**. A  copy of the  TRIA disclosure sent  with the original  quote is attached hereto. | | |

© All rights reserved.

**IN WITNESS WHEREOF,** the **Insurer** has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.

**PRESIDENT**
National Union Fire Insurance
Company of Pittsburgh, Pa.

**SECRETARY**
National Union Fire Insurance
Company of Pittsburgh, Pa.

**AUTHORIZED REPRESENTATIVE**

**COUNTERSIGNED AT**          **DATE**          **COUNTERSIGNATURE**

*MARSH USA INC.*
*99 HIGH STREET*
*BOSTON, MA 02110*

*1323680*

MNSCPT                                3

© All rights reserved

**IN WITNESS WHEREOF,** the Insurer has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.

_____
PRESIDENT

_____
AUTHORIZED REPRESENTATIVE

_____
SECRETARY

_____    _____    _____
COUNTERSIGNATURE        DATE            COUNTERSIGNED AT

_1323680_

94106 (2/07)

**POLICYHOLDER DISCLOSURE**
**NOTICE OF TERRORISM INSURANCE COVERAGE**
(APPLICABLE TO CERTIFIED AND NON- CERTIFIED ACTS)

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury- in concurrence with the Secretary of State, and the Attorney General of the United States- to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

**COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE**

Insured Name: *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

Policy Number: *01-817-25-28*
Policy Period Effective Date From: *November 1, 2014*     To: *November 1, 2015*

**EDUCATIONAL INSTITUTION RISK PROTECTOR**
**PRESIDENT AND FELLOWS OF HARVARD COLLEGE MANUSCRIPT**
**Liability and Occurrence-Related Insurance Policy**

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by **Application**, which forms a part of this policy, the **Insurer** agrees as follows:

General Terms and Conditions

Unless otherwise explicitly stated to the contrary herein or in any **Coverage Part**, these **General Terms and Conditions** shall be applicable to and deemed incorporated into and made a part of all coverages in **Coverage Part A**. These General Terms and Conditions are not applicable to the Crime Coverage Part. The terms and conditions set forth in each **Coverage Part** shall only apply to that particular **Coverage Part** and shall in no way be construed to apply to any other **Coverage Part** of this policy.

1.   **DEFINITIONS**

 a) " **Advisory Board Member"** means: (i) an individual serving on an advisory board, advisory committee, investment committee, limited partner committee or similar board or committee of any **Investment Entity**.

  " **Application"** means all current: (i) signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this policy; (ii) documents filed by the **Named Entity** with any federal, state, local or foreign regulatory agency for the twelve (12) month period preceding the beginning of the **Policy Period**; (iii) written warranties submitted with or made in the application submitted for this policy or any other policy of which this policy is in whole or part a renewal or replacement or which it succeeds in time; and (iv) financial statements for all **Plans** with investment portfolios.

 b) " **Benefits"** means any obligation under a **Plan** to a participant or beneficiary under a **Plan** which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

 c) " **Claim"** means:

  (i) a written demand for monetary, non-monetary or injunctive relief, commenced by an **Insured's** receipt of such written demand;

  (ii) a civil, criminal, administrative, regulatory, arbitration, mediation, or other proceeding for monetary, non-monetary or injunctive relief which is initiated by (i) the filing or service of a complaint, summons, writ, motion, order or similar document, (ii) the return of an indictment, or the filing of an information, complaint or similar document (in the case of a criminal proceeding), (iii) the receipt or filing of a notice of charges;

© All rights reserved.

(iii)   a 1) written demand seeking extradition or rendition of an **Insured** commenced by an **Insured's** receipt of such written demand; or 2) execution of a warrant for the arrest of an Insured Person where such execution is an element of extradition.

(v)   a written demand to toll or waive the applicable statute of limitations regarding a potential **Claim** as described in paragraphs (i) through (iii) above;

(vi)   an **Investigation Claim**;

(vii)   as respects **Employment Practices Claims**, an administrative or regulatory investigation by the **EEOC**, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to an **Insured**; or

*Provided, however*, in no event, shall the term " **Claim**" include any labor or grievance proceeding which is subject to a collective bargaining agreement.

The term " **Claim**" shall also include any **Professional Services Claim**, **Fiduciary Liability Claim**, **Employment Practices Claim**, **Crisis Management Event**, **Pension Crisis Management Event**, **Financial Claim**, **Security/Privacy Claim** and **Media Claim**.

d)   " **Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

e)   " **Computer System**" means any computer hardware, software or any components thereof that are linked together through a network of two or more devices accessible through the Internet, internal network or connected with data storage or other peripheral devices (including, without limitation, wireless and mobile devices), and are under ownership, operation or control of, or leased by, a **Organization**.

For this **Coverage Section**, " **Computer System**" also means "cloud computing" and other hosted resources operated by a third party service provider for the purpose of providing hosted computer resources to an **Organization** as provided in a written contract between such third party and a **Organization**.

© All rights reserved

f) **"Confidential Information"** means any of the following information in the care, custody and control of an **Organization** or a third party to which an **Organization** has provided such information, or for which an **Organization** or such third party is legally responsible:

(i) Information from which an individual may be uniquely and reliably identified or contacted, including, without limitation, an individual's name, address, telephone number, social security number, driver's license number, or state-issued identification card number;

(ii) Personal financial information, including without limitation any account relationship(s), financial account number(s), debit or credit card number(s), account balance(s), account history/ies, access codes, personal identification numbers, passwords, salary or income information or tax information;

(iii) Information concerning an individual that would be considered "nonpublic personal information" within the meaning of Title V of the Gramm-Leach-Bliley Act of 1999 (Public Law 106-102, 113 Stat. 1338) (as amended) and its implementing regulations or protected personal information under any similar federal, state, local or foreign law;

(iv) Information concerning an individual that would be considered "protected health information" within Health Insurance Portability and Accountability Act of 1996 (as amended) and its implementing regulations or "electronic protected health information (ePHI)" within the Health Information Technology for Economic and Clinical Health Act (HITECH ACT) and its implementing regulations;

(v) Information used for authenticating any individual's personal or financial information or for conducting any transaction with any student or faculty member or Employee, including without limitation any security code(s), access code(s), personal identification number(s) or password(s), or any other information that can be used to obtain any other Confidential Information (including without limitation any user id(s), password(s) or security questions); or

(vi) Any third party's trade secrets, data, designs, interpretations, forecasts, formulas, methods, practices, processes, records, reports or other item of information that is not available to the general public.

MNSCPT

3

© All rights reserved.

g)    **"Continuity Date"** means:

    (vii)   with respect to any Claim that would have been covered under Not-For-Profit Protector #612-19-39 issued to the Named Entity for the initial policy period from July 1, 2008 through July 1, 2009, if such **Claim** had been made during the policy period of such policy, February 22, 1989; and

    (viii)  With respect to any **Claim** relating to performance of **legal services**; June 2, 2008 for the $10,000,000 excess of $10,000,000; and May 31, 2010 for the $5,000,000 excess of $20,000,000; and

    (ix)   with respect to all other Claims, May 31, 2010.

h)    **"Consulting Fees"** means fees charged by a third party actuary, benefits consultant or accountant resulting solely from the correction of an actual or potential ERISA Breach of Duty, but excluding any fees, costs or expenses associated with: (i) a Plan audit; or (ii) identifying, finding or assessing such ERISA Breach of Duty.

i)    **"Corporate Counsel"** means any attorney at law admitted to the bar in or otherwise licensed to the practice of law in the United States of America or any of its territories, Canada or any other foreign jurisdiction, but solely while an **Employee** of an **Organization**.  **"Corporate Counsel"** includes any past, present or future General Counsel, deputy general counsel, assistant general counsel, senior counsel, or university attorney or associate attorney of an **Organization**.  " Corporate Counsel" shall not mean a "secondment attorney" (i.e., an attorney employed by an outside law firm and temporarily assigned by agreement between such law firm and an **Organization** to perform professional legal services at the direction of such **Organization**).

j)    " **Corporate Trustee Company** " means any company formed and operating outside the United States that is established by the sponsor organization and duly appointed to act as trustee of a **Plan**.

k)    **Covered Penalties**, solely in connection with a **Plan**, shall mean:

© All rights reserved

(i) *Sec 502(i)* the 5% or less civil penalty imposed upon an **Insured** under Section 502(i) of **ERISA;**

(ii) *Section 502(l)* the 20% or less civil penalty imposed upon an **Insured** under Section 502(l) of **ERISA,** with respect to a covered settlement or judgment;

(iii) *United Kingdom* the civil fines and penalties assessed against an **Insured** by either the United Kingdom's Pensions Ombudsman or the Pensions Regulator or any successor body thereto;

(iv) *Voluntary Compliance Loss* **Voluntary Compliance Loss subject to the aggregate sublimit of liability set forth in Clause 3 LIMIT OF LIABILITY (FOR ALL LOSS, INCLUDING DEFENSE COSTS)** of this coverage section;

(v) *Section 502(c)* the civil penalties under Section 502(c) of **ERISA**, other than penalties under the Pension Protection Act, subject to the aggregate sublimit of liability set forth in (" **Section 502(c) Penalties**");

(vi) *Pension Protection Act* **the civil penalties under the Pension Protection Act of 2006, subject to the aggregate sublimit of liability set forth in Clause 3 LIMIT OF LIABILITY (FOR ALL LOSS, INCLUDING DEFENSE COSTS)** of this coverage section (" **Pension Protection Act Penalties**");

(vii) *HIPAA* **the civil penalties for violations of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), subject to the aggregate sublimit of liability set forth in Clause 3 LIMIT OF LIABILITY (FOR ALL LOSS, INCLUDING DEFENSE COSTS)** of this coverage section (" **HIPAA Penalties**");

© All rights reserved.

(viii) *Health Care Reform*

**2.   the civil penalties imposed under rules and regulations (including interim final rules and regulations) provided by governmental agencies (including the U.S. Department of Health and Human Services, the U.S. Department of the Treasury, the U.S. Internal Revenue Service ("IRS"), and the DOL, the Office of Consumer Information and Insurance Oversight, and the Employee Benefits Security Administration), for inadvertent violations by an Insured of Health Care Reform Law, subject to the aggregate sublimit of liability set forth in Clause 3 LIMIT OF LIABILITY (FOR ALL LOSS, INCLUDING DEFENSE COSTS)**

of this coverage section (" **Health Care Reform Penalties**"); and

(ix) Section 4975

**3.   the 15% or less tax penalty imposed upon an Insured under Section 4975 of the Internal Revenue Code of 1986, with respect to covered judgments, subject to the aggregate sublimit of liability set forth in Clause 3 o LIMIT OF LIABILITY (FOR ALL LOSS, INCLUDING DEFENSE COSTS)**

f this coverage section (" **Section 4975 Penalties**").

d)   " **Crisis Management Event,**" " **Crisis Management Fund**" and " **Crisis Management Services**" shall have the meaning ascribed to such terms in Appendix D attached to this policy.

k)   " **Cyberterrorism**" means the premeditated use of disruptive activities against any computer system or network by an individual or group of individuals, or the explicit threat by an individual or group of individuals to use such activities, with the intention to cause harm, further social, ideological, religious, political or similar objectives, or to intimidate any person(s) in furtherance of such objectives. " **Cyberterrorism**" does not include any such activities which are part of or in support of any military action, war or warlike operation.

l)   " **Cyber Extortion Loss**" means:

i) Monies paid by an **Organization** with the **Insurer's** prior written consent to terminate or end a **Security Threat** that would otherwise result in harm to an **Organization**; and

ii) The costs to conduct an investigation to determine the cause of a **Security Threat**.

© All rights reserved.

l)      " **Defense Costs**" means the reasonable fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond), which consent shall not be unreasonably withheld or delayed, resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against an **Insured**, including reasonable attorneys' fees, costs or expenses resulting from the correction, under the DOL Voluntary Fiduciary Correction Program, of an actual or potential **ERISA Breach of Duty,** but excluding any fees, costs and expenses associated with finding or assessing such **ERISA Breach of Duty** and any compensation of **Insured Persons** or employees of an **Insured**. **Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

**Defense Costs** shall also include reasonable and necessary fees, costs and expenses consented to by the **Insurer** consented to by the **Insurer** and resulting solely from an **Insured Person** lawfully: (a) opposing, challenging, resisting or defending against any request for any effort to obtain the Extradition of that **Insured Person**; or (b) appealing any order **or** other grant of Extradition of that **Insured Person.**

m)     " **E-Consultant Firm**" means any firm on the **Insurer's** list of approved firms. The list of approved E-Consultant Firms is accessible at http: //www.aig.com/us/panelcounseldirectory by clicking on the link for "e-Consultant Panel Members."

n)      " **E-Discovery**" means the development, collection, storage, organization, cataloging, preservation and/or production of electronically stored information.

o)      " **E-Discovery Loss**" means the reasonable consulting fees for the **E-Discovery Consultant Services** provided solely to an **Organization** by an **E-Consultant Firm**. Provided however **E-Discovery Loss** shall not include any costs of discovery other than the **E-Discovery Loss.**

p)      " **E-Discovery Consultant Services**" means the following services performed by an E-Consultant firm:

(i) Assisting the Insured with managing and minimizing the internal and external costs associated with **E-Discovery;**

(ii) Assisting the Insured in developing an **E-Discovery** strategy which may include interviewing qualified and cost effective E-Discovery vendors; and

(iii) Serving as a project manager, advisor and/or consultant to the Insured, defense counsel and the Insurer in executing and monitoring the **E-Discovery** strategy.

© All rights reserved.

**E-Discovery Consultant Services** also include any other services provided by the E-Consultant firm that the **Insured**, **Insurer** and the **E-Consultant** firm agree are reasonable given the circumstances of the **Claim**.

q)  **"Education Services"** means any advice, service, activity or oversight relating to (i) peer review, credentialing or the tenure process; (ii) teaching, instructing, tutoring or mentoring; or (iii) educational services, counseling, academic placement, instruction or oversight of university operations.

r)  "**Employee**" means any past, present or future employee on an **Organization's** payroll, other than an **Executive** of an **Organization**, whether such employee is in a supervisory, co-worker, temporary, subordinate or volunteer position or otherwise, including: (i) any part-time, volunteer, seasonal and temporary employee or staff or faculty member (salaried or unsalaried); (ii) any student while acting or serving as a seasonal teaching assistant, section group leader, resident assistant, dormitory assistant, laboratory technician or other seasonal or temporary employee, **Independent Contractor** or staff member of or to an **Organization**, but only if the **Organization** provides indemnification to such student or independent contractor; or (iii) any attorney, not an **Executive**, employed by an **Organization** and on an **Organization's** payroll.

e)  "**Employee Benefit Law**" means **ERISA** or any similar federal, state, local or foreign common or statutory law (including, but not limited to the United Kingdom's Pensions Act 2004, Pensions Act 1995, and Pension Schemes Act 1993; and the Pension Benefit Standards Act, 1985 of Canada), as amended, and any rules and regulations promulgated thereunder to which a **Plan** is subject. Solely with respect to the acts described in subparagraph (iii)(D) of the definition of **Wrongful Act**, **Employee Benefit Law** shall also include the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and any laws concerning, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

s)  "**Employment Practices Claim**" means a **Claim** alleging an **Employment Practices Violation**.

© All rights reserved.

t)     "**Employment Practices Violation**" means any actual or alleged: (i) wrongful dismissal, discharge or termination, either actual or constructive, of employment, including breach of implied contract; (ii) harassment (including, but not limited to, sexual harassment whether 'quid pro quo', hostile work environment, or otherwise); (iii) discrimination (including, but not limited to, discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability); (iv) **Retaliation**; (v) employment-related misrepresentation to an **Employee** of the **Organization** or applicant for employment with the **Organization** or an **Outside Entity**; (vi) employment-related libel, slander, humiliation, defamation or invasion of privacy; (vii) wrongful failure to employ, retain or promote; (viii) wrongful deprivation of career opportunity with the **Organization** or wrongful demotion or negligent **Employee** evaluation, including the giving of negative or defamatory statements in connection with an **Employee** review or reference; (ix) wrongful discipline; (x) failure to grant tenure, or any other withholding of or delay in granting tenure; and (xi) false imprisonment; (xii) **Wrongful Internet Activity**; and (xiii) with respect to any of the foregoing items (i) through (xi) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights; but only if the **Employment Practices Violation** relates to an **Employee** or **Executive** of an **Organization** or an **Outside Entity Executive**, or applicants for employment with an **Organization** or an **Outside Entity**, whether committed directly, indirectly, intentionally or unintentionally.

With respect to a **Claim** brought by anyone other than an **Insured Person** or applicant for employment with the **Organization** or an **Outside Entity**, including, but not limited to, students, patients, members, customers, vendors and suppliers of an **Organization**, the term **Employment Practice Violation** shall also mean only any actual or alleged harassment (including sexual harassment, whether "quid pro quo", hostile work environment or otherwise) or unlawful discrimination (including, but not limited to, discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, political views or other opinions, pregnancy, or disability), or the violation of the civil rights of a person relating to such harassment or discrimination.

u)     "**ERISA**" means the Employee Retirement Income Security Act of 1974, including any amendment or revision thereto (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996 as it relates to Sections 102(b) and 104(b)(1) of ERISA, the Newborns' and Mothers' Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998)including any amdndment or revision thereto.

© All rights reserved.

v)   " **ERISA Breach of Duty**" means any actual or alleged violation of the responsibilities, obligations or duties imposed upon **Insureds** by **ERISA** or equivalent laws of any foreign jurisdiction to which a **Plan** is subject.

w)   " **Event-Related Loss**" means the following reasonable expenses and costs incurred by an **Insured** within one year of discovery of a **Security Failure** or **Privacy Event:**

(i) to conduct an investigation (including a forensic investigation) to determine the cause of the **Security Failure** or **Privacy Event;**

(ii) for a public relations firm, crisis management firm or law firm agreed to by the **Insurer** to advise an **Insured** on minimizing the harm to such **Insured**, including, without limitation, maintaining and restoring public confidence in such **Insured;**

(iii) to notify those whose **Confidential Information** is the subject of the **Security Failure** or **Privacy Event** and advise of any available remedy in connection with the **Security Failure** or **Privacy Event**, including, without limitation, those expenses and costs for printing, advertising and mailing of materials;

(iv) for identity theft education and assistance, identity theft call center services, credit file or identity monitoring and victim reimbursement insurance made available to those persons notified about a **Security Failure** or **Privacy Event** pursuant to subparagraph (3) above;

(v) for any other services approved by the **Insurer** at the **Insurer's** sole and absolute discretion, such consent not to be unreasonably withheld;

(vi) to restore, recreate or recollect **Electronic Data**; or

(vii) to determine whether **Electronic Data** can or cannot be restored, recollected or recreated

x)   " **Excess Benefits Penalties**" means any " **Excess Benefits**" penalty assessed in the amount of 10% by the Internal Revenue Service ("IRS") against any **Insured(s)** for management's involvement in the award of an " **Excess Benefit**" and the **Defense Costs** attributable thereto; *provided, however,* **Excess Benefits Penalties** shall specifically exclude: (1) any 25% penalty assessed by the IRS against an **Insured** deemed to have received an **Excess Benefit**; (2) **Defense Costs** incurred to defend any **Insured** if it has been in fact determined that such individual received an **Excess Benefit**; and (3) any 200% penalty assessed by the IRS for failure to correct the award of an **Excess Benefit**. The term " **Excess Benefits**" means an excess benefit as defined in the Taxpayer Bill of Rights Act, 2, 26 U.S.C. 4958.

© All rights reserved

y)   " **Executive**" means:

   (i)   any past, present or future duly elected or appointed director (including any member of any board or committee), officer, president, regent, trustee, trustee emeritus, governor, dean, senior associate dean, associate dean, assistant dean, acting dean, academic dean, administrative dean, personnel director, chief of staff, deputy chief of staff, chancellor, provost, senior vice provost, vice provost, senior associate provost, associate provost, assistant provost, ombudsman, fellow, executive director, department head, treasurer, corporate secretary, assistant secretary, managing director, chief executive officer, chief financial officer, chief operating officer, chief trusts and gifts officer, management committee member, member of the board of managers, managing member, executive vice president, senior vice president, vice president or natural person general partner of any **Organization** (including without limitation any member of the Board of Overseers, the President and Fellows of Harvard College or the Council of Deans);

   (ii)   any past, present or future General Counsel, deputy general counsel, assistant general counsel, associate general counsel, senior counsel, university counsel, university attorney, associate attorney, tax director; Chief Compliance Officer or Risk Manager (or equivalent position) of an **Organization**;

   (iii)   any trustee, administrator or fiduciary of a **Plan**: (a) who is a natural person and employed by the **Plan**; (b) for whose actions the **Plan** is legally responsible; (c) to whom the **Plan** owes a contractual or legal duty to indemnify; or

   (iv)   any functional or foreign equivalent of any position listed in (i) through (iii) above.

z)   " **Fiduciary Liability Claim**" means any **Claim** alleging a **Wrongful Act** described in subparagraphs (iii)(C), (iii)(D) and (iii)(E) of the definition of **Wrongful Act**.

aa)   "**Financial Claim**" means:

   (i)   a **Claim** made against any **Insured** based upon, arising out of or relating, directly or indirectly, to any:

      (A) actual or alleged violation of any law, regulation or rule, whether statutory, regulatory, civil or common law and which is:

MNSCPT                                    11

© All rights reserved.

    a. alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any interests constituting or representing a security, debt or other investment or financial interest in an **Organization, Investment Entity** or **Outside Entity**; or

    b. brought by, or on behalf of, any creditor, security holder or other holder, purchaser or seller of any interests constituting or representing a security, debt or other investment or financial interest in an **Organization, Investment Entity** or **Outside Entity**, with respect to such security holder's, creditor's, investor's, purchaser's or seller's interest in such **Organization, Investment Entity** or **Outside Entity**; or

    c. brought by, or on behalf of, any person or entity pursuant to any guaranty, fidelity bond, performance bond, asset securitization, bond issuance or other form of risk sharing arrangement; or

**(ii) Claim** brought derivatively on the behalf of an **Organization, Investment Entity** or **Outside Entity** by a shareholder, member, partner, creditor or holder of any other investment or financial interest in such **Organization, Investment Entity** or **Outside Entity**;

bb) " **Financial Insolvency**" means the: (i) appointment by any government official, agency, commission, court or other governmental authority of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate an insolvent **Organization**; (ii) the filing of a petition under the bankruptcy laws of the United States of America; or (iii) as to (i)or (ii), any functional or foreign equivalent

cc) " **Foreign Jurisdiction**" means any jurisdiction, other than the United States or any of its territories or possessions.

dd) " **Foreign Policy**" means the standard director and officer, managerial, professional, non-profit, employment practices, investment management, fiduciary, data privacy and/or media liability insurance policy (including all mandatory endorsements, if any) approved by AIG to be sold within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded under this policy.

If more than one such policy exists, then " **Foreign Policy**" means the standard basic policy form typically offered for sale in that **Foreign Jurisdiction** for comparable risks by the **Insurer** or any other company AIG. The term " **Foreign Policy**" shall not include any partnership managerial, pension trust or professional liability coverage.

© All rights reserved

ee) **" Health Care Reform Law "** means the Patient Protection and Affordable Care Act ("PPACA") and the Health Care and Education Reconciliation Act of 2010.

ff) **" HMC"** means Harvard Management Company and any direct or indirect **Subsidiary(ies)** thereof.

gg) **" HIPAA Penalties"** means civil monetary penalties imposed upon an **Insured** for violation of **HIPAA Privacy Regulations**.

hh) **" HIPAA Privacy Regulations"** means the privacy provisions of HIPAA and any amendments thereto.

ii) **" Indemnifiable Loss"** means **Loss** for which an **Organization** has indemnified or is permitted or required to indemnify an **Insured Person** pursuant to law, contract or the charter, by-laws, statutes, partnership agreement, operating agreement, declaration of trust or other similar document of such **Organization**.

For the purposes of retermining whether **Loss** constitutes **Indemnifiable Loss** each **Organization** shall be conclusivly deemed to have indemnified the **Insured Persons** to the maximum extent that an **Organization** is permitted or required to provide such indemnification persuant to law, contract or the charter, by laws, statutes, partnership agreement, operating agreement, declaration of trust or other similar document of such **Organization**

jj) **" Independent Contractor"** means any person who is not an **Employee** and who is leased or contracted to an **Organization** or who acts as an independent contractor to an **Organization** or who otherwise provides services to or on behalf of an **Organization** but only if, and to the extent, such **Organization** is legally liable for or provides indemnification to such person pursuant to a written contract or agreement.

kk) **Independent Director** means any individual who is a director or trustee of an **Investment Entity** and who is not an "Interested Person" within the meaning of Section 2(a)(19) of the Investment Company Act of 1940 (as amended).

ll) **" Insured"** means any past, present or future: (i) **Insured Person;** (ii) **Organization;** (iii) **Plan** (but only with respect to any **Fiduciary Liability Claim);** or (iv) **Plan Committee** of an **Organization,** in its capacity as a fiduciary, trustee or settlor of a **Plan,** or in its administration of a **Plan.**

With respect to any **Media Claim, Professional Services Claim** or **Security/Privacy Claim** only, **"Insured"** also means any person or entity (not otherwise an **Insured**) that an **Organization** has expressly agreed in writing, prior to the commission of a **Wrongful Act,** to add as an **Insured** under this policy, but only for the **Wrongful Acts** of the **Organization.**

© All rights reserved.

nn)  " **Insured Person**" means any past, present or future: (i) **Executive** of an **Organization**; (ii) **Employee** of an **Organization**; (iii) **Outside Entity Executive**; (iv) any member of a **Plan Committee**; or (v) any individual described in the preceding subsections (i), (ii), (iii) or (iv) to the extent of his, her or their capacity as a fiduciary, administrator or trustee of a **Plan.**

oo)  " **Insurer**" means the insurance company indicated in the Declarations and any, assignee of or successor thereto.

pp)  " **Investigation Claim**" means a civil, criminal, administrative, regulatory investigation of an **Insured** by a federal, state, local, foreign or offshore government, regulatory authority or agency, including but not limited to an investigation brought by the Equal Employment Opportunity Commission, Department of Labor, Pension Benefit Guaranty Corporation, the Securities and Exchange Commission, Department of Justice, Department of Treasury, state attorney general's office or grand jury (or any other federal, state, local or foreign governmental authority), but only after the service of a subpoena, Wells Notice, "target" letter (within the meaning of Title 9, Section 11.151 of the United States Attorneys' Manual), order of investigation, civil investigative demand, notice of charges, search warrant, or other similar request or document upon an **Insured.**

"**Investigation Claim**" shall not mean any routine regulatory supervision, examination, inspection or compliance review.

qq)  "**Investment Advisory Services**" means any of the following services by **HMC**, an **Organization** at the request or with the consent of **HMC**, or any **Insured Person** of the foregoing:

(i)  the rendering of, or failure to render, financial, economic, investment or investment management services or advice;

(ii)  the organization or formation of, offer, purchase or sale, or solicitation for the purchase or sale, or disposition or divestiture of, or of any interest(s) in, an **Investment Entity** or **Outside Entity;**

(iii)  the rendering of, or failure to render, advisory, consulting, management, monitoring, administrative, investment, governance, consent or financial advice to, or with respect to, an **Investment Entity** or an **Outside Entity;**

(iv)  the rendering of, or failure to render, advisory, consulting, management, monitoring, administrative, investment or financial advice to, for or on behalf of any third-party at the request or with the consent of **HMC;**

(v)  any act, omission, statement, advice or services by an **Insured Person** in such **Insured Person**'s capacity as an **Insured Person** or **Outside Entity Executive** or **Outside Entity;** or

© All rights reserved

(vi)    the selection, due diligence, oversight or management of another investment manager selected by any **Insured** to: (a) manage assets of any **Organization**, or (b) serve on any investment committee of an **Organization** or to manage an **Investment Entity,**

but only if any of the foregoing services are performed (1) in the ordinary course of an **Insured's** business; (2) in the **Insured's** capacity as such or as a result of the **Insured's** status as such; and (3) on behalf of or relating to the Harvard University endowment, any gift annuity, any charitable remainder trust or any other planned giving program, including without limitation, any offer, solicitation, advice, service, activity, structuring or administration with respect to a planned giving program.

rr)    **"Investment Advisory Services Claim"** means a **Claim** made against any **Insured** alleging any actual or alleged **Wrongful Act** in the performance of, or failure to perform, **Investment Advisory Services.**

ss)    " **Investment Entity**" means any entity that is a partnership, corporation, trust, limited liability company, investment fund, investment vehicle (or the functional or foreign equivalent of the foregoing): (i) in which an **Organization**, at any time, maintains or maintained or proposes to maintain any debt, equity, convertible, limited partnership, limited liability company or other investment, financial or ownership interest; (ii) at which an **Insured Person** serves on any board or committee that was created pursuant to the limited partnership agreement, limited liability company agreement, operating agreement or other organizational document of such fund, entity or vehicle; or (iii) listed as an **Investment Entity** in an endorsement to this policy.

tt)    " **Legal Services**" means any professional legal services that are rendered by:

(i)     a **Corporate Counsel** in his or her capacity as such;

(ii)    a **Corporate Counsel** while a full time, permanent **Executive** or **Employee** of an **Organization** (including *pro bono* services and other professional legal services performed outside the scope of their employment with an **Organization**); and

(iii)   any **Insured Person** but solely while acting under the supervision of and at the direction of a **Corporate Counsel**.

" **Legal Services**" shall also include notarizing, certifying or acknowledging any signature rendered in connection with subparagraphs (i) through (iii) above.

uu)    " **Limit of Liability**" means the **Limit of Liability** stated in Item 4(a) of the Declarations for all coverages under this policy other than Coverage Part B. Commercial Crime Coverage Part. The Limit of Liability is in addition to and not a part of the Crime Limit of Liability stated in Item 4(b) of the Declarations, which is applicable to the Coverage Part B. Commercial Crime Coverage Part.

© All rights reserved.

vv) " **Loss**" means, with respect to Coverage Part A, damages, settlements, plaintiff's attorney's fees, judgments (including pre/post-judgment interest on a covered judgment), **Voluntary Compliance Loss, Covered Penalties, Event-Related Loss, Cyber Extortion Loss** and other amounts (including civil fines and civil penalties and punitive, exemplary and multiplied damages that are insurable by applicable law; and not subject to any specific proscription in the underlying claim by the SEC or other entity or agency issuing such penalty) and **Defense Costs** (including, but not limited to: **Defense Costs** from any **Claim** arising out of or alleging any violation of (1) the Securities Act of 1933, as amended (including without limitation Sections 11, 12 or 15 thereof); (2) the Securities Exchange Act of 1934, as amended (including without limitation Sections 10, 14, 20, 20A or 30A (the Foreign Corrupt Practices Act) or Rule 10b-5 or Rule 14a-9 thereof); (3) any state Blue Sky law; (4) the Investment Company Act of 1940, as amended; or (5) the Investment Advisers Act of 1940, as amended; (6) the Commodity Exchange Act; (7) the Commodity Futures Modernization Act; (8) the Commodity Future Trading Commission Act; (9) the CFTC Reauthorization Act; (10) any self-regulatory organization rule or regulation; or (11) any foreign equivalent of the foregoing);

*Provided, however*, that " **Loss**" (other than **Defense Costs**) shall not include: (i) civil or criminal fines or penalties imposed by law; (ii) taxes, but solely with respect to an **Investment Advisory Services Claim,** only those taxes that are levied against an **Insured;** (iii) any amounts for which no **Insured** is financially liable, which are without legal recourse to any **Insured** or for which an **Insured** has not suffered any financial or economic loss or loss of other property; (iv) employment-related benefits, stock options, severance payments, golden parachutes, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation, unless and to the extent that recovery of such amounts is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Insured Person;** (v) **Benefits**, or that portion of any settlement or award in an amount equal to and comprising such **Benefits**, unless and to the extent that recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Insured Person**; (vi) overhead, over-charges or cost over-runs; (vii) an **Insured's** costs and expenses of complying with any injunctive or other form of equitable relief, including any costs or expenses incurred by any **Insured** to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person and costs or expenses to conduct any educational sensitivity or other program or seminar; (viii) production costs or the cost of recall, reproduction, reprinting, return or correction of **Material** by any person or entity; (ix) any liability or costs incurred in connection with any educational, sensitivity or other program, policy or seminar; (x) the return or reimbursement of fees, commissions, donations, gifts or other remuneration, or that portion of any settlement or award in an amount equal to the return of such fees, commissions, donations, gifts or other remuneration; (xi) any amounts deemed uninsurable under the law pursuant to which this policy shall be construed; or

© All rights reserved

(xii) cleanup costs relating to hazardous materials, pollution or product defects; *provided, however,* that **Loss** shall include a monetary award in, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** or loss in the actual accounts of participants in a **Plan** by reason of a change in value of the investments held by that **Plan**, including, but not limited to, the securities of the **Named Entity**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits."

Notwithstanding anything in this definition of " **Loss**" to the contrary, **Loss** shall specifically include, subject to the other terms, conditions and exclusions of this policy, including, but not limited to, exclusions relating to profit or advantage, fraud or criminal acts: (i) punitive, exemplary and multiple damages (including the multiple or liquidated damages awards under the Age Discrimination in Employment Act and the Equal Pay Act); (ii) **Excess Benefits Penalties**; (iii) civil fines and penalties assessed against an **Insured** by either the Pensions Ombudsman appointed by the Secretary of State for Social Services in the United Kingdom, by the Occupational Pensions Regulatory Authority in the United Kingdom, by the Pensions Regulator in the United Kingdom or any successor body thereto; (iv) the fifteen percent (15%) or less civil penalty imposed upon an **Insured** under Section 502(i) of **ERISA**; (v) the twenty percent (20%) or less penalty imposed upon an **Insured** under Section 502(l) of **ERISA**, with respect to covered settlements or judgments; (vi) **HIPAA Penalties**; (vii) any monetary amount an **Insured** is required by law or has agreed to by settlement to deposit into a consumer redress fund as a result of a **Security/Privacy Claim**; and (viii) civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. Sec. 78dd-2(g)(2)(B) or Section 11(1)(a) of the United Kingdom Bribery Act of 2010, Chapter 23. The enforceability of this paragraph shall be governed by such applicable law which most favors coverage for such penalties and punitive, exemplary and multiple damages. **Loss** shall also mean the reasonable fees and expenses of an independent fiduciary retained to review a proposed settlement of a covered **Fiduciary Claim**, including fees and expenses of any law firm hired by the independent fiduciary to facilitate a review of the proposed settlement.

Notwithstanding anything in this definition of " **Loss**" to the contrary, the **Insurer** shall not assert that a **Claim** alleging any violation of Section 11, 12 or 15 of the Securities Act of 1933, or the portion of any amounts incurred by **Insureds** which are attributable to such actual or alleged violation or **Defense Costs** incurred in defending against such a **Claim** constitutes uninsurable loss and shall treat that portion of all such settlements, judgments and **Defense Costs** as constituting **Loss** under the policy.

© All rights reserved.

**Loss** shall also include fines or penalties, if insurable by law, arising out of any violation of any **Specified Regulatory Legislation**; *provided, however*, it is understood and agreed that the maximum aggregate limit of the **Insurer's** liability for all **Loss** (including **Defense Costs**) arising from all **Claims** alleging a violation of any **Specified Regulatory Legislation** combined shall be $2,000,000 ("hereinafter " **Regulatory Fines and Penalties Sublimit of Liability**"). This **Regulatory Fines and Penalties Sublimit of Liability** is part of and not in addition to the **Limit of Liability**, and shall in no way serve to increase the **Limit of Liability**.Notwithstanding anything in this definition of " **Loss**" to the contrary, **Loss** shall not include:

(i)     the return of funds which were received from any federal, state or local governmental agency and any interest, fines or penalties arising out of the return of such funds; *provided, however*, that with regard to **Claims** for **Wrongful Acts** arising out of the return, or request to return such funds, this policy shall pay **Defense Costs** up to an amount not to exceed $5,000,000 (" **Government Funding Defense Costs Sublimit**"). This **Government Funding Defense Costs Sub-Limit of Liability** is part of, and not in addition to, the **Policy Aggregate Limit of Liability**, and shall in no way serve to increase such **Policy Aggregate Limit of Liability**. With respect to any **Defense Costs** coverage afforded pursuant to this subparagraph, it is understood that: the **Insurer** shall be liable to pay 60% of such **Defense Costs**, excess of a retention in the amount of $2,500,000 , and subject to the **Limit of Liability**. It is a condition of this insurance that the remaining40% of such **Defense Costs** shall be carried by the **Insureds** at their own risk and be uninsured; or

(ii)    the return of funds which were received as donations from any third party (" **Donated Funds**")

*Provided, however,* that **Loss** shall include **Defense Costs** incurred with respect to **Claims** seeking the foregoing.

In the event of a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, **Loss** with respect to such **Claim** shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; *provided, however,* that this paragraph shall not apply to **Defense Costs** or to any **Non-Indemnifiable Loss**.

© All rights reserved

**NOTE:** Notwithstanding anything in this Policy to the contrary, with respect to judgments, amounts paid in settlements or other amounts in which punitive, exemplary or multiplied damages, fines or penalties are awarded or paid, the coverage provided by this Policy shall apply to the broadest extent permitted by law, and the availability of such coverage shall be determined by the law of any applicable jurisdiction, (including but not limited to the jurisdiction where (i) the policy is issued, (ii) a **Wrongful Act** is alleged to have occurred, (iii) the **Insured** is domiciled or incorporated, or (iv) the Insurer is domiciled or incorporated) that is most favorable to such coverage. Furthermore, if, based on the written opinion of independent counsel (i) a jurisdiction is determined to be applicable, and (ii), fines, penalties, punitive, exemplary, special or multiplied damages are insurable under such applicable law, the Insurer will not dispute such written opinion.

ww) " **Management Control**" means: (i) owning interests representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of a majority of the board of directors or trustees of a corporation, the management committee members of a joint venture or partnership, the general partner of a limited partnership or the members of the management board or managing member of a limited liability company; (ii) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of a **Organization**, to elect, appoint or designate a majority of the board of directors of a corporation, the management committee of a joint venture or partnership, the general partner of a limited partnership or the management board or managing member of a limited liability company; or (iii) the functional or foreign equivalent of any of the foregoing.

xx) "**Material**" means media content in any form, including, without limitation, advertising and written, printed, audio, video, electronic, digital or digitized content of:

    (i)    broadcasts, including without limitation, broadcasts via television, motion picture, cable, satellite television, radio, wireless devices or the Internet; or

    (ii)    publications, including without limitation, publications via newspaper, journal, newsletter, magazine, book and other literary, monograph, brochure, directory, screen play, film script, playwright and video publications.

yy) "**Media Claim**" means any **Claim** made against an **Insured** in connection with **Material** and alleging a **Media Peril**.

zz) " **Media Peril**" means any:

    (i)    infringement of copyright, title, slogan, trademark, trade name, trade dress, mark, service mark, service name, infringement of domain name, deep-linking or framing, including, without limitation, unfair competition in connection with such conduct;

MNSCPT            19

© All rights reserved.

(ii)     plagiarism, piracy or misappropriation or theft of ideas under implied contract or other misappropriation or theft of ideas or information; including, without limitation, unfair competition in connection with such conduct;

(iii)    invasion, infringement or interference with rights of privacy or publicity, false light, public disclosure of private facts, intrusion and commercial appropriation of name, persona or likeness; including, without limitation, emotional distress or mental anguish in connection with such conduct;

(iv)    defamation, libel, slander, product disparagement or trade libel or other tort related to disparagement or harm to character or reputation; including, without limitation, unfair competition, emotional distress or mental anguish in connection with such conduct;

(v)     wrongful entry or eviction, trespass, eavesdropping or other invasion of the right to private occupancy, or false arrest, detention or imprisonment or malicious prosecution; including, without limitation, any emotional distress or mental anguish in connection with such conduct;

(vi)    negligent or intentional infliction of emotional distress, outrage or prima facie tort in connection with **Material**; or

(vii)   **Loss** caused by a third party, which has no ownership relationship with any **Insured**, acting upon or making a decision or decisions based on the content of **Material** disseminated by an **Insured** or with an **Insured's** permission.

aaa)    "**Named Entity**" means the President and Fellows of Harvard College.

bbb)    "**Non-Indemnifiable Loss**" means **Loss** for which an **Organization** has neither indemnified nor is permitted or required to indemnify an **Insured Person** pursuant to law or contract or the charter, bylaws, statutes, operating agreement or similar document of an **Organization**.

ccc)    "**Organization**" means:

(i)     the **Named Entity** and any **Subsidiary** thereof; or

(ii)    **HMC** and any **Subsidiary** thereof; or

(iii)   each entity listed on the *Schedule of Insured Harvard Affiliated Entities*; or

(iv)    in the event any bankruptcy proceeding shall be instituted by or against any of the foregoing entities, the term "**Organization**" shall also mean the resulting debtor-in-possession (or foreign equivalent status outside the United States), if any;

MNSCPT                                    20

© All rights reserved.

Notwithstanding the foregoing, with respect to any **Fiduciary Liability Claim**, the definition of "**Organization**" shall include the entities described in the preceding paragraph only in their capacity as a fiduciary, administrator, trustee or settlor of a **Plan**.

"**Organization**" shall not mean or include any **Outside Entity** listed on the Schedule of Harvard Management Company Outside Entities (or any **Subsidiary** thereof) which is attached to this policy.

ddd) "**Outside Entity**" means any (i) past, present or future not-for-profit organization or government or, quasi-government authority or agency on which an **Insured Person** serves as director, officer, advisory board member, shadow-director, shareholder's representative, committee member, trustee, trustee emeritus, or governor at the request or direction of an **Organization**; or (ii) entity listed as an **Outside Entity** in the *Schedule of* Harvard Management Company *Outside Entities* attached to this policy (including any **Subsidiary** thereof).

eee) "**Outside Entity Executive**" means any: (i) **Insured Person** of the **Organization** serving in the capacity as director, officer, advisory board member, shadow-director, shareholder's representative, committee member, trustee, trustee emeritus, or governor of an **Outside Entity**, but only if such service is at the specific request or direction of the **Organization**; (ii) **Advisory Board Member**; or (iii) any other person listed as an **Outside Entity Executive** in an endorsement to this policy. It is understood and agreed that, in the event of a disagreement between the **Organization** and an individual as to whether such individual was acting "at the specific request or direction of the **Organization**," this policy shall abide by the determination of the **Organization** on this issue and such determination shall be made by written notice to the **Insurer** within ninety (90) days after the disagreement is first stated in writing to the **Organization**. In the event no determination is made within such period, this policy shall apply as if the **Organization** determined that such **Insured Person** was not acting at the **Organization's** specific request or direction.

fff) "**Pension Plan**" means a pension plan as defined in any **Employee Benefit Law**.

ggg) "**Pension Crisis Management Event**," "**Pension Crisis Management Fund**" and "**Pension Crisis Management Services**" shall have the meaning ascribed to such terms in Appendix D attached to this policy.

hhh) "**Plan**" means automatically any plan, fund, trust or program (including, but not limited to, any plan, fund, trust or program considered or created by the **Named Entity** during the **Policy Period**, any IRA-based Plan, fringe benefit plan, cafeteria plan, dependent care assistance program, welfare plan, non-qualified plan, or qualified **Pension Plan**), established anywhere in the world, which was, is or shall be sponsored solely by the **Organization**, or sponsored jointly by the **Organization** and a labor organization, solely for the benefit of the **Executives** or **Employees** of the **Organization**, subject to the provisions set forth below:

© All rights reserved.

(i)    if such **Plan** was sold, spun-off, transferred or terminated prior to the inception date of this policy, the coverage as is afforded hereunder shall only apply for **Wrongful Acts** that occurred or that are alleged to have occurred prior to earliest of: the date such **Plan** was sold, spun-off, transferred or terminated; the date that the **Organization** or **Insured Person** ceased to be a fiduciary or ceased his, her or its administration of a sold, spun-off or transferred **Plan**; or in the case of a terminated **Plan**, the final date of asset distribution of such **Plan**;

(ii)   if such **Plan** is sold, spun-off, transferred or terminated during the **Policy Period**, the **Named Entity** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the end of the **Policy Period**. The coverage as is afforded hereunder shall only apply for **Wrongful Acts** that occurred or that are alleged to have occurred prior to the earliest of: the date any such **Plan** was sold, spun-off, transferred or terminated; the date that the **Organization** or **Insured Person** ceases to be a fiduciary or ceases his, her or its administration of a sold, spun-off or transferred **Plan**; or in the case of a terminated **Plan**, the final date of asset distribution of such **Plan**;

(iii)  if such **Plan** is a **Pension Plan** and:

(A)   is acquired during the **Policy Period** as a result of the **Named Entity's** acquisition of a **Subsidiary** whose assets total less than twenty-five percent (25%) of the total consolidated assets of the **Named Entity** as of the inception date of this policy; or

(B)   is acquired during the **Policy Period** and such **Plan's** assets total less than twenty-five percent (25%) of the total consolidated assets of all covered **Pension Plans** as of the inception date of this policy;

Then this policy shall apply to such **Plan** (but solely with respect to any **Wrongful Act** occurring after the date of such acquisition). The **Named Entity** shall provide the **Insurer** with full particulars of such new **Plan** before the end of the **Policy Period**; or

(v)    if such **Plan** is a **Pension Plan** and:

(A)   is acquired during the **Policy Period** as a result of the **Named Entity's** acquisition of a **Subsidiary** whose assets total more than twenty-five percent (25%) of the total consolidated assets of the **Named Entity** as of the inception date of this policy; or

(B)   is acquired during the **Policy Period** and such **Plan's** assets total more than twenty-five percent (25%) of the total consolidated assets of all covered **Pension Plans** as of the inception date of this policy,

© All rights reserved

then, this policy shall apply to such **Plan** (but solely with respect to any **Wrongful Act** occurring after the date of such acquisition), for a period of ninety (90) days after its acquisition. Coverage is provided after the initial 90) day period so long as the **Named Entity** shall have provided the **Insurer** with a completed **Application** for such new **Plan** and agreed to any additional premium or amendment of the provisions of this policy required by the **Insurer** relating to such new **Plan**. This ninety (90) day reporting condition shall not apply if such new **Plan** does not constitute one of the five largest **Pension Plans** of the **Named Entity** and the failure to report such **Plan** within the 90) day reporting period was due to inadvertent omission by the **Named Entity** and upon discovery of such **Plan**, the **Named Entity** shall notify the **Insurer** as soon as practicable, provide any information required by the **Insurer** relating to such **Plan** and pay any premium required by the **Insurer** relating to such **Plan**.

The Definition of **Plan** shall also include the following government-mandated programs: unemployment insurance, Social Security or disability benefits, but solely with respect to a **Wrongful Act** defined in subparagraph (iii)(D) of the definition of **Wrongful Act**;

In no event, however, shall the definition of **Plan** include any multiemployer plan as defined in **ERISA** Secs. 3(37) and Sec. 4001(a)(3)).

iii)     **"Plan Committee"** means any employee benefit committee, including, but not limited to any plan investment or administration committee of an **Organization**, including a Corporate Trustee Company, in its capacity as a fiduciary, settlor or trustee of a **Plan**.

jjj)     **"Policy Period"** means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in such Item 2 or the effective date of cancellation of this policy.

kkk)     **"Pollutants"** means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and **Waste**. " **Waste**" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

lll)     **"Privacy Event"** means any of the following occurring, or alleging to have occurred after the **Retroactive Date** and prior to the end of the **Policy Period**:

(i)     any failure to protect **Confidential Information** (whether due to "hacking," "phishing," "spoofing," a data breach or other unauthorized access to or use of **Confidential Information**, other social or electronic engineering technique, inadvertence or otherwise) including, without limitation, that which results in an identity theft or other wrongful emulation of the identity of an individual or corporation;

© All rights reserved.

(ii)    a failure to disclose any failure to protect **Confidential Information** in violation of any **Security Breach Law**; or

(iii)    a violation of any federal, state, foreign or local privacy statute alleged in connection with a **Claim** for compensatory damages, judgments, settlements, pre-judgment and post-judgment interest from a failure to protect **Confidential Information** or a violation of any **Security Breach** Law.

(v) wrongful collection of **Confidential Information** by an **Insured**;

(vi)any violation of a confidentiality or nondisclosure agreement by an Insured;

(vii)Any violation of an Organization's privacy policy

mmm)" **Professional Services** " means:

(i)    **Investment Advisory Services;**

(ii)    **Property Management Services;**

(iii)    **Legal Services;**

(iv)    **Education Services;**

(viii)    **Urban Consulting Services;**

(ix)    **Publication Services** and

(x)    **Research Services**

(vii)    any other professional services (other than **Investment Advisory Services**) performed for others, *provided, however*, that any such professional service which generates annual fees greater than $500,000 must be reported to the **Insurer** within 90 days after the Risk Manager or the Office of General Counsel become aware that fees greater than $500,000 are being generated by such professional services.

© All rights reserved

The **Organization** shall provide such information as the **Insurer** may require to (i) determine if the **Insurer** is willing to continue to insure such professional services under this policy; (ii) determine what, if any, premium charge shall apply; and (iii) add the appropriate definition of such professional services by endorsement to this policy. Such services shall not be included in the definition of **Professional Service** from the date the Risk Manager or the Office of General Counsel become aware or should have been aware that annual fees for such services exceed $500,000 until the **Insurer** has added such professional services to this definition by endorsement to this policy; performed by an **Organization** or by an **Insured Person** while acting within the scope of their duties as an **Executive** or **Employee** of an **Organization**.

nnn) " **Professional Services Claim** " means a **Claim** made against any **Insured** alleging a **Wrongful Act** in the performance of, or failure to perform, **Professional Services**.

ooo) "**Property Management Services**" means any of the following services provided in connection with the management of commercial or residential property not owned by any **Insured Person**:

(i)     developing management plans and budgets;

(ii)    overseeing or coordinating the physical maintenance of real property and/or buildings or fixtures;

(iii)   tenant relation services, including the evaluation and selection of tenants, collection of rent and the processing of evictions;

(iv)   developing, implementing and managing contracts necessary to the daily functioning of real property and/or buildings or fixtures; or

(v)    selecting or overseeing any security services;

(vi)   record keeping.

**Property Management Services** does not include the management of renovation and reconstruction plans or any contracts or subcontracts in connection therewith; analysis, evaluation or consultation concerning environmental hazards or exposures; or obtaining, maintaining or negotiating property and liability insurance contracts.

© All rights reserved.

Publication Service" means the following services performed by Harvard University Press and Harvard Business School Publishing for others: (i) the provision of hosting, on-demand, web-based service, software programs, tools, kits, and object libraries, all third-party or open source code embedded therein or any equipment, any upgrades, updates, releases, fixes, enhancements; (ii) modifications to licensed software provided by Harvard University Press or Harvard Business School Publishing ; (iii) written (including electronic) technical, user, and operational materials or specifications published by Harvard Business School Publishing applicable to such software, equipment ad services; or (iv) any other service related to (i), (ii), or (iii) above.

ppp) " **Related Wrongful Act(s)**" means **Wrongful Act(s)** which are the same, related or continuous, or **Wrongful Act(s)** which arise from a common nucleus of facts. **Claims** can allege **Related Wrongful Act(s)** regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action.

qqq) "**Research Services(s)**" means any educational, academic or clinical research, investigation, testing or analysis performed by any administrator, faculty, principal investigator, postdoctoral fellows, research associates, research administrators or students.

rrr) " **Retaliation**" means a retaliatory act of an **Insured** alleged to be in response to any of the following activities: (i) the disclosure or threat of disclosure by an **Employee** of the **Organization** or an **Outside Entity** to a superior or to any governmental authority or regulatory agency of any act by an **Insured** which act is alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder; (ii) the actual or attempted exercise by an **Employee** of the **Organization** or an **Outside Entity** of any right that such **Employee** has under any law, statute or regulation, including, without limitation, rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights; (iii) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle-blower" law; or (iv) strikes of an **Employee** of the **Organization** or an **Outside Entity**.

sss) " **Retroactive Date**" means:

(i)    with respect to any **Professional Services Claim** that would have been covered under Not-For-Profit Protector #612-19-39 issued to the Named Entity for the initial policy period from July 1, 2008 through July 1, 2009, if such **Claim** would have been made during the policy period of such policy, February 22, 1989; or

(ii)    with respect to all other **Professional Services Claims** and all **Media Claims** and **Security/Privacy Claims**, May 31, 2010.

MNSCPT                                      26

© All rights reserved

ttt) **"Security Breach Law"** means any statute or regulation of the European Union, United Kingdom, United States of America, Canada or any other country, province, state, territory or jurisdiction that requires an entity storing **Confidential Information** on its **Computer System,** or any entity that has provided **Confidential Information** to an information holder, to provide notice of any actual or potential unauthorized access by others to **Confidential Information** stored on such **Computer System,** including but not limited to, the statute known as California SB 1386 (§1798.82, *et al.* of the California Civil Code).

**"Security Failure"** means any of the following occurring or alleging to have occurred after the **Retroactive Date** and prior to the end of the **Policy Period:**

(i) a failure or violation of the security of a **Computer System** including, without limitation, that which results in or fails to mitigate any unauthorized access, unauthorized use, misappropriation, spear-phishing, denial of service attack or receipttransmission of a unauthorized or corrupting code or infection through Trojan horses, worms, spyware, logic bomb, malware or advanced persistent threats;;

(ii) physical theft of hardware controlled by an Organization (or components thereof) on which electronic data is stored, by a person other than an **Insured**, from a premises occupied or controlled by an **Organization**; or

(iii) failure to disclose or report an event described in Sub-paragraph (1) or (2) above in violation of a **Security Breach Law** .

**" Security Failure"** includes any such failure or violation, resulting from the theft of a password or access code from an **Insured's** premises, the **Computer System,** or an officer, director or employee of a **Company** by non-electronic means.

uuu) **" Security Threat"** means any threat or connected series of threats to commit an intentional attack against a **Computer System** for the purpose of demanding money, securities or other tangible or intangible property of value from an **Organization.**

vvv) **" Security/Privacy Claim"** means a **Claim** made against any **Insured** alleging a **Security Failure** or **Privacy Event.**

www)**" Specified Regulatory Legislation "** means (1) the Campus Sexual Assault Victims' Bill of Rights Act of 1991; (2) the Student Right to Know Act of 1991; (3) the Federal Education Rights and Privacy Act of 1974 ("FERPA," or the "Buckley Amendment"); (4) the Crime Awareness and Campus Security Act of 1990 ("Clery Act"); (5) the Uniform Student Freedom of Expression Act; (7) the Freedom of Information Act (5 U.S.C. 552) and any similar state law; (8) Subtitle F of Title II of HIPAA; and (9) any state "Open Public Meeting" or "Sunshine" law.

© All rights reserved.

xxx)  **"Subsidiary"** means any past or present: (i) entity of which one or more **Organization(s)** have **Management Control** on or before the inception of the **Policy Period**, either directly or indirectly; or (ii) entity which qualifies as a **Subsidiary** pursuant to Clause 6 of this policy.

Notwithstanding the foregoing, coverage as is afforded under this policy with respect to a **Claim** made against any **Subsidiary** or any **Insured Persons** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time that the **Named Entity** obtained **Management Control** of such **Subsidiary** and prior to the time that such **Named Entity** ceased to have **Management Control** of such **Subsidiary**.

yyy)  **"Urban Consulting Services"** means consultation regarding planning, design, outreach, development, social service, community service or other similar advice or service for cities, municipalities or other local governments.

zzz)  **"Voluntary Compliance Loss"** means fines, penalties, sanctions, and reasonable and necessary fees, costs or expenses related to the assessment of or correction of a **Plan's** noncompliance in accordance with any **Voluntary Compliance Program** and which are incurred during the **Policy Period** (or during the policy period of a policy issued by the Insurer of which this policy is a continuous renewal **Compliance Loss"** shall not include any compensation of any **Insured Persons** or any employee of an **Insured**.

aaaa) **Voluntary Compliance Program"** any voluntary compliance resolution program or similar voluntary settlement program administered by the DOL, IRS, PBGC or other similar governmental authority or any similar program administered by any governmental authority located outside the United States of America, to correct any inadvertent non-compliance by a **Plan**, including, but not limited to:

> (1) Employee Plans Compliance Resolution System;

> (2) Delinquent Filer Voluntary Compliance Program;

> (3) Voluntary Fiduciary Correction Program;

> (4) Premium Compliance Evaluation Program; and

> (5) Participant Notice Voluntary Correction Program

bbbb) **"Wrongful Act"** means:

> (i) With respect to an **Insured Person**, any actual or alleged act, omission, breach of duty, neglect, error, statement, misstatement, misleading statement, supervision or failure to supervise:

MNSCPT                                28

© All rights reserved

(A) with respect to any **Executive** of an **Organization**, by such **Executive** in his or her capacity as such or any matter asserted against such **Executive** by reason of his or her status as such;

(B) with respect to any **Employee** of an **Organization**, by such **Employee** in his or her capacity as such or any matter asserted against such person by reason of his or her status as such;

(C) with respect to any **Outside Entity Executive**, by such **Outside Entity Executive** in his or her capacity as such or any matter claimed against such **Outside Entity Executive** by reason of his or her status as such; or

(D) with respect to any **Advisory Board Member**, by such **Advisory Board Member** in his or her capacity as such or any matter claimed against such **Advisory Board Member** by reason of his or her status as such;

(ii) With respect to an **Organization** any actual or alleged:

(A) act, omission, breach of duty, neglect, error, statement, misstatement, misleading statement, negligent supervision of or failure to supervise by such Organization;

(iii) With respect to all **Insureds** any actual or alleged:

(A) **Privacy Event**; or

(B) **Security Failure**.

(C) any actual or alleged violation of any of the responsibilities, obligations or duties imposed upon fiduciaries by **Employee Benefit Law** with respect to a **Plan**, including, but not limited to the actual or alleged improper selection of or inadequate monitoring of third-party service providers; or any allegation made against an **Insured** by reason of his, her or its actual or alleged status as a fiduciary of a **Plan**; or

© All rights reserved.

(D)  any actual or alleged act, error, omission, breach of duty, neglect, misstatement or misleading statement solely in the performance of, or failure to perform, one or more of the following administrative duties or activities, but only with respect to a **Plan**:  (i) counseling employees, participants and beneficiaries; (ii) providing interpretations; (iii) handling of records, calculating or determining benefits, preparing, distributing or filing required notices or documents; (iv) activities effecting enrollment, termination or cancellation of employees, participants and beneficiaries under the **Plan**; (v) complying with **HIPAA** failure to properly and timely provide COBRA notices or other required notices, (vii) the alleged failure to make timely determinations of eligibility for benefits; or (viii) any allegation made against an Insured solely by reason of his, her or its actual or alleged administration of a **Plan**;

(E)  a violation of the United Kingdom's Pensions Ombudsman or Pensions Regulator;

(F)  **Wrongful Internet Activity**; or

(G)  any actual or alleged act, error or omission by an **Insured** in a settlor capacity as respects a **Plan**.

Notwithstanding anything in this **Policy** to the contrary, the **Insurer** and **Insureds** agree that any **Investigation Claim** shall be treated as a **Claim** for a **Wrongful Act**.

(eeee)  "**Wrongful Internet Activity**" means the acts, errors, or omissions in subparagraphs (i) through (xi) of the definition of **Employment Practices Violation**, when committed by an **Employee** by means of the internet, including, but not limited to, social networking activities, regardless of whether such internet activity is during or after work hours or on or off the work premises. For purposes of the application of this definition, an individual shall be deemed to be an **Employee** regardless of whether such individual was acting in his or her capacity as an **Employee**.

## 4.  CURRENCY AND VALUATION

All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in the currency of the United States of America.

© All rights reserved

If a judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Entity**) or, in United States of America dollars, at the rate of exchange published in *The Wall Street Journal* on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of *The Wall Street Journal*).

**5.      LIMIT OF LIABILITY (FOR ALL LOSS, INCLUDING DEFENSE COSTS)**

The **Limit of Liability** is the aggregate limit of the **Insurer's** liability for all **Loss, Crisis Management Loss, Event-Related Loss** and **Cyber Extortion Loss** combined under any and all coverage parts combined and arising out of:

(a)     all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable);

(b)     solely with respect to **Crisis Management Loss**, all **Crisis Management Events** occurring during the **Policy Period**;

(c)     solely with respect to **Event-Related Loss**, all **Security Failures** and **Privacy Events** occurring during the **Policy Period**; and

(d)     solely with respect to **Cyber Extortion Loss**, all **Security Threats** occurring during the **Policy Period**.

The **Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Limit of Liability** for the **Policy Period**. Further, a **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable) and which pursuant to Clause 3(b) or 3(c) of Coverage Part A is considered made during the **Policy Period** or **Discovery Period**, shall also be subject to the single aggregate **Limit of Liability**.

**Defense Costs** are not payable by the **Insurer** in addition to the **Limit of Liability**. **Defense Costs** are part of **Loss** and, as such, are subject to the **Limit of Liability** for **Loss**. Amounts insured for **Defense Costs** shall be applied against the retention.

Notwithstanding the foregoing, the following sublimits shall apply:

© All rights reserved.

**CRISISFUND® INSURANCE**

The maximum limit of the **Insurer's** liability for all **Crisis Management Loss** arising from all **Crisis Management Events** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be $100,000 (herein the " **Crisis Management Fund**"). The **Crisis Management Fund** shall be the maximum limit of the **Insurer** under this policy for **Crisis Management Loss**, regardless of the number of **Crisis Management Events** occurring during the **Policy Period**; *provided, however*, the **Crisis Management Fund** shall be part of and not in addition to the **Limit of Liability**, and shall in no way serve to increase the **Insurer's Limit of Liability**.

**VOLUNTARY COMPLIANCE LOSS SUBLIMIT OF LIABILITY**

The maximum limit of the **Insurer's** liability for all **Voluntary Compliance Loss** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be $250,000 (the " **Voluntary Compliance Loss Sublimit of Liability**"). The **Voluntary Compliance Loss Sublimit of Liability** shall be part of, and not in addition to, the **Limit of Liability**, and shall in no way serve to increase the **Insurer's Limit of Liability**.

**HIPAA PENALTIES SUBLIMIT OF LIABILITY**

The maximum limit of the **Insurer's** liability for all **HIPAA Penalties**, in the aggregate, shall be $,500,000 (the " **HIPAA Penalties Sublimit of Liability**"). The **HIPAA Penalties Sublimit of Liability** shall be part of, and not in addition to, the **Limit of Liability**, and shall in no way serve to increase the **Insurer's Limit of Liability**.

**HEALTH CARE REFORM PENALTIES SUBLIMIT OF LIABILITY**

The maximum limit of the Insurer's liability for all **Health Care Reform Penalties**, in the aggregate shall be $250,000 (the " **Health Care Reform Penalties Sublimit of Liability**"). The **Health Care Reform Penalties Sublimit of Liability** shall be part of, and not in addition to, the **Limit of Liability**, and shall in no way serve to increase the **Insurer's Limit of Liability**

**SECTION 4975 PENALTIES SUBLIMIT OF LIABILITY**

The maximum limit of the Insurer's liability for all **Section 4975 Penalties**, in the aggregate shall be $250,000 (the " **Section 4975 Penalties Sublimit of Liability**"). The **Section 4975 Penalties Sublimit of Liability** shall be part of, and not in addition to, the **Limit of Liability**, and shall in no way serve to increase the **Insurer's Limit of Liability**

© All rights reserved

**502(c) PENALTIES SUBLIMIT OF LIABILITY**

The maximum limit of the Insurer's liability for all **502(c) Penalties**, in the aggregate shall be $250,000 (the " **502(c) Penalties Sublimit of Liability**"). The **502(c) Penalties Sublimit of Liability** shall be part of, and not in addition to, the **Limit of Liability**, and shall in no way serve to increase the **Insurer's Limit of Liability**

**PENSION PROTECTION ACT PENALTIES SUBLIMIT OF LIABILITY**

The maximum limit of the Insurer's liability for all **Pension Protection Act Penalties**, in the aggregate shall be $250,000 (the " **Pension Protection Act Penalties Sublimit of Liability**"). The **Pension Protection Act Penalties Sublimit of Liability** shall be part of, and not in addition to, the **Limit of Liability**, and shall in no way serve to increase the **Insurer's Limit of Liability**

**EVENT MANAGEMENT SUBLIMIT OF LIABILITY**

The maximum limit of the **Insurer's** liability for all **Event-Related Loss** arising out of the Event Management Insuring Agreement, in the aggregate, shall be $7,500,000 (the " **Event Management Sublimit of Liability**"). The **Event Management Sublimit of Liability** shall be part of, and not in addition to, the **Limit of Liability**, and shall in no way serve to increase the **Insurer's Limit of Liability**.

**E-DISCOVERY CONSULTANT SERVICES SUBLIMIT OF LIABILITY**

The **Insurer's** maximum liability for all **E-Discovery Loss**, in the aggregate, arising from all **Claims** covered under this Policy, shall be $25,000 (the " **E-Discovery Sublimit of Liability**"). The **E-Discovery Sub-Limit of Liability** shall be part of and not in addition to the **Limit of Liability** and will in no way serve to increase the **Insurer's Limit of Liability**.

**E-Discovery Consultant Services** shall conclude once such services are no longer required or necessary or when the **E-Discovery Sub-Limit of Liability** has been exhausted, whichever comes first.

6.  **DISCOVERY CLAUSE**

The provisions of this Clause do not apply to the Event Management Insuring Agreement.

If the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy, then the **Named Entity** shall have the right, upon payment of the applicable " **Additional Premium Amount**" for the applicable period following the effective date of such cancellation or nonrenewal as specified below (herein referred to as the " **Discovery Period**"), in which to give the **Insurer** written notice of **Claims** first made against any **Insured** during said **Discovery Period** for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by the canceled or nonrenewed policy.

MNSCPT

33

© All rights reserved.

The rights contained in this Clause 4 shall terminate, however, unless written notice of such election together with the **Additional Premium Amount** due is received by the **Insurer** within thirty (30) days after the effective date of cancellation or nonrenewal.

The **Additional Premium Amount** for the elected **Discovery Period** shall be the total annual premium charged for this policy multiplied by a percentage determined by the **Insurer** in its sole and absolute discretion that does not exceed the following for the length time of elected for the **Discovery Period** as follows: One (1) year, 100%; two (2) years, 125%; three (3) years, 150%; six years, 200%; unlimited duration, 225%.

In the event of a **Transaction**, as defined in Clause 6 of these **General Terms and Conditions**, the **Named Entity** shall have the right, within forty-five (45) days before the end of the **Policy Period**, to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**) for a period of up to six (6) years or for such longer or shorter period as the **Named Entity** may request. The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions and premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged for coverage during the **Discovery Period** shall be fully earned at inception. This Clause shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause shall terminate unless written notice of election of a **Discovery Period** together with any additional premium due is received by the **Insurer** no later than thirty (30) days after the effective date of the cancellation, nonrenewal or **Transaction**.

7.   **CANCELLATION CLAUSE**

a)  By **Named Entity**: This policy may be canceled by the **Named Entity** at any time only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer's** authorized agent or to the **Insurer**.

b)  By the **Insurer**: This policy may only be canceled by the **Insurer** for non-payment of premium, by delivering to the **Named Entity** by registered, certified, other first class mail or other reasonable delivery method, at the address of the **Named Entity** set forth in Item 1 of the Declarations, written notice stating when, not less than twenty (20) days thereafter, the cancellation shall be effective. Proof of mailing or delivery of such notice as aforesaid shall be sufficient proof of notice and this policy shall be deemed canceled as to all **Insureds** at the date and hour specified in such notice.

c)  Return of Premium: If this policy shall be canceled by the **Named Entity**, the **Insurer** shall retain pro rata proportion of the premium hereon.

© All rights reserved.

8.   **ORGANIZATIONAL CHANGES**

a)   If during the **Policy Period**:

    (i)   the **Named Entity** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert;

    (ii)   any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Entity**;

    (iii)   the **Named Entity** shall dissolve; or

    (iv)   the **Named Entity** shall change from not-for-profit to for-profit status

(any such event being a "**Transaction**"), then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to, or at, the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Transaction**. This policy may not be canceled after the effective time of the **Transaction** and the entire premium for this policy shall be deemed earned as of such time. The **Named Entity** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in Clause 4 of this policy.

b)   **Subsidiary** Additions:   "**Subsidiary**" also means any entity of which the **Named Entity** first acquires **Management Control** during the **Policy Period**, and of which the book value of such entity's assets determined in accordance with Generally Accepted Accounting Principles total less than 25% of the similarly calculated assets of the **Named Entity** as of the inception date of the Policy Period.

c)   **Insured Persons**: Coverage will automatically apply to all new **Insured Persons** of an **Organization** or **Outside Entity** following the inception date of this policy.

© All rights reserved.

9.     **SUBROGATION**

a)     In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to each **Insured's** rights of recovery thereof, and each **Insured** shall execute all papers required and shall do everything that may be reasonably necessary, including, without limitation, the assertion of indemnification or contribution rights, to secure such rights including the execution of any and all documents necessary to enable the **Insurer** to bring suit in the name of each such **Insured**. In no event, however, shall the **Insurer** exercise its rights of subrogation against an **Insured Person** under this policyb)

In the event that the **Insurer** shall for any reason pay **Indemnifiable Loss** on behalf of an **Insured Person**, the **Insurer's** subrogation rights shall include, but not be limited to, the assertion of indemnification or contribution rights with respect to any such payments it makes or advances. Additionally, upon the **Insurer** making any payment of **Loss** within the retention, the **Insurer** shall have the contractual right hereunder to recover from the **Organization** such **Loss** which was paid within the retention. Such direct contractual right of recovery against the **Organization** shall be in addition to and independent of the **Insurer's** subrogation right pursuant to this Clause 7 and any other rights the **Insurer** may have under applicable law. Notwithstanding the foregoing, this subparagraph (b) shall not apply to **Indemnifiable Loss** of an **Insured Person** which the **Organization** failed to pay due to the **Organization's Financial Insolvency**.

c)     Nothing in this Clause 7 shall be construed to grant any indemnification right by or on behalf of any **Organization** to any **Insured Person**.

10.    **OTHER INSURANCE AND INDEMNIFICATION**

Except in the case of personal liability insurance maintained by an **Insured Person**, and any insurance contract providing coverage that is specifically excess of this policy, all **Loss** payable under this policy will be specifically excess of, and will not contribute with, any other valid and collectible insurance paid to or on behalf of an **Insured**, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is written to be specifically excess of this policy.

Coverage as is afforded by this policy shall be specifically excess of any: (i) valid and collectible indemnification paid to any **Insured Person**; and (ii) any other valid and collectible insurance actually paid to any **Insured**.

Coverage provided hereunder shall be specifically primary to any personal liability/personal umbrella excess or non-indemnifiable difference in conditions insurance available to **Insured Persons**, except that the Insurer shall recognize erosion of the applicable Retention under this policy by payment from either the **Insureds** or another insurer (including without limitation personal liability/personal umbrella excess or non-indemnifiable difference in conditions insurance).

© All rights reserved

Further, in the event other insurance is provided to an **Insured Person** serving at an **Outside Entity, Investment Entity**, leasing company or independent contractor referenced in the above paragraph, or is provided under any pension trust or employee benefit plan fiduciary liability insurance policy, and such other insurance is provided by the **Insurer** or any other insurance company affiliate thereof (" **Other Policy**") (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a claim as required), then the **Insurer's** maximum aggregate **Limit of Liability** for all **Loss** of **Insureds** covered both under this policy and such **Other Policy** shall be $35,000,000. For the avoidance of doubt, Other Policy shall not include any policies providing coverage excess to this Policy.

## 11.  NOTICE AND AUTHORITY

It is agreed that the **Named Entity** shall act on behalf of each and every **Insured** with respect to the giving of notice of any **Claim**, the giving and receiving of notice of cancellation or non-renewal, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining of any right to a **Discovery Period**; *provided, however*, that any Insured may provide notice of a **Claim** in order to fulfill the notice requirements in this policy.

## 12.  ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**, which consent shall be in the sole and absolute discretion of the **Insurer**.

## 13.  DISPUTE RESOLUTION PROCESS

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, must first be submitted to the non-binding mediation process as set forth in this Clause.

The non-binding mediation will be administered by any mediation facility to which the **Insurer** and the **Named Entity** mutually agree, in which all implicated **Insureds** and the **Insurer** shall try in good faith to settle the dispute by mediation in accordance with the American Arbitration Association's (" **AAA**") then-prevailing Commercial Mediation Rules. The parties shall mutually agree on the selection of a mediator. The mediator shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator shall also give due consideration to the general principles of the law of the state where the **Named Entity** is incorporated in the construction or interpretation of the provisions of this policy.

© All rights reserved.

In the event that such  non-binding mediation does not result  in a settlement of the subject dispute or difference:

a)  either party shall have the right to commence a judicial proceeding; or

b)  either party shall have the right, with  all other parties consent, to commence an arbitration proceeding  with  the **AAA**  that will be  submitted  to  an arbitration panel of three (3) arbitrators as follows: (i) the **Insured** shall  select  one (1) arbitrator; (ii) the **Insurer** shall select one (1) arbitrator;     and     (iii)     said arbitrators shall  mutually agree  upon  the  selection  of  the  third  arbitrator.  The arbitration shall  be  conducted in  accordance  with  the **AAA's**  then  prevailing Commercial Arbitration Rules.

Notwithstanding the foregoing,  no judicial  or arbitration  proceeding shall  be commenced until at least  sixty (60) days  after the date  the non-binding mediation shall  be  deemed  concluded  or  terminated.  Each  party  shall  share  equally   the expenses of the non-binding mediation. *Provided, however*, that if such delay could or would  result in  the running  of  any statute  of  limitations,  the  parties agree  to waive any and all statute of limitations arguments.

The non-binding mediation  may be  commenced in Boston,  Massachusetts or  New York, New York.  The **Named Entity** shall act on behalf of each and every **Insured** in connection with  any  non-binding  mediation  under  this  Clause,  the  selection  of arbitration or judicial proceeding or the selection of mediators or arbitrators.

## 14.   ACTION AGAINST INSURER

a)     Except as provided in Clause 11 of the  **General Terms and Conditions** of the policy, no action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been compliance with all of the terms of this policy, nor until the amount of the **Insured's** obligation to pay shall have been  finally determined either  by judgment  against  the **Insured**  after actual  trial  or by written agreement of the  **Insured**, the claimant and the **Insurer.**

b)     Any person  or organization,  or  the  legal representative thereof  who has secured a judgment against  an **Insured** or  entered into a  written agreement with an  **Insured**,  with  the **Insurer**'s  consent,  which  consent  shall not  be unreasonably withheld, to  pay an  amount of **Loss**  covered hereunder,  shall thereafter be  entitled  to  recover  under  this  policy  to  the  extent  of  the insurance afforded by this policy.

c)     Except as provided in Section 12(b), no person or organization shall have any right under this policy to join  the **Insurer** as a party  to any action against an **Insured** to determine the **Insured's** liability, nor shall the **Insurer** be impleaded by the **Insured** or their legal representatives.

© All rights reserved

**15.  BANKRUPTCY**

    a)    Bankruptcy or insolvency of any **Organization** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations hereunder.

    b)    The coverage provided under this policy is intended to protect and benefit the **Insured Persons.** If a liquidation or reorganization proceeding is commenced by the **Named Entity** or any other **Organization** (whether voluntarily or involuntarily) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law (collectively "Bankruptcy Law") then, in regard to a covered **Claim** under this policy, the **Insureds** hereby:

        (i)    waive and release any automatic stay or injunction to the extent it may apply in such proceeding to the proceeds of this policy under such Bankruptcy Law; and

        (ii)    agree not to oppose or object to any efforts by the **Insurer** or any **Insured** to obtain relief from any stay or injunction to the extent applicable to the proceeds of this policy as a result of the commencement of such liquidation or reorganization proceeding.

**16.  EXTENSIONS**

Subject otherwise to the terms hereof, this policy shall cover **Loss** arising from any **Claim** made against: (i) the estates, heirs, or legal representatives of deceased **Insured Persons**, and the legal representatives of **Insured Persons** in the event of incompetency, insolvency or bankruptcy, who were **Insured Persons** at the time the **Wrongful Acts** upon which such **Claims** are based were committed; or (ii) the lawful spouse or domestic partner (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world or the provisions of any formal program established by the **Organization** or any **Subsidiary**) of an **Insured Person** for all **Claims** arising solely out of his or her status as the spouse or domestic partner of an **Insured Person**, including a **Claim** that seeks damages recoverable from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner; *provided, however*, this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** of the spouse or domestic partner, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**, subject to the policy's terms, conditions and exclusions.

**17.  PRIORITY OF PAYMENTS**

    a)    In the event of **Loss** arising from one or more covered **Claims** (with the exception of any **Employment Practices Claim**) for which payment is due under this policy, then the **Insurer** shall in all events:

MNSCPT              39

© All rights reserved.

    (i)      first, pay all **Non-Indemnifiable Loss** of an **Insured Person** for which coverage is provided under this policy;

    (ii)     second, pay all **Indemnifiable Loss** of every **Insured Person** for which coverage is provided under this policy; and

    (iii)   third, only after payments of all **Loss** have been made pursuant to subsections (a)(i), and (ii) of this Clause 15, then with respect to whatever remaining amount of the **Limit of Liability** is available after such payment, at the written request of the President of the **Named Entity**, either pay or withhold payments of such other **Loss** for which coverage is provided or may be available under this policy.

b)    The bankruptcy or insolvency of any **Organization**, any **Insured Person** or any other entity or person shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this coverage section pursuant to this Clause.

c)    Nothing in this Clause shall be construed to increase the **Limit of Liability** of the **Insurer** under this policy, which **Limit of Liability** shall remain the maximum liability of the **Insurer** for all **Loss** under this policy.

## 18.  SEVERABILITY AND REPRESENTATIONS

In granting coverage under the policy, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application** for this policy as being accurate and complete in all material respects. All such statements and representations are the basis of this policy and are to be considered as incorporated into this policy.

The **Insureds** agree that in the event that the particulars and statements contained in the **Application** are not accurate and complete and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then the coverage under this policy shall be void *ab initio* as to any **Insured** who knew as of the inception date of the **Policy Period** of the facts that were not accurately and completely disclosed in the **Application** (whether or not such **Insured** knew that such facts were not accurately and completely disclosed in the **Application**). Solely for purposes of determining whether this policy shall be void *ab initio* as to an **Insured**, such aforesaid knowledge possessed by any **Insured** shall not be imputed to any other **Insured**.

© All rights reserved

**19.   SERVICE OF SUIT**

It is agreed that in the event of failure of the **Insurer** to pay any amount claimed to be due hereunder, and in the event the parties determine to have such dispute or difference resolved through a judicial proceeding, the Insurer, at the request of the Insured, will submit to the jurisdiction of any court of competent jurisdiction within the United States.  Nothing in this Clause 17 constitutes, or should be understood to constitute, a waiver of the Insurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

It is further agreed that service of process in such suit may be made upon General Counsel, Legal Department, Chartis Specialty Insurance Company, 175 Water Street New York, NY 10038, or his or her representative, and that in any suit instituted against the Insurer upon this contract, the Insurer will abide by the final decision of such court or of any appellate court in the event of any appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Insurer hereby designates the Superintendent, Commissioner, or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successor or successors in office as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named General Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**20.   STATE AMENDATORY INCONSISTENT**

In the event that there is an inconsistency between any: (a) state amendatory endorsement attached to this policy, or any other wording attached to this policy to comply with applicable law or regulation; and (b) any other term, condition or limitation of this policy; then, to the extent permitted by law, and subject to those limitations below, the **Insurer** shall resolve the inconsistency by applying those terms, conditions or limitations that are more favorable to the **Insureds**.

This Clause shall not apply to the extent that: (a) any state amendatory or other wording expressly limits coverage in order to comply with applicable law, or (b) any such amendatory or other compliance wording amends language applicable to premium amount for this policy.  In such event, the state amendatory or other compliance wording will govern over any other term, condition or limitation of the policy.

**21.   HEADINGS AND DEFINED TERMS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

© All rights reserved.

22. **CHOICE OF LAW**

This policy, and its terms and conditions, shall be subject to, and interpreted in accordance with, the substantive laws of the Commonwealth of Massachusetts without regard to its conflict of laws principles.

23. **WORLDWIDE EXTENSION**

Where legally permissible, this policy shall apply to any **Claim** made against any **Insured** anywhere in the world. For **Claims** made and maintained in a **Foreign Jurisdiction** for **Wrongful Acts** committed in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claims** the provisions of the **Foreign Policy** in the **Foreign Jurisdiction** that are more favorable to such **Insured** in the **Foreign Jurisdiction**; *provided, however*, that this paragraph shall apply only to provisions more favorable by virtue of insuring clauses, extensions, definitions, exclusions, pre-authorized securities or other defense counsel, discovery or extended reporting period, notice and authority, dispute resolution process or order of payments provisions, if any, of the **Foreign Policy** when compared to the same or similar clauses of this policy. This paragraph shall not apply to excess provisions or policy provisions that address non-renewal, defense within or without limits, taxes, claims made and reported provisions or any other provision of this policy intended to govern coverage worldwide.

© All rights reserved

**EDUCATIONAL INSTITUTION RISK PROTECTOR**

**PRESIDENT AND FELLOWS OF HARVARD COLLEGE MANUSCRIPT**

**Liability and Occurrence-Related Insurance Policy**

<u>**Coverage Part A**</u>**: D&O, EPL, E&O, Fiduciary Liability, Security, Privacy and Media Content Liability Insurance Coverage Part**

**THIS IS A CLAIMS MADE AND REPORTED COVERAGE PART WITH DEFENSE COSTS INCLUDED IN THE LIMIT OF LIABILITY.   PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance upon the **Application** and all statements therein which form a part of this policy, the **Insurer** and the **Insureds** agrees as follows:

1.   **INSURING AGREEMENTS**

    Solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy affords the following coverage:

    a)    *Insured Person Liability*: This policy shall pay the **Loss** of any **Insured Person** arising from a **Claim** first made against such **Insured Person** during the **Policy Period** (or **Discovery Period**, if applicable) for any **Wrongful Act** of such **Insured Person**, except when and to the extent that the **Organization** or **Plan** has indemnified such **Insured Person**. This Insuring Agreement (a) shall not apply to **Loss** arising from a **Claim** made against an **Outside Entity Executive**.

    b)    *Organization Coverage:*

        (i)    *Organization Liability*:   This policy shall pay the **Loss** of an **Organization** or any **Plan** arising from a **Claim** first made against such **Organization** or **Plan** during the **Policy Period** (or **Discovery Period**, if applicable) for any **Wrongful Act** of an **Organization** or **Plan.**

        (ii)    *Indemnification of Insured Persons*:   This policy shall pay the **Loss** of an **Organization** or any **Plan** arising from a **Claim** first made against an **Insured Person** during the **Policy Period** (or **Discovery Period**, if applicable) for any **Wrongful Act** of such **Insured Person**, but only when and to the extent that the **Organization** or **Plan** has such **Insured Person**. This Insuring Agreement (b)(ii) shall not apply to **Loss** arising from a **Claim** made against an **Outside Entity Executive.**

© All rights reserved.

c) *Outside Entity Executive Liability*: This policy shall pay the **Loss** of any **Outside Entity Executive** arising from a **Claim** first made against such **Outside Entity Executive** during the **Policy Period** (or **Discovery Period**, if applicable) for any **Wrongful Act** of such **Outside Entity Executive**, but only excess of: (i) any indemnification actually paid by the **Outside Entity**; and (ii) any valid and, collectible insurance coverage afforded to the **Outside Entity Executives** applicable to such **Claim**, except when and to the extent that an **Organization** has indemnified such **Outside Entity Executive**.

d) *Crisisfund Insurance:* This policy shall pay the **Crisis Management Loss** of an **Organization** solely with respect to a **Crisis Management Event** occurring during the **Policy Period** or **the Discovery Period** (if applicable) and reported to the Insurer pursuant to the terms of this policy, up to the amount of the **Crisis Management Fund**; *provided, however*, that payment of any **Crisis Management Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law. This coverage (d) shall apply regardless of whether a **Claim** is ever made against an Insured arising from such **Crisis Management Event** and, in the case where a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the **Claim** being first made.

e) *Cyber Extortion Insuring Agreement*: This policy shall pay **Cyber Extortion Loss**, in excess of the applicable retention, that an **Organization** incurs solely as a result of a **Security Threat** that first occurred during the **Policy Period**.

f) *Event Management Insuring Agreement*: This policy shall pay **Event-Related Loss**, in excess of the applicable retention, that an **Organization** incurs solely as a result of a **Security Failure** or **Privacy Event** that has actually occurred or is reasonably believed by such **Organization** and the **Insurer** to have occurred during the **Policy Period**.

g) *Voluntary Compliance Loss Coverage*: This policy shall pay any **Voluntary Compliance Loss** first ascertained by or assessed against an **Insured**, subject to the aggregate sublimit of liability set forth in Clause 3. Limit of Liability of the General Terms and Conditions of this policy. The payment of any **Voluntary Compliance Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that circumstances giving rise to such **Voluntary Compliance Loss** result in a **Claim**.

© All rights reserved

h)    *E-Discovery Consultant Services Coverage:* The **Insurer** shall pay on an **Organization's** behalf, the **E-Discovery Loss** of such **Organization** arising from a **Claim** made against any **Insured** for a covered **Loss**, for which **E-Discovery** is required or becomes necessary. An **Organization** may select a pre-approved **E-Consultant Firm** to perform **E-Discovery Consultant Services** without further approval by the **Insurer** at such time that it becomes necessary for such **Organization** or an **Insured Person** thereof to respond to a discovery request. Coverage for **E-Discovery Loss**, up to the **E-Discovery Sub-Limit of Liability**, shall not be subject to any Retention amount Payment of any **E-Discovery Loss** shall not waive any rights of the **Insurer** under this policy or at law.

## 2.1    EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

a)    arising out of, based upon or attributable to the gaining any material personal profit or financial advantage by such **Insured** to which a final, non-appealable adjudication in any underlying action or proceeding other than an action or proceeding initiated to determine coverage under the policy establishes such **Insured** was not legally entitled; *provided, however,* that this exclusion shall not apply to **Loss** attributable to any actual or alleged violation of Section 11, 12 or 15 of the Securities Act of 1933.

b)    arising out of, based upon or attributable to payments to such **Insured** of any remuneration by any **Organization** or **Outside Entity** without the previous approval of such **Organization's** or **Outside Entity'** s security holders or members, if a final, non-appealable adjudication in any underlying action or proceeding other than an action or proceeding initiated to determine coverage under the policy establishes such payments to such **Insured**, without such previous approval, to be illegal; *provided, however,* that this exclusion shall not apply to **Loss** attributable to any actual or alleged violation of Section 11, 12 or 15 of the Securities Act of 1933. This exclusion shall also not apply to **Employment Practices Claims**.

© All rights reserved.

c)   arising out of, based upon or attributable to  the committing by such **Insured** of any deliberate criminal  or deliberate fraudulent act, or any willful violation of **Employee Benefit Law**, if any final, non-appealable adjudication in any underlying action or proceeding other than an action or proceeding initiated to determine coverage under the policy establishes that such deliberate criminal, deliberate fraudulent or willful violation of statute, rule or law was committed; *provided, however*, for acts or omissions which are treated as a criminal violation in a **Foreign Jurisdiction** that are not treated as a criminal violation in the United States of America, the imposition of a criminal sanction in such **Foreign Jurisdiction** will not, by itself, be conclusive proof that a deliberate criminal or deliberate fraudulent act occurred.

d)   alleging, arising out of, based upon or attributable to the facts alleged, or to the same or **Related Wrongful Acts** alleged or contained, in any **Claim**, or circumstances, of which notice has been given and accepted for coverage, under any Directors & Officers, Professional Services, Employment Practices, Fiduciary, Media Content, or Security/Privacy policy of which this policy is a direct or indirect renewal or replacement

e)   alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (i) litigation against an **Insured**; or (ii) administrative or regulatory proceeding or investigation against an **Insured** of which an **Insured** had notice, or alleging any **Wrongful Act** which is the same or **Related Wrongful Act(s)** to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation.

f)   for violation(s) of any of the responsibilities, obligations or duties imposed by the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; *provided, however*, this exclusion shall not apply to the extent that a **Claim** is for **Retaliation** or to the extent it is an **Investment Advisory Services Claim**.

g)   alleging, arising out of, based upon or attributable to any of the following:

© All rights reserved

    i. the refusal, failure or inability of any **Insured**(s) to pay wages or overtime pay (or amounts representing such wages or overtime pay) for services rendered or time spent in connection with work related activities (as opposed to tort-based back pay or front pay damages for torts other than conversion);

    ii. improper deductions from pay taken by any **Insured**(s) from any **Employee**(s) or purported **Employee**(s); or

    iii. failure to provide or enforce legally required meal or rest break periods;

*provided, however*, this exclusion shall not apply to the extent that a **Claim** is: for **Retaliation**;

h)   alleging, arising out of, based upon or attributable to bodily injury, sickness, disease, death or emotional distress of any person, or damage to, loss of use of or destruction of any tangible property; *provided, however*:

    iv. this exclusion shall not apply to (i) **Defense Costs** incurred in the defense of a **Fiduciary Liability Claim**; (ii) mental anguish and emotional distress alleged in any **Employment Practices Claim**; (iii) any **Financial Claim**; or and

    v. with respect to any **Media Claim** or **Security/Privacy Claim**, "tangible property" shall not include electronic data and "emotional distress" shall only be excluded if arising out of bodily injury, sickness or disease.

h)   Alleging, arising out of, based upon or attributable to medical malpractice including, but not limited to, the rendering of or failure to render medical professional services, treatment or advise

i)   which is brought by or on behalf of any **Insured**, whether directly or derivatively; *provided, however*, that this exclusion shall not apply to:

    i. any **Claim** brought by or on behalf of an **Insured Person** where such **Claim** is in the form of a cross-claim or third-party claim for contribution or indemnity;

© All rights reserved.

ii. any **Claim**, if such **Claim** is instigated and continued independent of, and without the solicitation of, or voluntary assistance of, or voluntary participation of, or intervention of any **Executive**;

iii. any **Claim** brought by or on behalf of any examiner, trustee, creditors' committee (whether on behalf of the estate, a bankruptcy trustee, or derivatively on behalf of the debtor in possession), receiver, liquidator, conservator, administrator or rehabilitator (or any assignee thereof) of any **Organization**;

iv. any **Claim** brought by any past **Executive** of an **Organization** who has not served as a duly elected or appointed director, officer, trustee, managing director or regent to an **Organization**, for at least two (2) years prior to such **Claim** being first made against any person;

v. any **Claim** brought by an **Executive** of an **Organization** formed and operating in a **Foreign Jurisdiction** against such **Organization** or any other **Executive** thereof, provided that such **Claim** is brought and maintained outside the United States, Canada and any other common law country (including any territories thereof);

vi. an **Employment Practices Claim**;

vii. any **Employee** or **Executive**, but only to the extent such **Employee** or **Executive** is alleging a **Privacy Event** or a failure to disclose a **Security Failure** or **Privacy Event** in violation of a **Security Breach Law**;

viii. any **Claim** brought or maintained by or on behalf an **Executive** of an **Organization** where such **Executive** is or was compelled by statute, rule, regulation or court order to bring such **Claim**, whether or not falling within protected "whistleblower" activity;

ix. any **Fiduciary Liability Claim**;

© All rights reserved

x. to any **Claim** by an **Insured** while engaging or who has engaged in any protected activity specified in 18 U.S.C. 1514A(a), "whistleblower" protection pursuant to the Sarbanes-Oxley Act of 2002, Section 21F of the Securities Exchange Act of 1934 (15 U.S.C. 78), the False Claims Act (31 U.S.C. § 3729-3733), the Dodd-Frank Wall Street Reform and Consumer Protection Act, or any protected activity specified in any other "whistleblower" protection provision of an applicable federal, state, local or foreign law;

xi. to any **Claim** brought against an **Independent Director** or against an **Investment Fund** so long as at least one **Independent Director** remains a co-defendant in such **Claim**;

xii. to any **Claim** brought by an **Investment Fund** where failure to bring or maintain such **Claim** would be a breach of fiduciary duty owed by any **Insured** to such **Investment Fund** or investors in such **Investment Fund**.

j) for any **Wrongful Act** arising out of an **Insured Person** serving in a capacity as an **Outside Entity Executive** of an **Outside Entity** if such **Claim** is brought by the **Outside Entity**; *provided, however,* this exclusion (k) shall not apply:

i. to the extent such **Claim** is instigated and continued independent of, and without the solicitation of, or voluntary assistance of, or voluntary participation of, or intervention of any **Executive** of an **Organization**;

ii. any **Claim** brought by or on behalf of any examiner, trustee, creditors' committee (whether on behalf of the estate, a bankruptcy trustee, or derivatively on behalf of the debtor in possession), receiver, liquidator, conservator, administrator or rehabilitator (or any assignee thereof) of such **Outside Entity**;

k) for the **Insured's** performance of services as a broker or placement agent, including but not limited to the performance of services as a broker-dealer, a real estate agent or a real estate broker for a fee *provided, however* this exclusion shall not apply to any **Financial Claim**.

© All rights reserved.

l)      for: (i) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (ii) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; *provided, however,* that this exclusion shall not apply to (i) **Non-Indemnifiable Loss**, other than **Non-Indemnifiable Loss** constituting **Cleanup Costs**; (ii) any **Financial Claim**; or (iii) any **Employment Practices Claim.**

m)      arising out of, based upon or attributable to any actual or alleged contractual liability of an **Organization** under any express contract or agreement, including any liability for liquidated damages, setoffs or amounts assumed in the form of a hold harmless or indemnity agreement; *provided, however,* that this exclusion does not apply to any:

     i.    liability which would have attached in the absence of such contract or agreement;

     ii.    obligation to prevent a **Security Failure** or a **Privacy Event** or, with respect to a **Privacy Event**, the liability or obligation under a confidentiality or non-disclosure agreement;

     **iii. Employment Practices Claim;**

     iv. the performance of, or failure to perform, **Investment Advisory Services** or

     **v. Non-Indemnifiable Loss** of an **Insured Person**.

n)      alleging, arising out of, based upon or attributable to any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; *provided, however,* this exclusion shall only apply to **Employment Practices Claims**; *provided, further,* that this exclusion shall not apply to the extent that a **Claim** is for **Retaliation.**

o)      for the rendering or failing to render any professional service other than a **Professional Service**.

p)      alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**, including but not limited to:

© All rights reserved

i.  **Nuclear Material** located at any **Nuclear Facility** owned by, or operated by or on behalf of, the **Organization** or an affiliate of the **Organization**, or discharged or dispersed therefrom; or

ii. **Nuclear Material** contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the **Organization** or an affiliate of the **Organization**; or

iii. the furnishing by an **Insured** or the **Organization** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **Nuclear Facility**; or

iv. **Claims** for damage or other injury to the **Organization** or its shareholders which allege, arise from, are based upon, are attributed to or in any way involve, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**; or

v.  which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its limit of liability; or

vi. with respect to which: (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

*Provided, however*, that this exclusion will not apply **Non-Indemnifiable Loss**

As used in this exclusion:

© All rights reserved.

" **Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants, Hazardous Properties** and **Waste.**

" **Hazardous Properties**" include radioactive, toxic or explosive properties.

" **Nuclear facility**" means:

(i)      any nuclear reactor;

(ii)     any equipment or device designed or used for

     (a)      separating the isotopes of uranium or plutonium,

     (b)      processing or utilizing spent fuel, or

     (c)      handling, processing or packaging wastes;

(iii)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; and

(iv)     any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

" **Nuclear Material**" means source material, special nuclear material or byproduct material.

" **Nuclear Reactor**" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

© All rights reserved

" **Source Material**," " **Special Nuclear Material**," and " **Byproduct Material**" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

" **Spent Fuel**" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

" **Waste**" means any waste material (i) containing by product material, and (ii) resulting from the operation by any person or organization of any **Nuclear Facility** included within the definition of nuclear facility under paragraph (i) or (ii) thereof.

q)   alleging, arising out of, based upon or attributable to the ownership, management, maintenance, operation and/or control by the **Organization** or any **Outside Entity** of any captive insurance company, including but not limited to any **Claim** alleging the insolvency or bankruptcy of an **Organization** or any **Outside Entity** as a result of the ownership, operation, management and control of any captive insurance company.

For the purposes of this exclusion, "captive insurance company" shall not include: (i) Controlled Risk Insurance Co. of Vermont, Inc.; or (ii) Controlled Risk Insurance Co., Ltd. (Caymen Islands).

r)   alleging, arising out of, based upon or attributable to any employee stock ownership plan as defined in ERISA, or any other **Plan** under which investments are made primarily in securities of an **Organization.**

For the purpose of determining the applicability of the foregoing Exclusions, other than Exclusions (d), 9e), (k) and (l) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Insured Person**.

## 2.2   EXCLUSIONS APPLICABLE TO Fiduciary Liability ClaimS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Fiduciary Liability Claim** made against an **Insured:**

a)   alleging, arising out of, based upon or attributable to any **Wrongful Act** as respects the **Plan** taking place at any time when the **Organization** did not sponsor such **Plan**.

© All rights reserved.

**2.3    EXCLUSIONS APPLICABLE TO Professional Services ClaimS, Media ClaimS or Security/Privacy ClaimS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Professional Services Claim** (other than an **Investment Advisory Services Claim**), **Media Claim** or **Security/Privacy Claim** made against an **Insured**:

a)    alleging, arising out of, based upon or attributable to any infringement of patent or misappropriation of trade secrets; *provided, however*, this exclusion shall not apply to: an otherwise covered **Privacy Event** alleging misappropriation of trade secrets.

b)    alleging, arising out of, based upon or attributable to any:

   i. fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God or any other physical event, however caused;

   strikes or similar labor action, war, invasion, act of foreign enemy, hostilities or warlike operations (whether declared or not), civil war, mutiny, civil commotion assuming the proportions of or amounting to a popular rising, military rising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against these actions;

   ii. electrical or mechanical failures of infrastructure not under the control of an **Insured**, including any electrical power interruption, surge, brownout or blackout; *provided, however*, this Sub-paragraph (iii) shall not apply to a **Security Failure** or a **Privacy Event** that is caused by such electrical or mechanical failure;

   iii. failure of telephone lines, data transmission lines or other telecommunications or networking infrastructure not under the control of an **Insured**; *provided, however*, this Sub-paragraph (iv) shall not apply to a **Security Failure** or a **Privacy Event** that is caused by such failure of telephone lines, data transmission lines or other infrastructure comprising or supporting the Internet; or

© All rights reserved

iv. satellite failure.

c)   alleging, arising out of, based upon or attributable to any:

      i.   violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced And Corrupt Organizations Act, or "RICO"), as amended, or any regulation promulgated thereunder or any federal, state or local law similar to the foregoing, whether such law is statutory, regulatory or common law; or

      ii.   violation of the Telephone Consumer Protection Act of 1991, as amended.

d)   alleging, arising out of, based upon or attributable to any unfair or deceptive business practices, including, without limitation, violations of any local, state or federal consumer protection laws; *provided, however*, this exclusion shall not apply to: (i) **Claims** in connection with the providing of **Educational Services** or the collection of **Material**;

d)   brought by or on behalf of any business entity not an **Insured** that is controlled, managed or operated, directly or indirectly, by an **Insured Person**

e)   commenced as a criminal proceeding, whether initiated by the return of an indictment, filing of information or otherwise.

f)   alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring prior to the **Continuity Date** or any **Related Wrongful Act** thereto, regardless of when such **Related Wrongful Act** occurs.

for (1) the theft of money or securities from an **Insured**; or (2) the

transfer or loss of money or securities from or to an **Insured's** accounts or accounts under an **Insured's** control, including customer accounts, For purposes of this Sub-paragraph (e), the term "accounts" shall include, but are not limited to, deposit, credit, debit, prepaid and securities brokerage accounts.

© All rights reserved.

alleging, arising out of, based upon or attributable to any **Insured**'s rendering of or failure to render services as an architect or engineer.

g)     alleging, arising out of, based upon or attributable to any **Insured Person** notarizing, certifying or acknowledging any signature not signed in the presences of such **Insured Person** at the time of such notarization, certification or acknowledgment.

## 2.4    EXCLUSIONS APPLICABLE TO Media ClaimS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Media Claim** made against an **Insured**:

a)     alleging, arising out of, based upon or attributable to (1) false advertising or misrepresentation in advertising of an **Insured's** products or services, (2) any failure of goods, products or services to conform with an advertised quality or performance, or (3) any infringement of trademark or trade dress by any goods, products or services displayed or contained in any **Material**.

b)     brought by or on behalf of: (i) ASCAP, SESAC, BMI, RIAA or other music licensing organizations; (ii) the Federal Trade Commission; (iii) the Department of Health and Human Services or Office of Civil Rights; (iv) the Federal Communications Commission; or (v) any other federal, state, local or foreign government, agency or office; *provided, however*, solely with respect to unfair competition, and notwithstanding this Paragraph shall not apply to any **Defense Costs** arising out of a covered **Regulatory Action**.

c)     brought by or on behalf of any independent contractor, third-party distributor, licensee, sub-licensee, joint venturer, venture partner, any employee of the foregoing, or any **Employee** or agent of an **Insured** alleging, arising out of, based upon or attributable to disputes over the (i) ownership or exercise of rights in **Material**; or (ii) services supplied by such independent contractor, third-party distributor, licensee, sub-licensee, joint venturer, venture partner or employee or agent

© All rights reserved.

alleging, arising out of, based upon or attributable to any:

    i.   accounting or recovery of profits, royalties, fees or other monies claimed to be due from an **Insured**, or any **Claim** brought by any such party against an **Insured** claiming excessive or unwarranted fees, compensation or charges of any kind made by an **Insured**; or

    ii.   licensing fees or royalties ordered, directed or agreed to be paid by an **Insured** pursuant to a judgment, arbitration award, settlement agreement or similar order or agreement, for the continued use of a person or entity's copyright, title, slogan, trademark, trade name, trade dress, service mark, service name, or other intellectual property right.

## 2.5   EXCLUSIONS APPLICABLE TO Investment Advisory Services ClaimS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Investment Advisory Services Claim** made against an **Insured**:

    a)   arising out of the actual or alleged rendering or failing to render advice or other services to customers or clients (other than an **Outside Entity** or an **Organization**) of any **Insured** in connection with any merger, acquisition, restructuring or divestiture; *provided, however*, this exclusion shall not apply to coverage for an **Insured's** activities of managing investment portfolios or investment assets, or giving of financial advice or investment management services relating to or in connection with mergers, acquisitions, restructurings, divestitures or other purchase or sale transactions, as long as such **Insured** is not providing such services to or on behalf of any entity involved in such merger, acquisition, restructuring, divestiture or other purchase or sale transactions for a fee specific to such transaction;

    b)   alleging, arising out of, based upon or attributable to any **Insured's** activities as an underwriter, broker or dealer as those terms are defined respectively in Section 2(11) of the Securities Act of 1933 (as amended) and Sections 3(a) 4 and 3(a)5 of the Securities Act of 1934 (as amended); *provided, however*, this exclusion shall not apply to coverage for any **Insured's** activities syndicating shares, debt or other interests in any **Outside Entity**.

© All rights reserved.

3.    **NOTICE**

Notice hereunder shall be given in writing to the addressee by email at the following email address: c-claim@aig.com or by postal mail at the address identified in Item 6(b) of the Declarations. Notice shall include and reference this policy number as indicated in the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. If emailed, such email must reference the policy number for this policy. If emailed, the date of emailing shall constitute the date of notice and proof of emailing shall be sufficient proof of notice.

a)  The **Insureds** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of any **Claim** made against an **Insured**, a **Crisis Management Event** or **Privacy Event** or **Security Failure** or **Security Threat** as soon as practicable after: (i) the **Named Entity's** Risk Manager or General Counsel (or equivalent position) first receives notice of the **Claim**; (ii) the **Crisis Management Event** commences, or (iii) solely for the purposes of the Event Management Insuring Agreement and Cyber Extortion Insuring Agreement, the **Privacy Event, Security Failure** or **Security Threat** commences.

Notwithstanding the foregoing, the **Insured** shall not be required to give written notice of a **Claim** until the earliest occurrence of the following:

(i)    the **Claim** is or is sought to be certified as a class action; or

(ii) total **Loss** (including **Defense Costs**) of the **Claim** is reasonably estimated by the **Organization's** General Counsel or Risk Manager (or equivalent position) to exceed 50% of the applicable retention amount for such **Claim;**

*provided, however,* that in all events, all **Claims**, including **Claims** described in (i) - (ii) above, must be reported to the **Insurer** no later than ninety (90) days after the end of the **Policy Period** or the **Discovery Period** (if applicable).

Notwithstanding the foregoing, the **Named Entity** may provide to the **Insurer** on a semi-annual basis (commencing on the effective date of the policy) a bordereau of **Claims** (other than **Claims** described in (i) through (iii) above), first made against the **Insureds** during the **Policy Period**. Such **Claims** shall be subject to all of the terms and conditions of this policy, including, but not limited to, this Clause 3. The bordereau shall include:

© All rights reserved.

    (i)   the date of the **Claim;**

    (ii)  the date of the acts alleged to have given rise to the **Claim;**

    (iii) the name of the parties and the forum of the **Claim;**

    (iv) the name of the counsel selected to defend the **Claim;**

    (v)  the amount of **Defense Costs** incurred in the defense of the **Claim;**

    (vi) a brief description of the allegations contained in the **Claims;**

    (vii) the current status of the **Claim;** and

    (viii) details of any offer of settlement.

b) If written notice of a **Claim** has been given to the **Insurer** pursuant to Clause 3(a) above, then any subsequent **Claim** made against an **Insured** alleging, arising out of, based upon or attributable to the facts giving rise to such **Claim** for which such notice has been given, or alleging any **Wrongful Act** which is the same as or is a **Related Wrongful Act** thereto, shall be considered made at the time such notice was given.

c) If during the **Policy Period** or during the **Discovery Period** (if applicable) the **Insureds** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against the **Insureds** and the **Insureds** give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then any **Claim** which is subsequently made against the **Insureds** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or is a **Related Wrongful Act** to that alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given. This paragraph does not apply to the **Event Management Insuring Agreement.**

d) Solely with respect to the **Event Management Insuring Agreement**, before coverage will apply for any **Event-Related Loss**, an **Organization** must:

    (i)        complete and sign a written, detailed and affirmed proof of loss within 90 days after the discovery of any **Event-Related Loss** (unless such period has been extended by the **Insurer** in writing) which shall include, among any other pertinent information:

MNSCPT

© All rights reserved.

(A)     a full description of such **Event-Related Loss** and the circumstances surrounding such **Event-Related Loss**, which shall include, among any other necessary information, the time, place and cause of the **Event-Related Loss**;

(B)     a detailed calculation of any **Event-Related Loss**; and

(C)     all underlying documents and materials that reasonably relate to or form any part of the proof of such **Event-Related Loss**.

(ii)     upon the **Insurer's** request, submit to an examination under oath.

(iii)     immediately record the specifics of any **Event-Related Loss, Security Failure** or **Privacy Event** and the date such **Insured** first became aware of such **Event-Related Loss, Security Failure** or **Privacy Event**.

(iv)     provide the **Insurer** with any cooperation and assistance that the **Insurer** may request, including assisting the **Insurer** in:

(A)     any investigation of a **Security Failure, Privacy Event, Event-Related Loss** or circumstance;

(B)     enforcing any legal rights an **Insured** or the **Insurer** may have against anyone who may be liable to an **Insured**; and

(C)     executing any documents that the **Insurer** deems necessary to secure its rights under this policy.

If written notice of a **Privacy Event** or **Security Failure** has been given to the **Insurer** pursuant to this Clause, then any subsequent **Privacy Event** or **Security Failure** alleging, arising out of, based upon or attributable to the facts giving rise to such **Claim** or **Privacy Event** or **Security Failure** for which such notice has been given, shall be considered made at the time such notice was given.

**4.**    **RETENTION**

For each **Claim, Security Failure, Privacy Event** or **Security Threat**, the **Insurer** shall only be liable for the amount of **Loss** arising from such **Claim, Security Failure** or **Privacy Event** which is in excess of the retention amount stated in Item 5 of the Declarations, such Retention amount to be borne by the **Organization** and/or the **Insureds** ( *provided, however*, that the insurer shall recognize payment by another insurer on behalf of the Insureds, including without limitation personal liability/personal umbrella excess or non-indemnifiable difference in conditions insurance, to erode the retention), with regard to all: (i) **Indemnifiable Loss**; and (ii) **Loss** of the **Organization**. A single retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Related Wrongful Act(s)**.

© All rights reserved.

It is further understood and agreed that in the event the **Organization** fails or refuses to advance, pay or indemnify covered **Loss** of an **Insured Person** within the applicable Retention, if any, then the **Insurer** shall advance such amounts on behalf of the **Insured Person** until either (i) an **Organization** has agreed to make such payments, or (ii) the Retention has been satisfied; *provided, however*, that the **Insurer** shall be entitled to recover the amount of **Loss** advanced within the Retention from the **Organization** pursuant to Clause 7 SUBROGATION of the **General Terms and Conditions**. In no event shall any such advancement by the **Insurer** relieve any **Organization** of any duty it may have to provide advancement, payment or indemnification to any **Insured Person**. A single retention amount shall apply to **Loss** arising from **Claims** alleging **Related Wrongful Acts**.

Advancement, payment or indemnification of an **Insured Person** by an **Organization** is deemed "failed" if it has been requested by an **Insured Person** in writing and has not been provided by, agreed to be provided by or acknowledged as an obligation by an **Organization** within 60 days of such request; and advancement, payment or indemnification by an **Organization** is deemed "refused" if an **Organization** gives a written notice of the refusal to the **Insured Person**. Advancement, payment or indemnification of an **Insured Person** by an **Organization** shall only be deemed "failed" or "refused" to the extent such advancement, payment or indemnification is not provided, or agreed to be provided, or acknowledged by and collectible from an **Organization**. Any payment or advancement by the **Insurer** within an applicable Retention shall apply towards the exhaustion of the **Limits of Liability**.

No retention amount is applicable to: (i) **Crisis Management Loss**; (ii) **Non-Indemnifiable Loss**; (iii) **Voluntary Compliance Loss**; **(iv)** **Loss** from a **Claim** alleging a violation of any **Specified Regulatory Legislation**; (v) **HIPAA Penalties**; (vi) the initial $25,000 of **E-Discovery Loss** incurred in connection with a **Claim**.

## 5. DEFENSE PROVISIONS; DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)

The **Insurer does** not assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them. Regardless, the **Insurer** shall advance **Defense Costs** of such **Claim**, excess of the applicable retention amount, no later than 90 days after the receipt by the **Insurer** of itemized bills for such **Defense Costs** in excess of the applicable retention. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by **Insured** or **Organization**, severally according to their respective interests, in the event and to the extent that such **Insured** or **Organization** shall not be entitled under the terms and conditions of this policy to payment of such **Loss**.

Selection of counsel to defend **Claim** shall be made in accordance with Clause 7 of this **Coverage Part A**.

© All rights reserved.

The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** where any such amount(s) exceed 50% of the applicable Retention Amount without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to by the **Insurer**, in writing, shall be recoverable as **Loss** under the terms of this policy. The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer**, when it has not assumed the defense of a **Claim** pursuant to this Clause 56., shall be entitled to fully and effectively associate in the defense and negotiation of any settlement of any **Claim**, and provided further that in all events the **Insurer** may withhold consent to any settlement, stipulated judgment or **Defense Costs**, or any portion thereof, to the extent such **Loss** is not covered under the terms of this policy.

The **Insurer** shall have the right to effectively associate with the **Organization** in the defense of any **Claim** that appears reasonably likely to involve the **Insurer**, including, but not limited to, participating in negotiating a settlement. The **Organization** and the **Insureds** shall give the **Insurer** such cooperation and information as the **Insurer** may reasonably require.

This Clause 5 shall not be applicable to **Crisis Management Loss**.

## 6. ALLOCATION OF DEFENSE COSTS

If a **Claim** made against an **Insured** includes both covered and uncovered matters or if a **Claim** is made against an **Insured** and others who are not **Insureds**, the **Insureds** and the **Insurer** agree to exert their best efforts to agree upon a fair and proper allocation between insured **Loss** and uninsured loss.

## 7. PRE-AUTHORIZED DEFENSE ATTORNEYS PANEL COUNSEL CLAIMS

This **Clause 7** applies to any **Panel Counsel Claim**.

**Affixed** as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms (" **Panel Counsel Firms**") from which a selection of legal counsel shall be made to conduct the defense of any **Panel Counsel Claim** against an **Insured** pursuant to the terms set forth in this Clause.

The **selection** of the **Panel Counsel Firm** shall be from either: (1) the list of **Panel Counsel Firms** designated for the type of **Panel Counsel Claim** and be from the jurisdiction in which the **Panel Counsel Claim** is brought; or (2) the list of pre-approved counsel on any endorsement to this Policy.

In the event **Insureds** elect to choose from **Panel Counsel Firms** and a **Panel Counsel Claim** is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the **Panel Counsel Claim** is maintained or where the corporate headquarters or state of formation of the **Named Entity** is located.

MNSCPT                              62

© All rights reserved.

In such instance, however, the **Insurer** shall, at the written request of the **Named Entity**, assign a non-Panel Counsel Firm of the **Insurer's** choice in the jurisdiction in which the **Panel Counsel Claim** is brought to function as "local counsel" on the **Panel Counsel Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Panel Counsel Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select (in the case of the **Insured** defending the **Panel Counsel Claim**), or cause the **Insurer** to select (in the case of the **Insurer** defending the **Panel Counsel Claim**), a **Panel Counsel Firm** different from that selected by other **Insured** defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

As used in this Clause 7, the term " **Panel Counsel Claim** " means:

(1) any **Claim** under the **D&O Coverage Section**, **Media Content Coverage Section**, **Security And Privacy Coverage Section** or **SPL Coverage Section**;

(2) any **Employment Practices Claim**: (i) alleging discrimination or **Retaliation**; or (ii) that is certified as, or which is seeking certification as, a class action; and

(3) any **Fiduciary Liability Claim**: (i) brought by a government entity; (ii) which includes a request by the Insured for coverage of a **Voluntary Compliance Loss**; or (iii) that is certified as, or which is seeking certification as, a class action.

## 8.   EPL SETTLEMENT CLAUSE

The following paragraph applies only to **Employment Practices Claims**.

In the event the **Insureds** do not consent to the first **Insurer** recommended settlement that is within the **Limit of Liability** and that is acceptable to the claimant (" **Settlement Opportunity** ") within thirty (30) days of the date the **Insureds** are first made aware of the **Settlement Opportunity** (or in the case of a **Settlement Opportunity** which arises from a settlement offer by the claiming, then within the time permitted by the claiming to accept such offer, but in all event no later than thirty (30) days after the settlement offer was made), then, subject to the **Limit of Liability**, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed:

© All rights reserved.

(1) the amount for which the **Insurer** cold have settled such **Claim** plus **Defense Costs** incurred as of the date such settlement was proposed in writing by the **Insurer** (" **Settlement Opportunity Amount**"), plus (2) eighty percent (80%) of covered **Loss** in excess of such **Settlement Opportunity Amount**, it being a condition of this insurance that the remaining twenty percent (20%) of such **Loss** excess of the **Settlement Opportunity Amount** shall be carried by the **Organization** and the **Insureds** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the **Settlement Opportunity Amount** exceeds the applicable retention amount stated in Item 5 of the Declarations.

**EDUCATIONAL INSTITUTION RISK PROTECTOR**

**PRESIDENT AND FELLOWS OF HARVARD COLLEGE MANUSCRIPT**

**Liability and Occurrence-Related Insurance Policy**

**Coverage Part B:  Commercial Crime Coverage Part**

**Note**: The provisions of the General Terms and Conditions do not apply to this Crime Coverage Part.

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including its attachments and the material incorporated therein, solely with respect to this **Crime Coverage Part**, the **Insurer** agrees as follows:

1. *INSURING AGREEMENTS*

   Coverage is provided under the following Insuring Agreements applies to loss that the **Insured** sustains resulting directly from an **Occurrence** taking place during the Policy Period shown in the Declarations, except as provided in Condition 6(a)(xv) or 6(a)(xvi), which is **Discovered** by the **Insured** during the Policy Period shown in the Declarations or during the period of time provided in Condition 6(a)(x):

   *A. EMPLOYEE THEFT*

   The **Insurer** will pay for loss of or damage to **Money, Securities** and **Other Property** resulting directly from **Theft** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

   **B.    FORGERY OR ALTERATION**

   (1) The **Insurer** will pay for loss resulting directly from **Forgery** or alteration of checks, drafts, promissory notes, or similar written promises, orders to pay a sum certain in **Money** that are:

© All rights reserved.

    (A)      made or drawn by or drawn upon the **Insured**;

    (B)      made or drawn by one acting as the **Insured's** agent; or

        (C)      that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original it replaced.

(2) If the **Insured** is sued for refusing to pay any instrument covered in Insuring Agreement 1.B.(1) above, on the basis that it has been forged or altered, and the **Insured** has the **Insurer's** written consent to defend against the suit, the **Insurer** will pay for any reasonable legal expenses that the **Insured** incurs and pays in that defense. The amount that the **Insurer** will pay is in addition to the Limit of Liability applicable to this Insuring Agreement.

## C.    INSIDE THE PREMISES - THEFT OF MONEY AND SECURITIES

(1) The **Insurer** will pay for loss of **Money** or **Securities** inside the **Premises** or **Banking Premises**:

    (A)      resulting directly from **Theft** committed by a person present inside such **Premises** or **Banking Premises**; or

    (B)      resulting directly from disappearance or destruction.

(2) The **Insurer** will pay for loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Theft** of **Money** and **Securities**, if the **Insured** is the owner of the **Premises** or is liable for damage to it.

(3) The **Insurer** will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft** of or unlawful entry into those containers.

## D. INSIDE THE PREMISES - ROBBERY OR SAFE BURGLARY OF OTHER PROPERTY

(1) The **Insurer** will pay for loss of or damage to **Other Property**:

    (A)      inside the **Premises** resulting directly from an actual or attempted **Robbery** of a **Custodian**; or

    (B)      inside the **Premises** in a safe or vault resulting directly from an actual or attempted **Safe Burglary**.

(2) The **Insurer** will pay for loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Robbery** or **Safe Burglary** of **Other Property**, if the **Insured** is the owner of the **Premises** or is liable for damage to it.

© All rights reserved.

(3)   The **Insurer** will pay for loss of or damage to a locked safe or vault located inside the **Premises** resulting directly from an actual or attempted **Robbery** or **Safe Burglary**.

### E.   OUTSIDE THE PREMISES

(1)   The **Insurer** will pay for loss of **Money** and **Securities** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from **Theft**, disappearance or destruction.

(2)   The **Insurer** will pay for loss of or damage to **Other Property** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from an actual or attempted **Robbery**.

### F.   COMPUTER FRAUD

The **Insurer** will pay for loss of or damage to **Money, Securities** or **Other Property** resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**:

(1) to a person (other than a **Messenger**) outside those **Premises**; or

(2) to a place outside those **Premises**.

### G.   FUNDS TRANSFER FRAUD

The **Insurer** will pay for loss of **Funds** resulting directly from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Funds** from the **Insured's Transfer Account**.

### H.   MONEY ORDERS AND COUNTERFEIT PAPER CURRENCY

The **Insurer** will pay for loss resulting directly from the **Insured's** having accepted in good faith, in exchange for merchandise, **Money** or services:

(1) money orders issued by any post office, express company or bank that are not paid upon presentation; or

(2) **Counterfeit Money** of any country that is acquired during the regular course of business.

## 2.  DEFINITIONS

a)   " **Banking Premises** " means the interior of that portion of any building occupied by a banking institution or similar safe depository.

b)   " **Counterfeit Money** " means an imitation of **Money** that is intended to deceive and to be taken as genuine.

© All rights reserved.

c) " **Custodian** " means the **Insured**, or any of the **Insured's** partners or **Members**, or any **Employee** while having care and custody of property inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor.

d) " **Discover**", " **Discovered**" or " **Discovery**" means the time when the **Insured** first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this **Crime Coverage Part** has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

" **Discover**", " **Discovered**" or " **Discovery**" also means the time when the **Insured** first receives notice of an actual or potential **Claim** in which it is alleged that the **Insured** is liable to a third party under circumstances which, if true, would constitute a loss under this **Crime Coverage Part**.

e) " **Employee** " means:

(i)     any natural person:

(A)     while in the **Insured's** service and for sixty (60) days after termination of service, unless such termination is due to **Theft** or any dishonest act committed by the **Employee**;

(B)     who the **Insured** compensates directly by salary, wages or commissions; and

(C)     who the **Insured** has the right to direct and control while performing services for the **Insured**;

(ii)     any natural person who is furnished temporarily to the **Insured**:

(A)     to substitute for a permanent **Employee**, as defined in subparagraph 2(e)(i) above, who is on leave; or

(B)     to meet seasonal or short-term work load conditions;

while that person is subject to the **Insured's** direction and control and is performing services for the **Insured**, excluding, however, any such person while having care and custody of property outside the **Premises**;

(iii)     any natural person who is leased to the **Insured** under a written agreement between the **Insured** and a labor leasing firm, to perform duties related to the conduct of the **Insured's** business, but does not mean a temporary **Employee** as defined in subparagraph 2(e)(2) above;

(iv)     any natural person who is:

© All rights reserved.

(A)     a trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any **Employee Benefit Plan**; and

(B)     the **Insured's Manager** while that person is handling **Money** and **Securities** or **Other Property** of any **Employee Benefit Plan**.

(v)     any natural person who is a former **Employee**, partner, **Member, Manager**, director, trustee, trustee emeritus or executive director of the **Organization** retained as a consultant while performing services for the **Insured**;

(vi)    any natural person who is a guest student or intern pursuing studies or duties;

(vii)   any **Employee** of an entity merged or consolidated with the **Insured** prior to the effective date of this **Crime Coverage Part**;

(viii)  any of the **Insured's Managers**, directors, trustees, trustee emeritus or executive directors of or non-compensated officers while:

(a)     (A)    performing acts within the scope of the usual duties of an **Employee**; or

(B)     acting as a member of any committee duly elected or appointed by resolution of the **Insured's** board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on the **Insured's** behalf; or

(viii)  any non-compensated natural person other than one who is a fund solicitor, while performing services for the **Insured** that are usual to the duties of an **Employee**.

"**Employee**" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in this Paragraph (e).

f)   "**Employee Benefit Plan**" means any welfare or pension benefit plan that the **Insured** sponsors and that is subject to the Employee Retirement Income Security Act of 1974 ("**ERISA**") and any amendments thereto.

g)   "**Forgery**" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

h)   "**Fraudulent Instruction**" means:

© All rights reserved.

(i) an electronic, computer, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by the **Insured**, but which was, in fact, fraudulently transmitted by someone else without the **Insured's** knowledge or consent;

(ii) a written instruction (other than those described in Insuring Agreement 1.B.) issued by the **Insured**, which was forged or altered by someone other than the **Insured** without the **Insured's** knowledge or consent, or which purports to have been issued by the **Insured**, but was, in fact, fraudulently issued without the **Insured's** knowledge or consent; or

(iii) an electronic, computer, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by the **Insured** which purports to have been transmitted by an **Employee** but which was, in fact, fraudulently transmitted by someone else without the **Insured's** or the **Employee's** knowledge or consent.

i) " **Funds** " means **Money** and/or **Securities** in a **Transfer Account**.

j) " **Insured** " means the **Organization**.

k) " **Manager** " means a person serving in a directorial capacity for a limited liability company.

l) " **Member** " means an owner of a limited liability company represented by its membership interest, who also may serve as a **Manager**.

m) " **Messenger** " means the **Insured**, or a relative of the **Insured**, or any of the **Insured's** partners or **Members**, or any **Employee** while having care and custody of property outside the **Premises**, or any other person duly authorized by the **Insured** to have custody of **Money, Securities or Other Property** outside the premises.

n) " **Money** " means:

(i) currency, coins and bank notes in current use and having a face value; or

(ii) travelers checks, register checks and money orders held for sale to the public.

o) " **Occurrence** " means:

(i) as respects Insuring Agreement 1.A., " **EMPLOYEE THEFT,** " of this **Crime Coverage Part**:

(A) an individual act;

(B) the combined total of all separate acts whether or not related; or

(C) series of acts whether or not related;

© All rights reserved.

committed by the same **Employee** acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi); or

(ii) as respects Insuring Agreement 1.B., "**FORGERY OR ALTERATION**," of this **Crime Coverage Part**:

(A) an individual act;

(B)    the combined total of all separate acts whether or not related; or

(C) a series of acts whether or not related;

committed by the same person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi); or

(iii) as respects all other Insuring Agreements of this **Crime Coverage Part**:

(A) an individual act or event;

(B) the combined total of all separate acts or events whether or not related; or

(C) a series of acts or events whether or not related;

committed by the same person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, except as provided under Condition 6(a)(xv) or 6(a)(xvi).

p)  "**Other Property**" means any tangible property other than **Money** and **Securities** that has intrinsic value.  "**Other Property**" does not include intangible property, including, but not limited to, computer programs, electronic data or any other property excluded under this **Crime Coverage Part**.

q)  "**Pollution**" means the discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, soot, mold, spores, fungi, germs, fumes, acids, alkalis, chemicals and **Waste**.  "**Waste**" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

r)  "**Premises**" means the interior of that portion of any building the **Insured** occupies in conducting the **Insured's** business.

s)  "**Robbery**" means the unlawful taking of property from the care and custody of a person by one who has:

© All rights reserved.

    (i)  caused or threatened to cause that person bodily harm; or

    (ii)  committed an obviously unlawful act witnessed by that person.

t)  **" Safe Burglary "** means the unlawful taking of:

    (i)  property from within a  locked safe or vault  by a person unlawfully  entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

    (ii)  a safe or vault from inside the **Premises.**

u)  **" Securities "** means  negotiable  and  nonnegotiable  instruments  or  contracts representing either **Money** or property and includes:

    (i)  chips issued by the **Insured**, tokens, tickets, revenue and other stamps  (whether represented by actual stamps or unused value in a meter) in current use; and

    (ii) evidences of debt issued  in connection with credit or charge cards, which cards are not issued by the **Insured;**

    but does not include **Money.**

v)  **" Theft "** means the unlawful  taking of  **Money, Securities** or  **Other Property**  to the deprivation of the  **Insured.**  Solely  with respect to  Insuring Agreement 1.A.,  **Theft** shall also mean forgery.

w)  **" Transfer Account "** means  an  account  maintained  by  the  **Insured**  at a  financial institution from which the  **Insured** can initiate  the transfer, payment  or delivery of **Funds:**

    (i)  by means  of electronic,  computer,  telegraphic, cable, teletype,  telefacsimile or telephone  instructions  communicated  directly  through  an  electronic  funds transfer system; or

    (ii) by means  of written  instructions  (other  than  those  described in  Insuring Agreement 1.B.) establishing  the conditions under  which such  transfers are to be initiated  by  such financial  institution  through  an electronic  funds transfer system.

x)  **" Watchperson "** means any person the **Insured** retains specifically  to have care and custody of property inside the **Premises** and who has no other duties.

## 3.  EXCLUSIONS

This **Crime Coverage Part** does not apply to:

All rights reserved.

a) Acts Committed By The **Insured**, The **Insured's** partners Or The **Insured's Members**

**Loss** resulting from **Theft** or any other dishonest act committed by:

(i) the **Insured**; or

(ii) any of the **Insured's** partners or **Members**;

whether acting alone or in collusion with other persons.

b) Acts Of **Employees** Learned Of By The **Insured** Prior To The Policy Period

**Loss** caused by an **Employee** if the **Employee** had also committed **Theft** or any other dishonest act prior to the effective date of this **Crime Coverage Part** and the **Insured** or any of the **Insured's** partners, **Members**, **Managers**, officers, directors, trustees, trustee emeritus or executive directors, not in collusion with the **Employee**, learned of that **Theft** or dishonest act prior to the Policy Period shown in the Declarations.

c) Acts Of **Employees**, **Managers**, Directors, Trustees Or Representatives

**Loss** resulting from **Theft** or any other dishonest act committed by any of the **Insured's Employees**, **Managers**, directors, trustees, trustee emeritus, executive directors or authorized representatives:

(i) whether acting alone or in collusion with other persons; or

(ii) while performing services for the **Insured** or otherwise; except when covered under Insuring Agreement 1.A. of this **Crime Coverage Part**.

d) Confidential Information

**Loss** resulting from:

(i) the unauthorized disclosure of the **Insured's** patents, trade secrets, processing methods or customer lists; or

(ii) the unauthorized use or disclosure of confidential information of another person or entity which is held by the **Insured** including, but not limited to, financial information, personal information, credit card information, identification information or similar non-public information.

e) Governmental Action

**Loss** resulting from seizure or destruction of property by order of governmental authority.

MNSCPT                                    72

© All rights reserved.

f) Indirect Loss

**Loss** that is an indirect result of  an **Occurrence** covered by this **Crime Coverage Part** including, but not limited to, loss resulting from:

(i) the **Insured's** inability to realize income that the **Insured** would  have realized had there been no loss of or damage to **Money, Securities** or **Other Property**;

(ii) payment of damages of any type for which the **Insured** is legally liable; *provided, however*, the **Insurer** will pay compensatory damages arising directly from a loss covered under this **Crime Coverage Part**; or

(iii) payment of costs, fees or other expenses the **Insured** incurs in establishing either the existence or the amount of loss under this **Crime Coverage Part**.

g) Legal Fees, Costs And Expenses

Fees, costs and expenses incurred by the **Insured**  which are related to any legal action, except when covered under Insuring Agreement 1.B.

h) Nuclear Hazard

**Loss** or damage resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

i) Pollution

**Loss** or damage caused by or resulting from **Pollution**.

j) War and Military Action

**Loss** or damage resulting from:

(i) war, including undeclared or civil war;

(ii) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(iii) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

© All rights reserved.

k) Automatic Teller Machines

Loss of **Money** and **Securities** contained in any automatic teller machine ("**ATM**") or while being transported to or from any **ATM**. Such loss is excluded regardless of the cause, event, act, omission or failure which contributes to the loss, including, but not limited to, (i) any dishonesty, theft, disappearance, destruction, forgery, alternation, robbery or computer fraud by any person (whether or not an **Employee**) acting alone or in collusion with other persons, or (ii) any actual or alleged failure, malfunction or inadequacy of the **ATM**.

In all events, coverage under this **Crime Coverage Part** does not apply to the loss of or damage to any **ATM**.

Insuring Agreement 1.A., "EMPLOYEE THEFT," of this **Crime Coverage Part** does not apply to:

a) Inventory Shortages

**Loss**, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(i) an inventory computation; or

(ii) a profit and loss computation.

However, where the **Insured** establishes wholly apart from such computations that the **Insured** has sustained a loss, then the **Insured** may offer the **Insured's** inventory records and actual physical count of inventory in support of the amount of loss claimed.

b) Trading

**Loss** resulting directly or indirectly from trading, whether in the **Insured's** name or in a genuine or fictitious account.

c) Warehouse Receipts

**Loss** resulting from fraudulent or dishonest signing, issuing, canceling or failing to cancel, a warehouse receipt or any papers connected with it.

Insuring Agreements 1.C., "INSIDE THE PREMISES - THEFT OF MONEY AND SECURITIES," 1.D., "INSIDE THE PREMISES - ROBBERY OR SAFE BURGLARY OF OTHER PROPERTY," and 1.E., "OUTSIDE THE PREMISES," of this **Crime Coverage Part** do not apply to:

© All rights reserved.

a) Accounting Or Arithmetical Errors Or Omissions

**Loss** resulting from accounting or arithmetical errors or omissions.

b) Exchanges Or Purchases

**Loss** resulting from the giving or surrendering of property in any exchange or purchase.

c) Fire

**Loss** resulting from fire, however caused, except:

(i) loss from damage to a safe or vault; and

(ii) loss of or damage to **Money** and **Securities**.

d) Money Operated Devices

**Loss** of property contained in any money operated device unless the amount of **Money** deposited in it is recorded by a continuous recording instrument in the device.

e) Motor Vehicles Or Equipment And Accessories

**Loss** of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

f) Transfer Or Surrender Of Property

**Loss** of or damage to property after it has been transferred or surrendered to a person or place outside the **Premises** or **Banking Premises**:

(i) on the basis of unauthorized instructions;

(ii) as a result of a threat to do bodily harm to any person;

(iii) as a result of a threat to do damage to any property;

(iv) as a result of a threat to introduce a denial of service attack into the **Insured**'s computer system;

(v) as a result of a threat to introduce a virus or other malicious instruction into the **Insured's** computer system which is designed to damage, destroy or corrupt data or computer programs stored within the **Insured**'s computer system;

© All rights reserved.

(vi)    as a result of a threat to contaminate, pollute or render substandard the **Insured's** products or goods; or

(vii)    as a result of a threat to disseminate, divulge or utilize:

    (A)    the **Insured's** confidential information; or

    (B)    weaknesses in the source code within the **Insured's** computer system.

*Provided, however*, this Exclusion does not apply under Insuring Agreement 1.E. of this **Crime Coverage Part** to loss of **Money, Securities** or **Other Property** while outside the **Premises** in the care and custody of a **Messenger** if the **Insured**:

(i)    had no knowledge of any threat at the time the conveyance began; or

(ii)    had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

g) Vandalism

Loss from damage to the **Premises** or its exterior, or to any safe, vault, cash register, cash box, cash drawer or **Other Property** by vandalism or malicious mischief.

h) Voluntary Parting Of Title To Or Possession Of Property

Loss resulting from the **Insured**, or anyone acting on the **Insured's** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

Insuring Agreement 1.F., "COMPUTER FRAUD," of this **Crime Coverage Part** does not apply to:

a) Credit Card Transactions

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

b) Computer Losses Due To:

(i) loss of computer time or use;

(ii) unintentional errors or omissions; or

(iii)    voluntary giving or surrendering of property in a purchase or exchange, whether legitimate or fraudulent.

MNSCPT                    76

© All rights reserved.

c) Inventory Shortages

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(i)     an inventory computation; or

(ii) a profit and loss computation.

Insuring Agreement 1.G., "FUNDS TRANSFER FRAUD," of this **Crime Coverage Part** does not apply to:

a)     Computer Fraud

Loss resulting from the use of any computer to fraudulently cause a transfer of **Other Property**.

b) Loss Due To:

(i) unintentional errors or omissions; or

(ii) voluntary giving or surrendering of property in a purchase or exchange, whether legitimate or fraudulent.

## 4. CRIME LIMIT OF LIABILITY

The most the **Insurer** will pay for all loss resulting directly from all **Occurrences** combined under this policy is the Crime Limit of Liability shown in Item 4(b) of the Declarations (the "Crime Limit of Liability"). The Crime Limit of Liability applies to all Insuring Agreements under this Crime Coverage Part. The Crime Limit of Liability is in addition to and not a part of the Limit of Liability stated in Item 4(a) of the Declarations, which is applicable to the coverages provided under Coverage Part A. of this policy.

## 5. DEDUCTIBLE

The **Insurer** will not pay for loss resulting directly from an **Occurrence** unless the amount of loss exceeds the Deductible Amount shown in Item 5. of the Declarations. The **Insurer** will then pay the amount of loss in excess of the Deductible Amount, up to the Crime Limit of Liability.

MNSCPT                                     77

© All rights reserved.

**6. CONDITIONS**

**a) CONDITIONS APPLICABLE TO ALL INSURING AGREEMENTS OF THIS CRIME COVERAGE PART:**

**(i)     ADDITIONAL PREMISES OR EMPLOYEES**

If, while this **Crime Coverage Part** is in force, the **Insured** establishes any additional **Premises** or hire additional **Employees**, other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such **Premises** and **Employees** shall automatically be covered under this **Crime Coverage Part**. Notice to the **Insurer** of an increase in the number of **Premises** or **Employees** need not be given and no additional premium need be paid for the remainder of the Policy Period shown in the Declarations.

**(ii)    CANCELLATION OF COVERAGE SECTION**

(A)     The **Named Entity** shown in the Declarations may cancel this **Crime Coverage Part** by mailing or delivering to the **Insurer** advance written notice of cancellation.

(B)     The **Insurer** may cancel this **Crime Coverage Part** for non-payment of premium only by mailing or delivering to the **Named Entity** written notice of cancellation at least twenty (20) days before the effective date of cancellation.

(C)     The **Insurer** will mail or deliver the **Insurer's** notice to the **Named Entity's** last mailing address known to the **Insurer**.

(D)     Notice of cancellation of this **Crime Coverage Part** will state the effective date of cancellation. The Policy Period applicable to this **Crime Coverage Part** will end on that date.

(E)     If this **Crime Coverage Part** is cancelled, the **Insurer** will send the **Named Entity** any premium refund due. If the **Insurer** cancels, the refund will be *pro rata*. If the **Named Entity** cancels, the refund may be less than *pro rata*. The cancellation will be effective even if the **Insurer** has not made or offered a refund.

(F)     If notice is mailed, proof of mailing will be sufficient proof of notice.

**(iii)   CHANGES**

This **Crime Coverage Part** contains all the agreements between the **Insured** and the **Insurer** concerning the insurance afforded. The **Named Entity** shown in the Declarations is authorized to make changes in the terms of this **Crime Coverage Part** with the **Insurer's** consent. This **Crime Coverage Part**'s terms can be amended or waived only by endorsement issued by the **Insurer** and made a part of this **Crime Coverage Part**.

MNSCPT                                    78

© All rights reserved.

**(iv)     CONCEALMENT, MISREPRESENTATION OR FRAUD**

This **Crime Coverage Part** is void in any case of fraud by the **Insured** as it relates to this policy at any time. This **Crime Coverage Part** is also void if the **Named Entity** or any other **Insured**, at any time, intentionally conceals or misrepresents a material fact concerning:

(A)     this **Crime Coverage Part**;

(B)     the property covered under this **Crime Coverage Part**;

(C)     the **Insured's** interest in the property covered under this **Crime Coverage Part**; or

(D)     a **Claim** under this **Crime Coverage Part**.

**(v)     CONSOLIDATION - MERGER OR ACQUISITION**

If the **Insured** consolidates or merges with, or purchases or acquires the assets or liabilities of, another entity:

(b)     The **Insured** must give the **Insurer** written notice as soon as possible and obtain the **Insurer's** written consent to extend the coverage provided by this **Crime Coverage Part** to such consolidated or merged entity or such purchased or acquired assets or liabilities. If such consolidation, merger or purchase or acquisition of assets or liabilities increases the **Insured's** total assets by more than twenty-five percent (25%), the **Insurer** may condition the **Insurer's** consent by requiring payment of an additional premium; but for the first ninety (90) days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this **Crime Coverage Part** shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all **Occurrences** causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

**(vi)     COOPERATION**

The **Insured** must cooperate with the **Insurer** in all matters pertaining to this **Crime Coverage Part** as stated in its terms and conditions.

**(vii)     DUTIES IN THE EVENT OF LOSS**

(A)     After the **Insured Discovers** a loss or a situation that may result in loss of or damage to **Money**, **Securities** or **Other Property** the **Insured** must:

© All rights reserved.

(1) Notify the **Insurer** as soon as possible, but no later than sixty (60) days after **Discovery** of a loss or a situation that may result in loss of or damages to **Money, Securities** or **Other Property**. If the **Insured** has reason to believe that any loss (except for loss covered under Insuring Agreement 1.A. or 1.B.) involves a violation of law, the **Insured** must also notify the local law enforcement authorities.

(2) Submit to examination under oath at the **Insurer's** request and give the **Insurer** a signed statement of the **Insured's** answers.

(3)     Produce for the **Insured's** examination all pertinent records.

(4) Give the **Insurer** a detailed, sworn proof of loss within one hundred and twenty (120) days of the discovery of a loss or a situation that may result in loss of or damages to **Money, Securities** or **Other Property**, *provided, however*, that such proof of loss shall not be required solely in the event the **Insured** elects to have an independent investigative specialist as listed in Appendix E **("Investigative Specialist")** investigate the facts and determine the quantum of loss pursuant to Condition 6(a)(vii)(2) and such report is issued pursuant to the terms and conditions of that clause.

(5) Cooperate with the **Insurer** in the investigation and settlement of any **Claim**.

(B)     The Fidelity Research & Investigative Settlement Clause (FRISC)

The **Insured** may, with respect to such loss or situation that may result in loss or damage to **Money, Securities** or **Other Property**, elect to have an independent **Investigative Specialist** investigate the facts and determine the quantum of loss. The **Insured** and the **Insurer** shall jointly task and budget the **Investigative Specialist** regarding the scope and cost of the investigation to be performed. The final report issued by the **Investigative Specialist** will be definitive as respects the facts and the quantum of loss and shall be provided to both the **Insured** and the **Insurer**. After a joint review of the investigative report, if the **Insured** and the **Insurer** cannot agree upon the settlement of loss, then the **Insurer**, at the **Insured's** request, shall submit the dispute to arbitration, pursuant to the provisions of Clause 14. "DISPUTE RESOLUTION PROCESS" of the **General Terms and Conditions**. The **Insured** shall select an **Investigative Specialist** from the list of **Investigative Specialists** affixed as Appendix E and made part of this **Crime Coverage Part** located in the same jurisdiction in which the loss or situation that may result in loss or damage to **Money, Securities** or **Other Property** occurred.

MNSCPT                                          80

© All rights reserved.

In the event such loss or situation that may result in loss or damage to **Money, Securities** or **Other Property** occurred in a jurisdiction not included on the list, the **Insured** shall select an **Investigative Specialist** in the listed jurisdiction which is the nearest geographic jurisdiction to the jurisdiction in which the loss or situation occurred or where the corporate headquarters of the **Insured** is located. No changes shall be made during the Policy Period to the list of **Investigative Specialists** attached as Appendix E unless the amendments are at the **Insured's** request.

The **Insured** shall notify the **Insurer** in writing of the above election to have an independent **Investigative Specialist** investigate the facts and determine the quantum of loss within thirty (30) days from the date on which the **Insured** first notifies the **Insurer** pursuant to Condition 6(a)(vii)(1). Notwithstanding subparagraph (iii) of the Exclusion entitled "Indirect Loss", all fees, costs and expenses of the investigation, including any fee charged by the **Investigative Specialist**, shall be paid as follows: fifty percent (50%) of such fees, costs and expenses shall be paid by the **Insured** and fifty percent (50%) shall be paid out of the Crime Limit of Liability.   No Deductible Amount shall apply to the fees, costs and expenses of the independent investigation, including any fee charged by the **Investigative Specialist**.

In addition, whether or not the **Insured** elects to have an independent **Investigative Specialist** (as defined in Section vii) investigate the facts and determine the quantum of loss pursuant to the above terms and conditions, upon the Insurer's request, the **Insured** shall submit to examination by the **Insurer**, subscribe the same, under oath if required, give the **Insurer** a signed statement of the **Insured's** answers, and produce for the **Insurer's** examination all pertinent records, all at such reasonable times and places as the **Insurer** shall designate, and shall cooperate with the **Insurer** in all matters pertaining to loss or claims with respect thereto.

(viii) **EMPLOYMENT BENEFIT PLAN**

(A)  The **Employee Benefit Plans** (hereafter referred to as "**Plan**") are included as **Insureds** under Insuring Agreement 1.A.

(B)  With respect to loss sustained or **Discovered** by any such **Plan**, Insuring Agreement 1.A. is replaced by the following:

The **Insurer** will pay for loss of or damage to **Money, Securities** and **Other Property** resulting directly from fraudulent or dishonest acts committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

(C)  If the **Named Entity** is an entity other than a **Plan**, any payment the Insurer makes for loss sustained by any **Plan** will be made to the **Plan** sustaining the loss.

(D)  If two or more **Plans** are insured under this **Crime Coverage Part**, any payment the **Insurer** makes for loss:

MNSCPT                                    81

© All rights reserved.

(1)      sustained by two or more **Plans**; or

(2)      of commingled **Money**, **Securities** or **Other Property** of two or more **Plans**;

resulting directly from an **Occurrence** will be made to each **Plan** sustaining loss by prorating the Crime Limit of Liability of all **Plans** based upon the proportion that the amount of loss for each **Plan** bears to the total amount of loss for all **Plans** sustaining loss.

(E)      The Deductible Amount applicable to Insuring Agreement 1.A. does not apply to loss sustained by any **Plan**.

**(ix)    EXAMINATION OF THE INSURED'S BOOKS AND RECORDS**

The **Insurer** may examine and audit the **Insured's** books and records as they relate to this **Crime Coverage Part** at any time during the Policy Period and up to three (3) years afterward.

**(x)    EXTENDED PERIOD TO DISCOVER LOSS**

The **Insurer** will pay for loss that the **Insured** sustained prior to the effective date of cancellation of this **Crime Coverage Part**, which is **Discovered** by the **Insured**:

(A)      No later than one year from the date of that cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by the **Insured**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this **Crime Coverage Part**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(B)      No later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.

**(xi)    INSPECTION AND SURVEYS**

(A)      The **Insurer** has the right to:

(i)      make inspections and surveys at any time;

(ii)      give the **Insured** reports on the conditions the **Insurer** finds; and

(iii)      recommend changes.

© All rights reserved.

(B)    The **Insurer** is not obligated to make any inspections, surveys, reports or recommendations and any such actions the **Insurer** does undertake relate only to insurability and the premiums to be charged. The **Insurer** does not make safety inspections. The **Insurer** does not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And the **Insurer** does not warrant that conditions:

     (i)    are safe or healthful; or

     (ii)    comply with laws, regulations, codes or standards.

(C)    Conditions 6(a)(xi)(1) and 6(a)(xi)(2) above apply not only to the **Insurer**, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**(xii) JOINT INSURED**

(A)    If any additional **Insured** is added by Endorsement to this **Crime Coverage Part**, the **Named Entity** set forth in the Declarations will act for itself and for every other **Insured** for all purposes of this **Crime Coverage Part** (hereinafter "first **Named Entity**"). If the first **Named Entity** ceases to be covered, then the next **Named Entity** as set forth in such Endorsement will become the first **Named Entity**.

(B)    If any **Insured**, or partner, **Member** or officer of that **Insured** has knowledge of any information relevant to this **Crime Coverage Part**, that knowledge is considered knowledge of every **Insured**.

(C)    An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

(D)    If this **Crime Coverage Part** or any of its coverages is cancelled as to any **Insured**, loss sustained by that **Insured** is covered only if it is **Discovered** by the **Insured**:

     (i)    no later than sixty (60) days from the date of that cancellation. However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by that **Insured**, whether from the **Insurer** or another insurer, replacing in whole or in part the coverage afforded under this **Crime Coverage Part**, whether or not such other insurance provides coverage for loss sustained prior to its effective date;

     (ii)    no later than one (1) year from the date of that cancellation with regard to any **Employee Benefit Plan**.

MNSCPT                 83

© All rights reserved.

(E)    The **Insurer** will not pay more for loss sustained by more than one **Insured** than the amount the **Insurer** would pay if all such loss had been sustained by one **Insured**.

(F)    Payment by the **Insurer** to the first **Named Entity** for loss sustained by any **Insured**, other than an **Employee Benefit Plan**, shall fully release the **Insurer** on account of such loss.

**(xiii)  LEGAL ACTION AGAINST US**

The **Insured** may not bring any legal action against the **Insurer** involving loss:

(A)    unless the **Insured** has complied with all the terms of this **Crime Coverage Part** and policy;

(B)    until ninety (90) days after the **Insured** has filed proof of loss with the **Insurer** or 90 days after the **Investigative Specialist** has submitted the report; and

(C)    unless brought within two (2) years from the date the **Insured Discovered** the loss.

If any limitation in this Condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**(xiv)  LIBERALIZATION**

If the **Insurer** adopts any revision that would broaden the coverage under this **Crime Coverage Part** without additional premium within forty-five (45) days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this **Crime Coverage Part**.

**(xv)  LOSS SUSTAINED DURING THE PRIOR INSURANCE ISSUED BY THE INSURER OR ANY AFFILIATE**

(A) Loss Sustained Partly During This Policy And Partly During Prior Insurance

If the **Insured Discovers** loss during the Policy Period shown in the Declarations, resulting directly from an **Occurrence** taking place:

(1)    partly during the Policy Period shown in the Declarations; and

(2) partly during any Policy Period of any prior cancelled insurance that the Insurer or any affiliate issued to the **Insured** or any predecessor in interest;

© All rights reserved.

and this **Crime Coverage Part** became effective at the time of cancellation of the prior insurance, the **Insurer** will first settle the amount of loss that the **Insured** sustained during this Policy Period. The **Insurer** will then settle the remaining amount of loss that the **Insured** sustained during any Policy Period of the prior insurance.

(B)   Loss Sustained Entirely During Prior Insurance

If the **Insured Discovers** loss during the Policy Period shown in the Declarations, resulting directly from an **Occurrence** taking place entirely during any Policy Period of any prior cancelled insurance that the **Insurer** or any affiliate issued to the **Insured** or any predecessor in interest, the **Insurer** will pay for the loss, provided:

(1) this **Crime Coverage Part** became effective at the time of cancellation of the prior insurance; and

(2) the loss would have been covered under this **Crime Coverage Part** had it been in effect at the time of the **Occurrence**.

The **Insurer** will first settle the amount of loss that the **Insured** sustained during the most recent prior insurance. The **Insurer** will then settle any remaining amount of loss that the **Insured** sustained during any Policy Period of any other prior insurance.

(C)   In settling loss subject to this Condition:

(1) The most the **Insurer** will pay for the entire loss is the **Crime** Limit of Liability applicable during the period of loss, whether such limit was written under this **Crime Coverage Part** or was written under the prior insurance issued by the **Insurer.**

(2) The **Insurer** will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under this **Crime Coverage Part**. If no loss was sustained under this **Crime Coverage Part**, the **Insurer** will apply the Deductible Amount shown in the Declarations to the amount of loss sustained under the most recent prior insurance.

If the Deductible Amount is larger than the amount of loss sustained under this **Crime Coverage Part**, or the most recent prior insurance, the **Insurer** will apply the remaining Deductible Amount to the remaining amount of loss sustained during the prior insurance.

The **Insurer** will not apply any other Deductible Amount that may have been applicable to the loss.

© All rights reserved.

Notwithstanding any of the above provisions of this Condition 6(a)(xv), no payment made for loss under either this Policy Period or any prior Policy Period shall exceed (i) the amount of the loss sustained during the respective Policy Period; and/or (ii) the Crime Limit of Liability of the respective Policy Period.

**(xvi)  LOSS SUSTAINED DURING PRIOR INSURANCE NOT ISSUED BY THE INSURER OR ANY AFFILIATE**

(A)  If the **Insured Discovers** loss during the Policy Period shown in the Declarations, resulting directly from an **Occurrence** taking place during the Policy Period of any prior cancelled insurance that was issued to the **Insured** or a predecessor in interest by another company, and the period of time to discover loss under that insurance had expired, the **Insurer** will pay for the loss under this **Crime Coverage Part**, provided:

(1) this **Crime Coverage Part** became effective at the time of cancellation of the prior insurance; and

(2) the loss would have been covered under this **Crime Coverage Part** had it been in effect at the time of the **Occurrence**.

(B)  In settling loss subject to this Condition:

(1) The most the **Insurer** will pay for the entire loss is the lesser of the **Crime** Limits of Liability applicable during the period of loss, whether such limit was written under this **Crime Coverage Part** or was written under the prior cancelled insurance.

(2) The **Insurer** will apply the applicable Deductible Amount shown in the Declarations to the amount of loss sustained under the prior cancelled insurance.

(C) The insurance provided under this Condition is subject to the following:

(1) If loss covered under this Condition is also partially covered under Condition 6(a)(xv), the amount recoverable under this Condition is part of, not in addition to, the amount recoverable under Condition 6(a)(xv).

(2) For loss covered under this Condition that is not subject to Condition 6(a)(xvi)(3)(a) above, the amount recoverable under this Condition is part of, not in addition to, the **Crime** Limit of Liability applicable to the loss covered under this **Crime Coverage Part** and is limited to the lesser of the amount recoverable under:

MNSCPT                                86

© All rights reserved.

(a) this **Crime Coverage Part** as of its effective date; or

(b) the prior cancelled insurance had it remained in effect.

**(xvii)  OTHER INSURANCE**

If other valid and collectible insurance is available to the **Insured** for loss covered under this **Crime Coverage Part**, our obligations are limited as follows:

(A)     Primary Insurance

When this policy is written as primary insurance, and:

(1) The **Insured** has other insurance subject to the same terms and conditions as this **Crime Coverage Part**, the **Insurer** will pay the **Insurer's** share of the covered loss. The **Insurer's** share is the proportion that the **Crime** Limit of Liability bears to the total limit of all insurance covering the same loss.

(2) The **Insured** has other insurance covering the same loss other than that described in Condition 6(a)(xvii)(1)(A) above, the Insurer will only pay for the amount of loss that exceeds:

(a)     the **Crime** Limit of Liability and Deductible Amount of that other insurance, whether the **Insured** can collect on it or not; or

(b)     the Deductible Amount shown in the Declarations;

whichever is greater. The **Insurer's** payment for loss is subject to the terms and conditions of this **Crime Coverage Part**.

(B)     Excess Insurance

(1) When this **Crime Coverage Part** is written excess over other insurance, the **Insurer** will only pay for the amount of loss that exceeds the **Crime** Limit of Liability and Deductible Amount of that other insurance, whether the **Insured** can collect on it or not. The **Insurer's** payment for loss is subject to the terms and conditions of this **Crime Coverage Part** and policy.

(2) However, if loss covered under this **Crime Coverage Part** is subject to a Deductible, the **Insurer** will reduce the Deductible Amount shown in the Declarations by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance.

© All rights reserved.

**(xviii)  OWNERSHIP OF PROPERTY; INTERESTS COVERED**

The property covered under this **Crime Coverage Part** is limited to property:

(A) that the **Insured** owns or leases; or

(B) that the **Insured** holds for others whether or not the **Insured** is legally liable for the loss of such property.

However, this **Crime Coverage Part** is for the **Insured's** benefit only. It provides no rights or benefits to any other person or organization. Any **Claim** for **Loss** that is covered under this **Crime Coverage Part** must be presented by the **Insured**.

**(xix)  PREMIUMS**

The first **Named Entity** shown in the Declarations:

(A)     is responsible for the payment of all premiums; and

(B)     will be the payee for any return premiums the **Insurer** pays.

**(xx)  RECORDS**

The Insured must keep records of all property covered under this **Crime Coverage Part** so the **Insurer** can verify the amount of any loss.

**(xxi)  RECOVERIES**

(A)    Any recoveries, whether effected before or after any payment under this **Crime Coverage Part**, whether made by the **Insurer** or the **Insured**, shall be applied net of the expense of such recovery:

(1) First, to the **Insured** in satisfaction of the **Insured's** covered loss in excess of the amount paid under this **Crime Coverage Part**;

(2) Second, to the **Insurer** in satisfaction of amounts paid in settlement of the **Insured's** claim;

(3)     Third, to the **Insured** in satisfaction of any Deductible Amount; and

(4) Fourth, to the **Insured** in satisfaction of any loss not covered under this **Crime Coverage Part**.

(B)     Recoveries do not include any recovery:

(1) from insurance, suretyship, reinsurance, security or indemnity taken for the **Insurer's** benefit; or

© All rights reserved.

(2)      of original **Securities** after duplicates of them have been issued.

**(xxii) TERRITORY**

This **Crime Coverage Part** covers loss that the **Insured** sustains resulting directly from an **Occurrence** taking place anywhere in the world.

**(xxiii) TRANSFER OF THE INSURED'S RIGHTS AND DUTIES UNDER THIS CRIME COVERAGE PART**

(A)      The **Insured's** rights and duties under this **Crime Coverage Part** may not be transferred without the **Insurer's** written consent except in the case of death of an individual **Named Entity**.

(B)      If the **Insured** dies, the **Insured's** rights and duties will be transferred to the **Insured's** legal representative but only while acting within the scope of duties as the deceased **Insured's** legal representative. Until the **Insured's** legal representative is appointed, anyone having temporary custody of the **Insured's** property will have the **Insured's** rights and duties but only with respect to that property.

**(xxiv) TRANSFER OF THE INSURED'S RIGHTS OF RECOVERY AGAINST OTHERS TO THE INSURER**

The **Insured** must transfer to the **Insurer** all the **Insured's** rights of recovery against any person or organization for any loss the **Insured** sustained and for which the **Insurer** has paid or settled. The **Insured** must also do everything necessary to secure those rights and do nothing after loss to impair them.

**(xxv) VALUATION - SETTLEMENT**

(A)      The value of any loss for purposes of coverage under this **Crime Coverage Part** shall be determined as follows:

(1)      Loss of **Money** but only up to and including its face value. The **Insurer** will, at the **Insured's** option, pay for loss of **Money** issued by any country other than the United States of America:

(a)      at face value in the **Money** issued by that country; or

(b)      in the United States of America dollar equivalent determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was **Discovered**.

© All rights reserved.

(2)    Loss of **Securities** but only up to and including their value at the close of business on the day the loss was **Discovered**. The **Insurer** may, at the **Insurer's** option:

    (a)    pay the market value of such **Securities** or replace them in kind, in which event the **Insured** must assign to the **Insurer** all the **Insured's** rights, title and interest in and to those **Securities**; or

    (b)    pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, the **Insurer** will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

        (i)    market value of the **Securities** at the close of business on the day the loss was **Discovered**; or

        (ii)    the **Crime** Limit of Liability applicable to the **Securities**.

(3)    Loss of or damage to **Other Property** or loss from damage to the **Premises** or its exterior for the replacement cost of the property without deduction for depreciation. However, the **Insurer** will not pay more than the least of the following:

    (a)    the cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose;

    (b)    the amount the **Insured** actually spend that is necessary to repair or replace the lost or damaged property; or

    (c)    the **Crime** Limit of Insurance.

With regard to subparagraphs (i) through (iii) above, the **Insurer** will not pay on a replacement cost basis for any loss or damage:

    (i)    until the lost or damaged property is actually repaired or replaced; and

    (ii)    unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, the **Insurer** will pay on an actual cash value basis.

© All rights reserved.

(B)   The **Insurer** will, at the **Insured's** option, settle loss or damage to property other than **Money:**

(1) in the **Money** of the country in which the loss or damage occurred; or

(2) in the United States of America dollar equivalent of the **Money** of the country in which the loss or damage occurred determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was **Discovered.**

(C)   Any property that the **Insurer** pays for or replaces becomes the **Insurer's** property.

**(b) CONDITIONS APPLICABLE TO INSURING AGREEMENT 1.A., "EMPLOYEE THEFT," OF THIS CRIME COVERAGE PART:**

**(i) TERMINATION AS TO ANY EMPLOYEE**

Insuring Agreement 1.A. terminates as to any **Employee:**

(A)   As soon as:

(1)   the **Insured;** or

(2)   any of the **Insured's** partners, **Members, Managers,** officers, directors, trustees, trustee emeritus or executive directors not in collusion with the **Employee;**

learn of **Theft** or any other dishonest act committed by the **Employee** whether before or after becoming employed by the **Insured;** provided such **Theft** involved **Money, Securities or other Property** valued at $25,000 or more; or

(B) On the date specified in a notice mailed to the first **Named Entity.** That date will be at least sixty (60) days after the date of mailing.

The **Insurer** will mail or deliver the **Insurer's** notice to the first **Named Entity's** last mailing address known to the **Insurer.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**(ii)   TERRITORY**

The **Insurer** will pay for loss caused by any **Employee** while temporarily outside the territory specified in Condition 6(a)(xxii) for a period of not more than ninety (90) consecutive days.

© All rights reserved.

**(c) CONDITIONS APPLICABLE TO INSURING AGREEMENT 1.B., "FORGERY OR ALTERATION," OF THIS CRIME COVERAGE PART:**

**(i)    DEDUCTIBLE AMOUNT**

The Deductible Amount does not apply to legal expenses paid under Insuring Agreement 1.B.

**(ii)   MECHANICAL SIGNATURES**

The **Insurer** will treat signatures that are produced or reproduced mechanically the same as handwritten signatures.

**(iii)  PROOF OF LOSS**

The **Insured** must include with the **Insured's** proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

**(iv)   TERRITORY**

The **Insurer** will cover loss that the **Insured** sustains resulting directly from an **Occurrence** taking place anywhere in the world. Condition 6(a)(xxii) does not apply to Insuring Agreement 1.B.

**(d) CONDITIONS APPLICABLE TO INSURING AGREEMENTS 1.D., "INSIDE THE PREMISES - ROBBERY OR SAFE BURGLARY OF OTHER PROPERTY," and 1.E., "OUTSIDE THE PREMISES" OF THIS CRIME COVERAGE PART:**

**(i)    ARMORED MOTOR VEHICLE COMPANIES**

Under Insuring Agreement 1.E. of this **Crime Coverage Part**, the **Insurer** will only pay for the amount of loss the **Insured** cannot recover:

(A)    under the **Insured's** contract with the armored motor vehicle company; and

(B)    from any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

**(ii)   SPECIAL LIMIT OF LIABILITY FOR SPECIFIED PROPERTY**

The **Insurer** will only pay up to $5,000 for any one **Occurrence** of loss of or damage to precious metals, precious or semiprecious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

MNSCPT                              92

© All rights reserved.

The **Insurer** will only pay up to $25,000 for any one **Occurrence** of loss of or damage to manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

**(e) CONDITIONS APPLICABLE TO INSURING AGREEMENT 1.F., "COMPUTER FRAUD," OF THIS CRIME COVERAGE PART:**

**(i)      SPECIAL LIMIT OF INSURANCE FOR SPECIFIED PROPERTY**

The **Insurer** will only pay up to $5,000 for any one **Occurrence** of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**(ii)      TERRITORY**

The **Insurer** will cover loss that the **Insured** sustains resulting directly from an **Occurrence** taking place anywhere in the world.  Condition 6(a)(xxii) does not apply to Insuring Agreement 1.F.

MNSCPT                                       93

© All rights reserved.

## APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

In consideration of the premium charged, it is understood and agreed as follows: The information in our Panel Counsel lists/appendices is now accessible through our online Panel Counsel Directory at http://www.aig.com/us/panelcounseldirectory. To access the applicable online Panel Counsel Directory, please go to the website, click on the "Not-for-Profit (Employment and Non-Employment Claims)" link or the "Employment Practices Liability - Not for Profit Employment Claims" link.

References in this policy to list of Panel Counsel law firms or related appendices are deemed amended to refer to the applicable Panel Counsel Directories at the website referenced above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

© All rights reserved.

**APPENDIX D**

**EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY**
**PANEL COUNSEL LIST**

In consideration of the premium charged, it is understood and agreed as follows: The information in our Panel Counsel lists/appendices is now accessible through our online Panel Counsel Directory at http://www.aig.com/us/panelcounseldirectory at the "Panel Counsel" tab. To access the applicable online Panel Counsel Directory, please go to the website, click on the "Panel Counsel" tab and then click on the "ERISA" link.

References in this policy to list of Panel Counsel law firms or related appendices are deemed amended to refer to the applicable Panel Counsel Directories at the website referenced above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

Revised (6/08)

**POLICYHOLDER NOTICE REGARDING**

### E- DISCOVERY CONSULTANT SERVICES

You are hereby notified that the Insureds under the attached policy are entitled to retain the services of a pre- approved E- Consultant Firm from the E- DISCOVERY CONSULTING FIRMS listed below at the rates negotiated by the Insurer for any Claim covered under the policy in which E- Discovery is required or becomes necessary.

For the purpose of the E- Discovery Consultant Services discussed in this notice, the following definitions shall apply:

(a)   "E- Consultant Firm" means any E- DISCOVERY CONSULTING FIRMS listed below. Any "E- Consultant Firm" may be hired by an Insured to perform E- Discovery Consultant Services without further approval by the Insurer.

(b)   "E- Discovery" means the development, collection, storage, organization, cataloging, preservation and/or production of electronically stored information.

(c)   "E- Discovery Loss" means the reasonable and necessary consulting fees for the E- Discovery Consultant Services provided solely to the Insured(s) by an E- Consultant Firm.

Provided, however, E- Discovery Loss shall not include any costs of discovery other than E- Discovery Loss.

(d)   "E- Discovery Consultant Services" means solely the following services performed by an E- Consultant Firm:

1.   assisting the Insured with managing and minimizing the internal and external costs associated with E- Discovery;

2.   assisting the Insured in developing or formulating an E- Discovery strategy which shall include interviewing qualified and cost effective E- Discovery vendors;

3.   serving as project manager, advisor and/or consultant to the Insured, defense counsel and the Insurer in executing and monitoring the E- Discovery strategy; and

4.   such other services provided by the E- Consultant Firm that the Insured, Insurer and E- Consultant Firm agree are reasonable and necessary given the circumstances of the Securities Claim.

PLEASE NOTE: The Insurer shall only be liable for the amount of E- Discovery Loss arising from a Claim under the attached policy that is in excess of the applicable Retention amounts stated in Item 4 of the Declarations. In all events, the Insurer shall not waive any of the Insurer's rights under this policy or at law.

E- DISCOVERY CONSULTING FIRMS

The list of approved E- Consultant Firms is accessible through our online directory at http://www.aig.com/us/panelcounseldirectory. To access the applicable online E- Consultant Firm Directory, please go to the website and click on the "e- **Consultant Panel Members**" link.

References in this policy to the list of E- Consultant Firms or related appendices are deemed amended to refer to the applicable online E- Consultant Firm Directory at the website referenced above.

97885 (4/08)                                                          1

**APPENDIX B**
**CRISIS MANAGEMENT COVERAGE FOR D&O COVERAGE SECTION**

## I.  DEFINITIONS

(a) **"Crisis Management Event"** means one of the following events which, in the good faith opinion of the **Organization**, did cause or is reasonably likely to cause a **Material Effect**:

1. Management Crisis:

    The death, incapacity or criminal indictment of any duly elected or appointed director, officer, trustee, trustee emeritus or executive director, or any **Employee** on whom the **Organization** maintains key person life insurance.

2. Patient/Member Abuse:

    The public announcement or accusation that an individual under the management control of the **Organization** has intentionally caused bodily injury to, or death of, a patient, or has sexually abused a patient or member of the **Organization**.

3. Debt Default:

    The public announcement that the **Organization** had defaulted or intends to default on its debt.

4. Bankruptcy:

    The public announcement that the **Organization** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the **Organization**; or the imminence of bankruptcy proceedings, whether voluntary or involuntary.

5. Contribution Revocation:

    The withdrawal or return of a non-governmental grant, contribution or bequest in excess of $500,000.

6. Student Distress:

    The public announcement or accusation that a student of the **Organization** has: 1) attempted or committed suicide; or 2) been criminally assaulted by an assailant who is either unknown or who is not an Individual Insured.

7. Downsizing:

    The closing of any academic department or school.

8. Regulatory Crisis:

    Formal governmental or regulatory proceedings which allege a pattern of inadequate patient care.

9. Workplace Violence:

    The public announcement that an **Employee** of the **Organization** was the victim of a violent crime while on the premises of the **Organization**.

10. Child Abduction:
    The public announcement that a child was abducted or kidnapped while under the care or supervision of the **Organization**.

A **Crisis Management Event** shall first commence when the **Organization** or any of its directors or executive officers shall first become aware of the event during the **Policy Period** and shall conclude at the earliest of the time when the **Crisis**

℗ All rights reserved.

**Management Firm** advises the **Organization** that the crisis no longer exists or when the **Crisis Management Fund** has been exhausted.

(b) "**Crisis Management Firm**" means firm listed in the **Insurer's** online directory, at http://www.aig.com/us/panelcounseldirectory, as a pre-approved Crisis Management Firm. To access the applicable online Crisis Management Firm Directory, please go to the website and click on the "CrisisFund®" link.

(c) "**Crisis Management Loss**" means the following amounts incurred during the pendency of or within 90 days prior to and in anticipation of, the **Crisis Management Event**, regardless of whether a **Claim** is ever made against an Insured arising from the **Crisis Management Event** and, in the case where a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**:

(1) amounts for which the **Organization** is legally liable for the reasonable and necessary fees and expenses incurred by a **Crisis Management Firm** in the performance of **Crisis Management Services** for the **Organization** arising from a **Crisis Management Event**; and

(2) amounts for which the **Organization** is legally liable for the reasonable and necessary printing, advertising, mailing of materials, or travel by directors, officers, employees or agents of the **Organization** or the **Crisis Management Firm**, in connection with the **Crisis Management Event**.

(d) "**Crisis Management Services**" means those services performed by a **Crisis Management Firm** in advising the **Organization** or any of its directors, officers or employees on minimizing potential harm to the **Organization** arising from the **Crisis Management Event**, including but not limited to maintaining and restoring public confidence in the **Organization**.

(e) "**Delisting Crisis**" means written notice to an **Organization** that such **Organization's** securities will be or have been delisted from an **Exchange** at the initiation of such **Exchange**.

(f) "**Exchange**" means NASDAQ, the American Stock Exchange, the New York Stock Exchange and the Singapore Exchange.

(g) "**Material Effect**" means the publication of unfavorable information regarding the **Organization** which can reasonably be considered to lessen public confidence in the competence of the **Organization**. Such publication must in occur in either:

(1) a daily newspaper of general circulation in the geographic area of the **Organization**, or

(2) a radio or television news report on an **Organization** received in the geographic area of the **Organization**.

## II.  EXCLUSIONS

The term **Crisis Management Event** shall not include any event relating to:

1. any pending or prior litigation as of the **Continuity Date** for the D&O Coverage Section indicated in Item 3 Declarations;

2. any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy is a renewal or replacement or which it may succeed in time;

© All rights reserved.

3. the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**, or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; or

4. the hazardous properties of nuclear materials.

© All rights reserved.

**ENDORSEMENT#** *1*

This endorsement, effective *12:01 am     November 1, 2014*     forms a part of
policy number   *01-817-25-28*
issued to *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**NOTICE OF CLAIM**
**(REPORTING BY E-MAIL)**

In consideration of the premium charged, it is hereby understood and agreed as follows:

1.   *Email Reporting of Claims*: In addition to the postal address set forth for any Notice of
     Claim Reporting under this policy, such notice may also be given in writing pursuant
     to the policy's other terms and conditions to the Insurer by email at the following
     email address:

     c-claim@AIG.com

     Your email must reference the policy number for this policy. The date of the
     Insurer's receipt of the emailed notice shall constitute the date of notice.

     In addition to Notice of Claim Reporting via email, notice may also be given to the
     Insurer by mailing such notice to: AIG, Financial Lines Claims, P.O. Box 25947,
     Shawnee Mission, KS 66225 or faxing such notice to (866) 227-1750.

2.   *Definitions*: For this endorsement only, the following definitions shall apply:

     (a)   "Insurer" means the "Insurer," "Underwriter" or "Company" or other name
           specifically ascribed in this policy as the insurance company or underwriter for
           this policy.

     (b)   "Notice of Claim Reporting" means "notice of claim/circumstance," "notice of
           loss" or other reference in the policy designated for reporting of claims, loss
           or occurrences or situations that may give rise or result in loss under this
           policy.

     (c)   "Policy" means the policy, bond or other insurance product to which this
           endorsement is attached.

3.   This endorsement does not apply to any Kidnap & Ransom/Extortion Coverage
     Section, if any, provided by this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 001*

This endorsement, effective *12:01 am*  *November 1, 2014*  forms a part of
policy number  *01-817-25-28*
issued to  *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

**HARVARD MANAGEMENT COMPANY AFFILIATED INSURED ENTITIES**

In consideration of the  premium charged, and  notwithstanding any other provision  of this
Policy to the  contrary, each of  the following entities,  which are, unless  otherwise noted,
under **Management Control**, shall be  considered an **Organization** and  an **Insured** under the
Policy:

| Entity Name | Revised Classification |
|---|---|
| Harvard Private Capital Properties II, Inc. | Affiliated Entity |
| Red Clover Holdings, LLC | Affiliated Entity |
| Agricola El Cardonal Limitada | Affiliated Entity |
| Agricola Los Rios SpA | Affiliated Entity |
| Aldwych Street, LLC  - Dissolved 7/2/2014 | Affiliated Entity |
| AMERRA Agri Opportunities Fund, LP | Affiliated Entity |
| Aquila Inc. | Affiliated Entity |
| Ara Inc. | Affiliated Entity |
| Atlantic AREP III, LLC | Affiliated Entity |
| Atlantic Avenue Realty, Ltd. | Affiliated Entity |
| Atlantic Avenue Two GP, LLC | Affiliated Entity |
| Atlantic Avenue Two, LP | Affiliated Entity |
| Atlantic Beacon Capital VII Fund, LLC | Affiliated Entity |
| Atlantic BVSEF, LLC | Affiliated Entity |
| Atlantic C-III, LLC | Affiliated Entity |
| Atlantic CIREP Europ, LLC | Affiliated Entity |
| Atlantic Deutsche, LLC | Affiliated Entity |
| Atlantic DV4, LLC | Affiliated Entity |
| Atlantic DW III, LLC | Affiliated Entity |

*END 2*

This endorsement, effective *12:01 am     November 1, 2014*     forms a part of
policy number  *01-817-25-28*
issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Atlantic Euro Retail, LLC | Affiliated Entity |
| Atlantic Europe Investments GP Limited | Affiliated Entity |
| Atlantic Europe Investments LP | Affiliated Entity |
| Atlantic GAP VI, LLC | Affiliated Entity |
| Atlantic International Real Estate, LLC | Affiliated Entity |
| Atlantic IP Holdings, LLC | Affiliated Entity |
| Atlantic IP3 Holdings, LLC | Affiliated Entity |
| Atlantic Multifamily Housing, LLC | Affiliated Entity |
| Atlantic Net Lease Investor, LLC | Affiliated Entity |
| Atlantic Pacific Realty, Inc. - Dissolved 1/13/14 | Affiliated Entity |
| Atlantic Retail West, LLC | Affiliated Entity |
| Atlantic Retail West II, LLC | Affiliated Entity |
| Atlantic Retail West II CI, LLC | Affiliated Entity |
| Atlantic Student Housing, LLC | Affiliated Entity |
| Atlantic Toronto GP LLC | Affiliated Entity |
| Atlantic Toronto LP | Affiliated Entity |
| Atlantic WB Holdings, LLC | Affiliated Entity |
| Azara, LLC | Affiliated Entity |
| Black Kite Pty Ltd | Affiliated Entity |
| Blue Marble Holdings Corporation | Affiliated Entity |
| Brazil Teak, LLC | Affiliated Entity |
| BT2 Co., LLC | Affiliated Entity |

ENDORSEMENT# (Continued)

This endorsement, effective  *12:01 am     November 1, 2014*      forms a part of
policy number   *01-817-25-28*
issued to    *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Campo Grande, SA | Affiliated Entity |
| Chennai 2007 | Affiliated Entity |
| Clag, LLC | Affiliated Entity |
| Copayapu SpA | Affiliated Entity |
| Coral Living, LLC | Affiliated Entity |
| Demeter Holdings Corporation | Affiliated Entity |
| DF1 Ltd. | Affiliated Entity |
| DF3 Ltd. | Affiliated Entity |
| DG Participants Ltd. | Affiliated Entity |
| Diversified International Timber Holdings, LLC | Affiliated Entity |
| Ecuador Timber GP, LLC | Affiliated Entity |
| Egret Investments Ltd. | Affiliated Entity |
| Enki Holdings Corp. - Dissolved 3/31/14 | Affiliated Entity |
| Finn Investments, LLC | Affiliated Entity |
| Francolin | Affiliated Entity |
| Global Forest Investments, LLC | Affiliated Entity |
| GreenGold Value Forests Lithuania, UAB | Affiliated Entity |
| GreyStones Investments, LLC | Affiliated Entity |
| Guanare A.A.R.L. | Affiliated Entity |
| Guanare S.A. | Affiliated Entity |
| H Squared, LLC | Affiliated Entity |
| Harvard Investment Associates | Affiliated Entity |

*END 2*

This endorsement, effective *12:01 am*     *November 1, 2014*        forms a part of
policy number  *01-817-25-28*
issued to    *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Harvard Management Company, Inc. | Affiliated Entity |
| Harvard Management Company Advisors Limited | Affiliated Entity |
| Harvard Management Company UK Limited | Affiliated Entity |
| Harvard Management Private Equity Corporation | Affiliated Entity |
| Harvard Master Trust | Affiliated Entity |
| Harvard Private Capital Holdings, Inc. | Affiliated Entity |
| Harvard Private Capital Properties III, Inc. | Affiliated Entity |
| Harvard Private Capital Realty, Inc. | Affiliated Entity |
| HMC Adage Manager, Inc. | Affiliated Entity |
| HPC Cherokee Ventures, LLC | Affiliated Entity |
| HPC Patron Scotland, LP | Affiliated Entity |
| India Capital Opportunities 1 Limited | Affiliated Entity |
| Inversiones Tres Cumbres Ltda. | Affiliated Entity |
| ITAY, LLC | Affiliated Entity |
| Jerika II, LLC (dissolved - 7/2/12) | Affiliated Entity |
| Jerika, LLC | Affiliated Entity |
| Joshua Timberlands, LLC (dissolved) | Affiliated Entity |
| Keya Paha Properties, LLC | Affiliated Entity |
| KT1 Co. | Affiliated Entity |
| KT2 Co. | Affiliated Entity |
| KTR Limited (dissolved) | Affiliated Entity |
| Laertes, LLC | Affiliated Entity |

MNSCPT                              *END 2*

This endorsement, effective *12:01 am*   *November 1, 2014*   forms a part of
policy number  *01-817-25-28*
issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| LaSalle Asia Opportunity Cayman I Ltd | Affiliated Entity |
| Lathi, LLC | Affiliated Entity |
| Linden Holdco, LLC | Affiliated Entity |
| Lindene, Ltd. | Affiliated Entity |
| Locust I, LLC | Affiliated Entity |
| Longstocking Investment Corporation | Affiliated Entity |
| Los Laureles, S.A. (Chile) | Affiliated Entity |
| Lucy Holdings | Affiliated Entity |
| Medowlark LLC | Affiliated Entity |
| Monardella, LLC | Affiliated Entity |
| Nicateca Inc. | Affiliated Entity |
| Oklahoma Timber, LLC | Affiliated Entity |
| PA Timber Company, LLC | Affiliated Entity |
| Palpana LLC | Affiliated Entity |
| Pearl Retail, Inc. | Affiliated Entity |
| Pearl Retail, LLC | Affiliated Entity |
| Pennsylvania Timber, LP | Affiliated Entity |
| Performance Forest, LLC | Affiliated Entity |
| Phemus Corporation | Affiliated Entity |
| Pinares A.A.R.L. | Affiliated Entity |
| Pino, LLC | Affiliated Entity |
| Pomona, LLC | Affiliated Entity |

*END 2*

This endorsement, effective *12:01 am*   *November 1, 2014*   forms a part of
policy number   *01-817-25-28*
issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Rosela Sub TC Pty Limited | Affiliated Entity |
| Rosella Hold TC Pty Limite | Affiliated Entity |
| Rosella Ltd. | Affiliated Entity |
| Romply Merops SRL | Affiliated Entity |
| Scolopax SRL | Affiliated Entity |
| Shipping Venture Corporation | Affiliated Entity |
| Sia Empetrum | Affiliated Entity |
| Soil Innovations, LLC | Affiliated Entity |
| Sustainable Timbers S.A. | Affiliated Entity |
| SWT LP | Affiliated Entity |
| Taku, LLC | Affiliated Entity |
| Terena S.A. | Affiliated Entity |
| Third Wrangler Ltd. | Affiliated Entity |
| Toucanet SA (Colombian Branch) | Affiliated Entity |
| Valholl, Ltd | Affiliated Entity |
| Veriwaste, LP - Dissolved 9/22/14 | Affiliated Entity |
| Wastelands, LLC | Affiliated Entity |

In addition to the foregoing list of **Harvard-Affiliated Insured Organizations**, **Organization** shall also include any entity formed, controlled or acquired by another **Organization** during the Policy Period and reported in writing by another **Organization** to the Insurer as a newly-formed, controlled or acquired **Harvard-Affiliated Insured Organization** pursuant to the **Protocol for Periodic Reporting**.

*END 2*

This endorsement, effective *12:01 am*    *November 1, 2014*    forms a part of
policy number  *01-817-25-28*
issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

**Protocol for Periodic Reporting:**
The **Insured Organization** shall provide to the Insurer, approximately quarterly, a list of any additional newly formed, controlled or acquired **Harvard-Affiliated Outside Entities** and **Harvard-Affiliated Insured Organizations** which the **Insured Organization** seeks to include within the coverage provided hereunder.

**NOTE:**  The foregoing list of **Harvard-Affiliated Insured Organizations** shall not be construed to be an exhaustive list of all **Harvard-Affiliated Insured Organizations**, and the failure to identify any entity in this endorsement shall not prejudice or otherwise limit coverage for any person or entity otherwise an **Insured** under this Policy, including without limitation any newly formed, controlled or acquired **Organization** that is otherwise an **Organization** under the terms and conditions of the Policy.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

MNSCPT                    *END 2*

**ENDORSEMENT# *3***

This endorsement, effective *12:01 am    November 1, 2014*        forms a part of
policy number    *01-817-25-28*
issued to *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## EXCLUSIONS (F) AND (G) AMENDED ENDORSEMENT
### (GENERAL TERMS AND CONDITIONS AMENDMENT)

In consideration of the premium charged, it is hereby understood and agreed that notwithstanding any other provision of this policy (including any endorsement attached hereto whether such endorsement precedes or follows this endorsement in time or sequence), Clause 4. EXCLUSIONS of the General Terms and Conditions is hereby amended by deleting Exclusions (f) and (g) in their entirety and replacing them both with the following:

(f)  for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law.

It is acknowledged that **Claims** for violation(s) of any of the responsibilities, obligations or duties imposed by "similar federal, state, local or foreign statutory law or common law," as such quoted language is used in the immediately-preceding paragraph, include, without limitation, any and all **Claims** which in whole or in part allege, arise out of, are based upon, are attributable to, or are in any way related to any of the circumstances described in any of the following:

(1)  the refusal, failure or inability of any **Insured(s)** to pay wages or overtime pay (or amounts representing such wages or overtime pay) for services rendered or time spent in connection with work related activities (as opposed to tort-based back pay or front pay damages for torts other than conversion);

(2)  improper deductions from pay taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**; or

(3)  failure to provide or enforce legally required meal or rest break periods;

Notwithstanding the foregoing:

(1)  with respect to the EPL Coverage Section, this exclusion (f) shall not apply to the extent that a **Claim** is for **Retaliation**; and

(2)  solely with respect to violations of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 and the Consolidated Omnibus Budget Reconciliation Act, this exclusion

✪ All rights reserved.
*END 003*

**ENDORSEMENT#** *3*        (continued)

        shall not apply to the extent coverage is afforded pursuant to the FLI Coverage Section.

(g)    [intentionally omitted]


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 003*

97650 (3/08)                            Page 2 of 2

This endorsement, effective *12:01 am*      *November 1, 2014*       forms a part of
policy number  *01-817-25-28*
issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### HARVARD MANAGEMENT COMPANY OUTSIDE ENTITIES

In consideration of the  premium charged, and  notwithstanding any other provision  of this
Policy to the  contrary, each of  the following entities  shall be  considered **Outside Entities**
under the Policy:

| Entity Name | Classification |
| --- | --- |
| Denham Commodity Partners Fund III, LP | Outside Entity |
| Estancia Celina S.A. | Outside Entity |
| Lubert Adler Capital Real Estate Fund II, LP | Outside Entity |
| 365 Church Street Limited Partnership | Outside Entity |
| Adelaide-Peter Developments | Outside Entity |
| Agricola Brinzal Ltda. | Outside Entity |
| Agricola Crecer Ltda. | Outside Entity |
| Agricola Duramen Ltda. | Outside Entity |
| Agricola E Inversiones Pampa Alegre S.A. | Outside Entity |
| Agricola Fundo Bucalemu Limitada | Outside Entity |
| Agricola Rapel Limitada | Outside Entity |
| Agricola Retiro Limitada | Outside Entity |
| Agricola Ribera Limitada | Outside Entity |
| Alcion Real Estate Partners II, LP | Outside Entity |
| Alcion Real Estate Partners LP | Outside Entity |
| Anay Y Asociados SA | Outside Entity |
| Aracari SA | Outside Entity |
| Atlantic BPR, LLC | Outside Entity |
| Atlantic CRI II, LLC | Outside Entity |
| Atlantic C-III HY, LLC | Outside Entity |
| Atlantic Creative, LLC | Outside Entity |
| Atlantic Debt Investor, LLC | Outside Entity |
| Atlantic DV Holdings Ltd. | Outside Entity |
| Atlantic ECI Four, LLC | Outside Entity |
| Atlantic Japan RE, LLC - Dissolved June 2014 | Outside Entity |
| Atlantic Multifamily Housing III | Outside Entity |
| Atlantic RP Holdings, LLC | Outside Entity |
| Atlantic Southeast Industrial, LLC | Outside Entity |
| Atlantic Toronto 365 Church Street General Partner | Outside Entity |
| Atlantic Toronto A-P General Partner Inc. | Outside Entity |
| Atlantic Toronto Grenville General Partner Inc. | Outside Entity |
| Atlantic Toronto Holdings, Inc (fka Atlantic Toronto Adelaide-Peter LP Inc.) | Outside Entity |

**ENDORSEMENT#  4  (Continued)**

This endorsement, effective  *12:01 am     November 1, 2014*      forms a part of
policy number  *01-817-25-28*
issued to  *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Atlantic Urban Retail Holdings, LLC | Outside Entity |
| Atlantic Urban Retail Inc. | Outside Entity |
| Atlantic Western Industrial LLC | Outside Entity |
| Atlantic Western Industrial II, LLC | Outside Entity |
| Atlantic WFH Investor, LLC | Outside Entity |
| Baynorth HPCH, LLC | Outside Entity |
| Bellflower, LLC | Outside Entity |
| Black Kite Trust | Outside Entity |
| BPR Co-Investor LLC | Outside Entity |
| Brazil Timber Limitada | Outside Entity |
| Brodiaea, Inc. | Outside Entity |
| BT3 Co., LLC | Outside Entity |
| Calliopsis, LLC | Outside Entity |
| Capital Partners (2) US Tax Exempt Investors Fund LP | Outside Entity |
| Caracara Ltd | Outside Entity |
| Caracol Agropercuraria Ltda. | Outside Entity |
| Charlesbank Equity Fund IV, LP | Outside Entity |
| Charlesbank Realty Fund IV, LP | Outside Entity |
| Charlesbank Realty Fund V, LP | Outside Entity |
| Cherokee Investment Partners III Parallel Fund, LP | Outside Entity |
| Clag (Chile) SpA | Outside Entity |
| Composition Capital Asia Fund C.V. | Outside Entity |
| Composition Capital Asia II Feeder C.V. | Outside Entity |
| Composition Capital Europe Fund C.V. | Outside Entity |
| Composition Capital Europe II Feeder C.V. | Outside Entity |
| Coral Living II LLC | Outside Entity |
| Coral Living III, LLC | Outside Entity |
| Crista, LLC | Outside Entity |
| Cypress Realty IV, LP | Outside Entity |
| Dairy Farms Partnership | Outside Entity |
| Denham Commodity Partners Fund II, LP | Outside Entity |
| Denham Commodity Partners Fund, LP | Outside Entity |
| Devonian, LLC | Outside Entity |
| Eastern Rosella Trust | Outside Entity |
| Eco Cebaco SA | Outside Entity |
| Ecorinoco S.A.S. | Outside Entity |
| Ecuador Timber LP | Outside Entity |
| El Maria, SA | Outside Entity |

MNSCPT                              *END 4*

This endorsement, effective *12:01 am* *November 1, 2014* forms a part of policy number *01-817-25-28*
issued to *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Embarcadero Capital Investors Two REIT, Inc. | Outside Entity |
| Emerald Catastrophe Fund Ltd | Outside Entity |
| Emerging Countries Opportunity Fund LTD | Outside Entity |
| Empresas Verdes Argentina, S.A. | Outside Entity |
| Eton Park Merging Markets Overseas Fund, L.P. | Outside Entity |
| Flamenco SpA | Outside Entity |
| Florestas do Sul Agroflorestal Ltda | Outside Entity |
| Forestal Bosquepalm Cia Ltda. | Outside Entity |
| Forestal Foresevergel Cia Ltda. | Outside Entity |
| Galileia Agrodindustrial Ltda | Outside Entity |
| Gateway Real Estate Fund III - TE, LP | Outside Entity |
| Gavea Investment Fund II B L.P. | Outside Entity |
| GBE Investments, LP | Outside Entity |
| GKHC Investment, LLC | Outside Entity |
| Granary Investments | Outside Entity |
| Granary Normandien | Outside Entity |
| Granary Orange (PTY) LTD | Outside Entity |
| Granary Waterberg (PTY) LTD | Outside Entity |
| Green Rosella Trust | Outside Entity |
| Greengold European Capital SA | Outside Entity |
| Greengold Agrirom SRL | Outside Entity |
| Greengold Value Forests SRL | Outside Entity |
| Greenfield BLR Partners, LP | Outside Entity |
| HB Institutional LP | Outside Entity |
| Helios Royalty Partners I, LP | Outside Entity |
| Insolo Agrodindustrial S.A. | Outside Entity |
| Inversiones Brasil, SA | Outside Entity |
| Inversiones Catival, SA | Outside Entity |
| Inversiones Coral, SA | Outside Entity |
| Inversiones Hefei SAC | Outside Entity |
| Inversiones Lefkada SAC | Outside Entity |
| Inversiones Mosqueta SAC | Outside Entity |
| Inversiones Pirona SAC | Outside Entity |
| Inversiones Santa Rita, SA | Outside Entity |
| Inversiones Tunuyan, SA | Outside Entity |
| Investimentos e Participacoes Agrícolas Ltda. "IPA" | Outside Entity |
| IPE Agroindustrial Ltda | Outside Entity |
| Iron Point Real Estate Partners - TE (H), LP | Outside Entity |

*END 4*

**ENDORSEMENT# 4   (Continued)**

This endorsement, effective *12:01 am*   *November 1, 2014*   forms a part of
policy number   *01-817-25-28*
issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Jacana Properties SA | Outside Entity |
| Junco Properties SA | Outside Entity |
| Kaingaroa Timberlands - Sold 5/24/2013 | Outside Entity |
| Kleiner Perkins Caufield & Byers IV, LP | Outside Entity |
| Kupe Shipping Limited | Outside Entity |
| La Arenosa, SA | Outside Entity |
| La Jacaranda, SA | Outside Entity |
| La Mora, SA | Outside Entity |
| La Zarza, SA | Outside Entity |
| Las Acacias,SA | Outside Entity |
| Las Misiones, SA | Outside Entity |
| Liquid Realty Partners IV (PF1), L.P. | Outside Entity |
| Liquid Realty Partners IV Exempt (PF1) Limited | Outside Entity |
| Liquid Realty Partners IV Investments AIV (PF1), L.P. | Outside Entity |
| Liquid Realty Partners IV Investments II AIV (PF1) Limited | Outside Entity |
| Liquid Realty Partners IV Tax Exempt (PF1) II | Outside Entity |
| Liquid Realty Partners IV Tax Exempt (PF1), L.P. | Outside Entity |
| Longterm Forest Partners Cia Ltda. | Outside Entity |
| Los Almendros, SA | Outside Entity |
| Los Aromos, SA | Outside Entity |
| Los Arrayanes, SA | Outside Entity |
| Los Boldos S.A. | Outside Entity |
| Los Laureles, SA (Nicaragua) | Outside Entity |
| Lubert Adler Capital Real Estate Fund III, LP | Outside Entity |
| Lubert Adler Capital Real Estate Opportunity Fund, LP | Outside Entity |
| Maguari Ltd | Outside Entity |
| Masdevallia Ltd. | Outside Entity |
| Mirabilis SA | Outside Entity |
| Nazare Agroindustrial Ltda. | Outside Entity |
| Neanderthal Investments | Outside Entity |
| New Vernon India (Cayman) Fund LP | Outside Entity |
| Nica Teca SA | Outside Entity |
| Nicarao I Ltd. | Outside Entity |
| Nicarao II Ltd. | Outside Entity |
| Nicarao Ltd. | Outside Entity |
| Old Lane HMAFF LP | Outside Entity |
| Opera SA | Outside Entity |
| Oxford HPC Investment Company, LLC | Outside Entity |

MNSCPT                              *END 4*

This endorsement, effective *12:01 am    November 1, 2014*    forms a part of
policy number  *01-817-25-28*
issued to  *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*


by    *National Union Fire Insurance Company of Pittsburgh, Pa.*


| | |
|---|---|
| PARFEN SA | Outside Entity |
| Pino II, LLC | Outside Entity |
| PM Co-Investors LLC (ownership 50%) | Outside Entity |
| Pradaria Agroflorestal Ltda. | Outside Entity |
| Quebrada Honda S.A. | Outside Entity |
| Round Table Asset Recovery Fund Ltd | Outside Entity |
| Round Table Global Macro Fund Ltd | Outside Entity |
| Ruby Atlantic Hospitality, LLC | Outside Entity |
| Ruby Atlantic REIT, Inc. | Outside Entity |
| Sapphire Hospitality, LLC | Outside Entity |
| Serra Grande Agroindustrial Ltda. | Outside Entity |
| Sobralia Ltd. | Outside Entity |
| Sociedad Explotadora Agricola SpA | Outside Entity |
| Soil Innovations II, LLC | Outside Entity |
| Sora Ltd | Outside Entity |
| Stelis Ltd. | Outside Entity |
| Stolberg, Meehan & Scano II-A LP | Outside Entity |
| Sustainable Teak Participacoes Ltda. | Outside Entity |
| Tagua SpA | Outside Entity |
| TDR Scotland L.P. | Outside Entity |
| TFO Co-Investor LLC | Outside Entity |
| The Breithorn Fund LP | Outside Entity |
| The Eco Products Fund | Outside Entity |
| The Wildhorn Fund LP | Outside Entity |
| Tinamou | Outside Entity |
| Triton Fund II No. 2 L.P | Outside Entity |
| Trogon Properties SA | Outside Entity |
| Tshipise Buffalo (Proprietary) Ltd | Outside Entity |
| Uniteca Agroflorestal, SA | Outside Entity |
| Verbena, LLC | Outside Entity |
| Victoire Brazil Fund, LLC | Outside Entity |
| Vista Verde Agroindustrial Ltda. | Outside Entity |
| WBH Kirby Hill Co-Investment LLC | Outside Entity |

In addition to the  foregoing list of  **Harvard-Affiliated Outside Entities**, **Outside Entity** shall
also include any entity formed, controlled or acquired by an **Insured Organization** during the
Policy Period and reported in writing by an **Insured Organization** to the Insurer as a
newly-formed, controlled or acquired **Harvard-Affiliated Outside Entity** pursuant to the
**Protocol for Periodic Reporting**.


MNSCPT                    *END 4*

**ENDORSEMENT# 4 (Continued)**

This endorsement, effective *12:01 am*    *November 1, 2014*    forms a part of
policy number  *01-817-25-28*
issued to    *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*


**NOTE**: Nothing in this endorsement shall be construed to limit or eliminate coverage for any **Insured Person** arising from a **Claim** made against such **Insured Person**, regardless of whether such **Claim** alleges **Wrongful Acts** in connection with any service by any **Insured Person** at any **Outside Entity**, including without limitation as a director, officer, partner or other agent or representative of, at or with respect to any of the above-listed **Harvard-Affiliated Outside Entities**.

**NOTE**: The foregoing list of **Harvard-Affiliated Outside Entities** shall not be construed to be an exhaustive list of all **Harvard-Affiliated Outside Entities**, and the failure to identify any entity in this endorsement shall not, by itself, create coverage for any person or entity affiliated with an **Insured Organization** but not otherwise an **Insured** under this Policy.
**Protocol for Periodic Reporting:**

The **Insured Organization** shall provide to the Insurer, approximately quarterly, a list of any additional newly formed, controlled or acquired **Harvard-Affiliated Outside Entities** and **Harvard-Affiliated Insured Organizations** which the **Insured Organization** seeks to include within the coverage provided hereunder.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

MNSCPT                    *END 4*

This endorsement, effective *12:01 am*      *November 1, 2014*      forms a part of
policy number  *01-817-25-28*
issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PANEL COUNSEL FIRM LIST AMENDED

In consideration of the premium charged, it is hereby understood and agreed as follows:

1. Appendix A for  the Section of the  policy entitled "PRE-AUTHORIZED  DEFENSE
   ATTORNEYS FOR ALL CLAIMS" is amended to  include the following law firm(s) (the "
   **Listed Firms**"), but  solely with regard  to **Panel  Counsel Claim(s)** in  such **Listed Firm's**
   respective jurisdiction(s) listed below:

| | LAW FIRM | JURISDICTION |
|---|---|---|
| (a) | Bingham & McCutchen, LLP | Massachusetts |
| (b) | Bowditch & Dewey, LLC | Massachusetts |
| (c) | Burns & Levinson, LLP | Massachusetts |
| (d) | Choate Hall & Stewart | Massachusetts |
| (e) | Dwyer & Collora, LLP | Massachusetts |
| (f) | Edwards & Angell, LLP | Massachusetts |
| (g) | Epstein, Becker & Green, PC | Massachusetts |
| (h) | Foley Hoag, LLP | Massachusetts |
| (i) | Goodwin Proctor, LLP | Massachusetts |
| (j) | Goulston & Storrs, LLP | Massachusetts |
| (k) | Hinckley, Allen & Snyder, LLP | Massachusetts |
| (l) | Hogan & Hartson, LLP | Massachusetts |
| (m) | Holland & Knight, LLP | Massachusetts |
| (n) | Jackson Lewis, LLP | Massachusetts |
| (o) | McDermott, Will & Emery | Massachusetts & Washington, DC |
| (p) | Melik Porter & Shea, LLP | Massachusetts |
| (q) | Mirick O'Connell | Massachusetts |
| (r) | Morgan, Brown & Joy, LLP | Massachusetts |

**ENDORSEMENT# 5 (Continued)**

This endorsement, effective *12:01 am    November 1, 2014*       forms a part of
policy number    *01-817-25-28*
issued to    *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*


| | | |
|---|---|---|
| (s) | Murphy & Riley | Massachusetts |
| (t) | Proskauer Rose | New York |
| (u) | Ropes & Gray | Massachusetts |
| (v) | Sally & Fitch | Massachusetts |
| (w) | Schwartz Hannum, PC | Massachusetts |
| (x) | Veril Dana | Maine |
| (y) | Fitzhugh & Mariani, LLP | Massachusetts |
| (z) | Wilmer Hale | Massachusetts |
| (aa) | Foley & Lardner, LLP | Massachusetts |

2. The foregoing amendment to Appendix A shall not apply to any **Claim**:

   (a) for which the **Insurer** has assumed the defense pursuant to this Policy; or

   (b) brought in the form of a class or multiple plaintiff action;

   unless the **Insured** has received the **Insurer's** prior written consent.

3. Billing rates for the **Listed Firms** shall not exceed the following:

   The billing rates noted  above, however, shall not  apply as a cap  to any Listed Firms  who are on the  list of approved  AIG panel counsel  law firms, which  list is accessible  through the online  directory at  http://www.chartisinsurance.com/panelcounseldirectory, as  of the beginning of the Policy Period

   (a) Partner - $425/hour

   (b) Associate - $250/hour

   (c) Paralegal - $150/hour

4. The rates set forth above shall  apply for the life of any  **Claim** as long as such  **Claim** is in any  way covered  under this policy.  Such rates will be  applied to (i) all covered **Defense Costs**  and (ii) **Defense  Costs** applied  against an applicable  Retention.  The **Organization** shall bear,  at its  own expense,  that portion of  any fees  charged by the **Listed Firms** that exceeds the applicable rates set forth in this endorsement.

MNSCPT                        *END 5*

This endorsement, effective *12:01 am*    *November 1, 2014*    forms a part of
policy number  *01-817-25-28*
issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

5.  The **Insureds** agree to require the **Listed Firms** to follow the **Insurer's Litigation Guidelines** ("**Litigation Guidelines**"). Copies of the **Litigation Guidelines** will be provided to (i) any **Insured** upon request and (ii) a **Listed Firm** once a **Claim** that such firm has been retained to handle is submitted to the **Insurer**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

**MNSCPT**                     *END 5*

This endorsement, effective *12:01 am    November 1, 2014*    forms a part of
policy number   *01-817-25-28*
issued to    *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PANEL COUNSEL FIRM LIST AMENDMENT

In consideration of the premium charged, it is hereby understood and agreed as follows:

1. Appendix A for the Section of the policy entitled "PRE-AUTHORIZED DEFENSE
   ATTORNEYS FOR ALL CLAIMS" is amended to include the following law firm(s) (the "
   **Listed Firms**"), but solely with regard to **Panel Counsel Claim(s)** in such **Listed Firm's**
   respective jurisdiction(s) listed below:

   LAW FIRM                                          JURISDICTION

   (a)    Diedrich Donohue, LLP                      Massachusetts

2. The foregoing amendment to Appendix A shall not apply to any **Claim**:

   (a) for which the **Insurer** has assumed the defense pursuant to this Policy; or

   (b) brought in the form of a class or multiple plaintiff action;

   unless the **Insured** has received the **Insurer's** prior written consent.

3. Billing rates for the **Listed Firms** shall not exceed the following:

   The billing rates noted above, however, shall not apply as a cap to any Listed Firms who
   are on the list of approved AIG panel counsel law firms, which list is accessible through
   the online directory at http://www.chartisinsurance.com/panelcounseldirectory, as of the
   beginning of the Policy Period

   (a) Partner - $425/hour

   (b) Associate - $250/hour

   (c) Paralegal - $150/hour

4. The rates set forth above shall apply for the life of any **Claim** as long as such **Claim** is
   in any way covered under this policy. Such rates will be applied to (i) all covered
   **Defense Costs** and (ii) **Defense Costs** applied against an applicable Retention. The
   **Organization** shall bear, at its own expense, that portion of any fees charged by the
   **Listed Firms** that exceeds the applicable rates set forth in this endorsement.

*END 6*

This endorsement, effective *12:01 am* *November 1, 2014* forms a part of
policy number *01-817-25-28*
issued to *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

5. The **Insureds** agree to require the **Listed Firms** to follow the **Insurer's Litigation Guidelines** (" **Litigation Guidelines** "). Copies of the **Litigation Guidelines** will be provided to (i) any **Insured** upon request and (ii) a **Listed Firm** once a **Claim** that such firm has been retained to handle is submitted to the **Insurer**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

MNSCPT *END 6*

## ENDORSEMENT# *7*

This endorsement, effective at *12:01 am    November 1, 2014*    forms a part of
Policy No. *01-817-25-28*
Issued to: *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### ECONOMIC SANCTIONS ENDORSEMENT

*This endorsement modifies insurance provided under the following:*

The Insurer shall not be deemed to provide cover and the Insurer shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the Insurer, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union or the United States of America.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 007*

89644 (6/13)                                                Page 1 of 1

This endorsement, effective *12:01 am    November 1, 2014*    forms a part of policy number  *01-817-25-28*

issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

**PRESIDENT AND FELLOWS OF HARVARD COLLEGE AFFILIATED INSURED ENTITIES**

In consideration of the premium charged, and notwithstanding any other provision of this Policy to the contrary, each of the following entities, which are, unless otherwise noted, under **Management Control**, shall be considered an **Organization** and an **Insured** under the Policy:

| Entity Name | Revised Classification |
|---|---|
| American Repertory Theatre Company, Inc. | Affiliated Entity |
| Associacao David Rockefeller Center de Universidade de Harvard | Affiliated Entity |
| Beau Geste XXV, LLC | Affiliated Entity |
| The Carl J. Shapiro Institute for Education and Research at Harvard Medical School and Beth Israel Deaconess Medical Center, Inc. | Affiliated Entity |
| Centre de Recherche Europeen de la HBS | Affiliated Entity |
| Dubai Harvard Foundation for Medical Research, Inc. | Affiliated Entity |
| Endowment for Research in Human Biology | Affiliated Entity |
| Fundacion Centro de Investigation de la Escuela de Administracion de Empresas de la Univeridad de Harvard para America Latina | Affiliated Entity |
| Giovanni Armenise - Harvard Foundation for Scientific Research, Inc. | Affiliated Entity |
| Harvard Business School Interactive, Inc. | Affiliated Entity |

**ENDORSEMENT# 8** (Continued)

This endorsement, effective *12:01 am    November 1, 2014*    forms a part of
policy number *01-817-25-28*
issued to *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Harvard Business School Publishing Corporation | Affiliated Entity |
| Harvard Business School Publishing India Private Limited | Affiliated Entity |
| Harvard Center Shanghai Co., Ltd | Affiliated Entity |
| Harvard China International, LLC | Affiliated Entity |
| Harvard Clinical Research Institute, Inc. | Affiliated Entity |
| Harvard Dedicated Energy Ltd | Affiliated Entity |
| Harvard Law School Association | Affiliated Entity |
| Harvard Magazine, Inc. | Affiliated Entity |
| Harvard Management Company | Affiliated Entity |
| Harvard Medical Center | Affiliated Entity |
| Harvard Medical Collaborative, Inc. | Affiliated Entity |
| Harvard NeuroDiscovery Center, Inc. (fka Harvard Center for Neurodegeneration and Repair, Inc.) | Affiliated Entity |
| Harvard Real Estate - Allston, Inc. | Affiliated Entity |
| Harvard Real Estate, Inc. | Affiliated Entity |
| Harvard University Beacon Yards LLC | Affiliated Entity |
| Harvard University Press Limited | Affiliated Entity |
| Harvard University Press of New York, Inc. | Affiliated Entity |
| Harvard Yenching Institute | Affiliated Entity |
| Ion, Inc. | Affiliated Entity |

This endorsement, effective *12:01 am*  *November 1, 2014*  forms a part of
policy number *01-817-25-28*
issued to  *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Medical, Academic and Scientific Community Organization, Inc. | Affiliated Entity |
| Public Health Foundation for Cancer and Blood Research | Affiliated Entity |
| Putnam Square Apartments Company Limited Partnership | Affiliated Entity |
| Putnam Square Apartments, Inc. | Affiliated Entity |
| Red Top, Inc. | Affiliated Entity |
| Student Clubs of HBS, Inc. | Affiliated Entity |
| Trustees for Harvard University (a DC Corporation) | Affiliated Entity |
| FIELD COURSE LLC | Affiliated Entity |

## HARVARD MANAGEMENT COMPANY AFFILIATED INSURED ENTITIES

In consideration of the premium charged, and notwithstanding any other provision of this Policy to the contrary, each of the following entities, which are, unless otherwise noted, under **Management Control**, shall be considered an **Organization** and an **Insured** under the Policy:

| Entity Name | Revised Classification |
|---|---|
| Harvard Private Capital Properties II, Inc. | Affiliated Entity |
| Red Clover Holdings, LLC | Affiliated Entity |
| Aldwych Street, LLC (New) | Affiliated Entity |

MNSCPT  *END 8*

This endorsement, effective  12:01 am     November 1, 2014        forms a part of
policy number   01-817-25-28
issued to    PRESIDENT AND FELLOWS OF HARVARD COLLEGE

by    National Union Fire Insurance Company of Pittsburgh, Pa.

| | |
|---|---|
| AMERRA Agri Opportunities Fund, LP | Affiliated Entity |
| Aquila Inc. | Affiliated Entity |
| Ara Inc. | Affiliated Entity |
| Atlantic Avenue Realty, Ltd. | Affiliated Entity |
| Atlantic Avenue Two GP, LLC | Affiliated Entity |
| Atlantic Avenue Two, LP | Affiliated Entity |
| Atlantic C-III, LLC | Affiliated Entity |
| Atlantic Deutsche, LLC | Affiliated Entity |
| Atlantic DV4, LLC | Affiliated Entity |
| Atlantic DW III, LLC | Affiliated Entity |
| Atlantic Europe Investments GP Limited | Affiliated Entity |
| Atlantic Europe Investments LP | Affiliated Entity |
| Atlantic GAP VI, LLC | Affiliated Entity |
| Atlantic International Real Estate, LLC (New) | Affiliated Entity |
| Atlantic IP Holdings, LLC | Affiliated Entity |
| Atlantic Multifamily Housing, LLC | Affiliated Entity |
| Atlantic Net Lease Investor, LLC | Affiliated Entity |
| Atlantic Pacific Realty, Inc. | Affiliated Entity |
| Atlantic Retail West, LLC | Affiliated Entity |
| Atlantic Student Housing, LLC | Affiliated Entity |
| Atlantic Toronto GP LLC | Affiliated Entity |
| Atlantic Toronto LP | Affiliated Entity |

This endorsement, effective *12:01 am*     *November 1, 2014*        forms a part of
policy number  *01-817-25-28*
issued to    *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Atlantic WB Holdings, LLC | Affiliated Entity |
| Azara, LLC | Affiliated Entity |
| Black Kite Pty Ltd | Affiliated Entity |
| Blue Marble Holdings Corporation | Affiliated Entity |
| Brazil Teak, LLC | Affiliated Entity |
| BT2 Co., LLC | Affiliated Entity |
| Campo Grande, SA | Affiliated Entity |
| Chennai 2007 | Affiliated Entity |
| Clag, LLC | Affiliated Entity |
| Coral Living, LLC | Affiliated Entity |
| Demeter Holdings Corporation | Affiliated Entity |
| DF1 Ltd. | Affiliated Entity |
| DF3 Ltd. | Affiliated Entity |
| Diversified International Timber Holdings, LLC | Affiliated Entity |
| Ecuador Timber GP, LLC | Affiliated Entity |
| Egret Investments Ltd. | Affiliated Entity |
| Enki Holdings Corp. | Affiliated Entity |
| Francolin (new 5/3/11) | Affiliated Entity |
| Global Forest Investments, LLC | Affiliated Entity |
| Guanare A.A.R.L. | Affiliated Entity |
| Guanare S.A. | Affiliated Entity |
| Harvard Investment Associates | Affiliated Entity |

This endorsement, effective *12:01 am    November 1, 2014*        forms a part of
policy number  *01-817-25-28*
issued to    *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Harvard Management Company, Inc. | Affiliated Entity |
| Harvard Management Company Advisors Limited (New) | Affiliated Entity |
| Harvard Management Private Equity Corporation | Affiliated Entity |
| Harvard Master Trust | Affiliated Entity |
| Harvard Private Capital Holdings, Inc. | Affiliated Entity |
| Harvard Private Capital Properties III, Inc. | Affiliated Entity |
| Harvard Private Capital Realty, Inc. | Affiliated Entity |
| HMC Adage Manager, Inc. | Affiliated Entity |
| HPC Cherokee Ventures, LLC | Affiliated Entity |
| HPC Patron Scotland, LP | Affiliated Entity |
| India Capital Opportunities 1 Limited | Affiliated Entity |
| Inversiones Tres Cumbres Ltda. | Affiliated Entity |
| ITAY, LLC | Affiliated Entity |
| **Jerika II, LLC (dissolved - 7/2/12)** | **Affiliated Entity** |
| Jerika, LLC | Affiliated Entity |
| Joshua Timberlands, LLC (dissolved) | Affiliated Entity |
| Keya Paha Properties, LLC | Affiliated Entity |
| KT1 Co. | Affiliated Entity |
| KT2 Co. | Affiliated Entity |
| KTR Limited (dissolved) | Affiliated Entity |
| Laertes, LLC | Affiliated Entity |
| LaSalle Asia Opportunity Cayman I Ltd | Affiliated Entity |

MNSCPT                              *END 8*

This endorsement, effective *12:01 am    November 1, 2014*    forms a part of
policy number  *01-817-25-28*
issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Lathi, LLC | Affiliated Entity |
| Lindene, Ltd. (New) | Affiliated Entity |
| Longstocking Investment Corporation | Affiliated Entity |
| Los Laureles, S.A. (Chile) | Affiliated Entity |
| Lucy Holdings | Affiliated Entity |
| Medowlark LLC | Affiliated Entity |
| Monardella, LLC (New) | Affiliated Entity |
| Nicateca Inc. | Affiliated Entity |
| Oklahoma Timber, LLC | Affiliated Entity |
| PA Timber Company, LLC | Affiliated Entity |
| Pearl Retail, Inc. (New) | Affiliated Entity |
| Pearl Retail, LLC (New) | Affiliated Entity |
| Pennsylvania Timber, LP | Affiliated Entity |
| Performance Forest, LLC | Affiliated Entity |
| Phemus Corporation | Affiliated Entity |
| Pinares A.A.R.L. | Affiliated Entity |
| Pino, LLC | Affiliated Entity |
| Romply Merops SRL | Affiliated Entity |
| Scolopax SRL | Affiliated Entity |
| Shipping Venture Corporation | Affiliated Entity |
| Sia Empetrum | Affiliated Entity |
| Soil Innovations, LLC | Affiliated Entity |

**ENDORSEMENT#** (Continued)

This endorsement, effective *12:01 am     November 1, 2014*      forms a part of
policy number  *01-817-25-28*
issued to    *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| Sustainable Timbers S.A. | Affiliated Entity |
| SWT LP | Affiliated Entity |
| Taku, LLC | Affiliated Entity |
| Terena S.A. | Affiliated Entity |
| Toucanet SA (Colombian Branch) (New) | Affiliated Entity |
| Valholl, Ltd | Affiliated Entity |
| Veriwaste, LP | Affiliated Entity |
| Wastelands, LLC | Affiliated Entity |

Pino, LLC is not under **Management Control**, however, a Harvard 501(c)(3) owns 100% of the preferred stock in this entity, and has the option at any time to convert such preferred stock to common stock. Accordingly, this entity should be considered **Harvard-Affiliated Insured Organization**.

Soil Innovations, LLC is not under **Management Control**, however, a Harvard 501(c)(3) owns 100% of the preferred stock in this entity, and has the option at any time to convert such preferred stock to common stock. Accordingly, this entity should be considered **Harvard-Affiliated Insured Organization**.

In addition to the foregoing list of **President and Fellows of Harvard College and Harvard Management Company Affiliated Insured Organizations**, **Organization** shall also include any entity formed, controlled or acquired by another **Organization** during the Policy Period and reported in writing by another **Organization** to the Insurer as a newly-formed, controlled or acquired **President and Fellows of Harvard College and Harvard Management Company Affiliated Insured Organization** pursuant to the **Protocol for Periodic Reporting**.

MNSCPT                    *END 8*

This endorsement, effective *12:01 am*   *November 1, 2014*   forms a part of policy number  *01-817-25-28*
issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

**Protocol for Periodic Reporting:**
The **Insured Organization** shall provide to the Insurer, approximately quarterly, a list of any additional newly formed, controlled or acquired **President and Fellows of Harvard College and Harvard Management Company Affiliated Outside Entities** and **President and Fellows of Harvard College and Harvard Management Company Affiliated Insured Organizations** which the **Insured Organization** seeks to include within the coverage provided hereunder.

<u>**NOTE**</u>: The foregoing list of **President and Fellows of Harvard College and Harvard Management Company Affiliated Insured Organizations** shall not be construed to be an exhaustive list of all **President and Fellows of Harvard College and Harvard Management Company Affiliated Insured Organizations**, and the failure to identify any entity in this endorsement shall not prejudice or otherwise limit coverage for any person or entity otherwise an **Insured** under this Policy, including without limitation any newly formed, controlled or acquired **Organization** that is otherwise an **Organization** under the terms and conditions of the Policy.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

MNSCPT                         *END 8*

This endorsement, effective *12:01 am*     *November 1, 2014*     forms a part of policy number    *01-817-25-28*
issued to    *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SEPARATE RETENTION FOR D&O CLAIMS MADE AGAINST SPECIFIED ENTITY (WITH ALLOCATION WORDING)

In consideration of the premium charged, it is hereby understood and agreed that Clause 4. RETENTION CLAUSE is amended by adding the following at the end thereof:

Notwithstanding the foregoing:

1. With respect to **Loss** in connection with any **D&O Claim** (as defined below) made against any **Specified Insureds** (as defined below), the **Insurer** shall only be liable for the amount of **Loss** arising from such **D&O Claim** which is in excess of the **Specified Retention** (as defined below), such **Retention** amount to be borne by the **Organization** and/or the **Insureds** and shall remain uninsured, with regard to all (i) **Indemnifiable Loss**; and (ii) **Loss** of the **Organization**.

2. In the event the application of the last sentence of the first paragraph of Clause 4. RETENTION CLAUSE would otherwise result in one retention amount applying to:

   (i)     **D&O Claim(s)** made against one or more **Specified Insureds**; and

   (ii)    one or more **Claims** made against **Insured(s)** other than a **Specified Insured** (" **Other Insureds**"),

   then two retention amounts shall nevertheless apply as follows: (a) the **Specified Retention** shall apply to **Loss** of **Specified Insureds**; and (b) the retention amount stated in Item 5 of the Declaration shall apply to all other **Loss**.

3. In the event the application of the last sentence of the first paragraph of Clause 4. RETENTION CLAUSE would otherwise result in one retention amount applying to:

   (i)     D& O **Claim(s)** made against one or more **Specified Insureds**; and

   (ii)    **Claims** other than **D&O Claims** made against one or more **Specified Insureds**,

   then two retention amounts shall nevertheless apply as follows: (a) the **Specified Retention** shall apply to **Loss** in connection with the **D&O Claims** ; and (b) the retention amount stated in Item 5 of the Declaration shall apply to all other **Loss**.

This endorsement, effective *12:01 am*   *November 1, 2014*   forms a part of
policy number *01-817-25-28*
issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

4. If more than one retention applies as described in paragraph 2 or 3, above, the **Insureds** and the **Insurer** shall use their best efforts to determine a fair and proper allocation of **Loss** as between the applicable retention amounts, taking into account the relative legal and financial exposures, and the relative benefits obtained. In the event that a determination as to an fair and proper allocation between retention amounts cannot be agreed to, then the **Insurer** allocate **Loss** in a manner in which the **Insurer** states to be fair and proper until a different allocation shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

It is further understood and agreed that, as used herein:

" **D&O Claim**" means any **Claim** other than a **Professional Services Claim**, **Fiduciary Liability Claim, Employment Practices Claim, Crisis Management Event , Pension Crisis Even** t, **Financial Claim** or **Media Claim.**

" **Specified Insureds** " means **Hansjorg Wyss Institute for Biologically Inspired Engineering at Harvard University, Inc.** and any **Insured Person** thereof.

" **Specified Retention** " means the retention amount of $50,000 which is applicable to D&O Claims made against any **Specified Insureds** .

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 9*

This endorsement, effective *12:01 am*  *November 1, 2014*  forms a part of
policy number  *01-817-25-28*
issued to  *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

## HARVARD RENEWAL ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall offer to renew this policy for one (1) additional year, such renewal policy to have a policy period from November 1, 2015 to November 1, 2016, on the same terms and conditions (except for this endorsement) and for the same premium as this policy, provided that:

(1)  the **Insurer** has paid no **Loss** under its **Policy** in connection with any **Claim** made against an **Insured** during the **Policy Period**; and

(2)  it is not reasonably expected that the **Insurer** will pay **Loss** under its **Policy** before November 1, 2015 in connection with any **Claim** made against an **Insured** during the **Policy Period**.

In the event the **Insurer** shall offer to renew this policy in accordance with the terms above, then the **Named Entity** shall be required to accept such renewal policy on the same terms and conditions and for the same premium. In the event that either of the conditions set forth in (1) and (2) above is not met, the **Insurer** shall not be required to renew this policy on the same terms and conditions and for the same premium and the **Named Entity** shall be permitted to obtain replacement coverage from another insurer. The **Insurer** shall notify the **Named Insured** on or before August 15, 2015, if either of the conditions set forth in (1) and (2) above may not be met.

For purposes of the application of this endorsement to any excess insurers, the terms **Insurer** and **Policy** shall have the meaning ascribed to each of those terms in the Declarations page of such excess policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 10*

MNSCPT

This endorsement, effective  *12:01 am*      *November 1, 2014*          forms a part of
policy number   *01-817-25-28*
issued to   *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DEFINITION OF INSURED PERSON AMENDED

In consideration of the premium charged, it is hereby understood and agreed that Clause 1.
DEFINITIONS of the  **General Terms and Conditions**,  the definition of  **"Insured Person"**  is
amended to include the following at the end thereof:

**"Insured Person"** also means Philip Langston.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

MNSCPT                              *END 11*

**ENDORSEMENT# *12***

This endorsement, effective *12:01 am*   *November 1, 2014*          forms a part of
policy number   *01-817-25-28*
issued to *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
| --- | --- | --- |
| MNSCPT | | EDUCATIONAL INSTITUTION RISK PROTECTOR DEC PAGE |
| 81285 | 01/03 | TRIA DEC DISCLOSURE FORM |
| MNSCPT | | EDUCATIONAL INSTITUTION RISK PROTECTOR |
| 99545 | 07/08 | APPENDIX A NOT FOR PROFIT PANEL COUNSEL ADDENDUM |
| 99544 | 06/08 | EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY PANEL COUNSEL |
| 97885 | 04/08 | POLICYHOLDER NOTICE REGARDING E-DISCOVERY CONSULTANT SERVICES |
| 94830 | 06/07 | APPENDIX B CRISIS MANAGEMENT COVERAGE FOR D&O COVERAGE SECTION |
| 99758 | 08/08 | NOTICE OF CLAIM (REPORTING BY E-MAIL) |
| MNSCPT | | HARVARD MANAGEMENT COMPANY AFFILIATED INSURED ENTITIES |
| 97650 | 03/08 | EXCLUSIONS (F) AND (G) AMENDED ENDORSEMENT (GENERAL TERMS AND CONDITIONS AMENDEMENT) |
| MNSCPT | | HARVARD MANAGEMENT COMPANY OUTSIDE ENTITIES |
| MNSCPT | | PANEL COUNSEL FIRM LIST AMENDED |
| MNSCPT | | PANEL COUNSEL FIRM LIST AMENDMENT |
| 89644 | 06/13 | ECONOMIC SANCTIONS ENDORSEMENT |
| MNSCPT | | PRESIDENT AND FELLOWS OF HARVARD COLLEGE AFFILIATED INSURED ENTITIES |
| MNSCPT | | SEPARATE RETENTION FOR D&O CLAIMS |
| MNSCPT | | HARVARD RENEWAL ENDORSEMENT |
| MNSCPT | | DEFINITION OF INSURED PERSON AMENDED |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |

*END 012*

**ENDORSEMENT#** *12*

This endorsement, effective *12:01 am*     *November 1, 2014*          forms a part of
policy number   *01-817-25-28*
issued to *PRESIDENT AND FELLOWS OF HARVARD COLLEGE*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
| --- | --- | --- |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

*END 012*



## CLAIM REPORTING FORM

Issuing Company: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Reported under Policy/Bond Number: _01-817-25-28_        Date: _____

Type of Coverage: D&O _____ E&O _____ Fidelity _____ (complete the Fidelity Supplemental on
the next page)

Insured's Name, as given on Policy Declarations (Face Page):

_PRESIDENT AND FELLOWS OF HARVARD COLLEGE_ _____

_____

_____

Contact Person: _____

Title: _____

Phone: _(_____)_____-_____Ext_____

eMail: _____ @ _____

Case or Claimant Name: _____

_____

If the party involved is different from "Insured" Name (as given on Policy Declarations) state
relationship:

_____

Insurance Broker/Agent: _MARSH USA INC._ _____

Address: _99 HIGH STREET, BOSTON, MA 02110_ _____

Address:_____

Contact: _JILL BERNUBE_ _____        Phone:_____

eMail: _Jill.A.Berube@marsh.com_ _____

Send Notice of Claims to:    AIG                      Phone: (888) 602-5246
                             Financial Lines Claims   Fax:    (866) 227-1750
                             P.O. Box 25947           Email:  c-Claim@AIG.com
                             Shawnee Mission, KS 66225



# CLAIM REPORTING FORM
## FIDELITY SUPPLEMENTAL
**(Only complete this supplemental if the Claim is being reported under Fidelity Coverage)**

Issuing Company: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Reported under Policy/Bond Number: _01-817-25-28_

---

Date of Discovery: _____   Estimated Amount of loss: _____

Cause of Loss:
| | | |
|---|---|---|
| Employee Dishonesty | _____ | Computer Fraud _____ |
| Funds Transfer | _____ | Robbery/Burglary _____ |
| ID Theft | _____ | Forgery _____ |
| Client Property | _____ | In Transit _____ |
| ERISA | _____ | Credit Card Forgery _____ |
| Other | _____ | if Other, describe: _____ |

---

Send Notice Of Claims To:  **AIG**
**Financial Lines Claims**
**P.O. Box 25947**
**Shawnee Mission, KS 66225**

Phone: (888) 602-5246
Fax:    (866) 227-1750
Email:  c-Claim@AIG.com

*centralized Customer Link and Information Management*

# Exhibit C

# Disclosure Statement



It is our pleasure to present the enclosed policy to you
for presentation to your customer.

**INSTRUCTION TO AGENT OR BROKER:**

WE REQUIRE THAT YOU TRANSMIT THE ATTACHED/ENCLOSED DISCLOSURE STATEMENT TO THE CUSTOMER
WITH THE POLICY.

Once again, thank you for your interest, and we look forward to meeting your needs and those of your customers.

# Disclosure Statement



**NOTICE OF DISCLOSURE FOR AGENT & BROKER COMPENSATION**

If you want to learn more about the compensation Zurich pays agents and brokers visit:

http://www.zurichnaproducercompensation.com

or call the following toll-free number:  (866) 903-1192.


This Notice is provided on behalf of Zurich American Insurance Company

and its underwriting subsidiaries.



# Advisory notice to policyholders regarding the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") regulations

No coverage is provided by this policyholder notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your declarations page for complete information on the coverages you are provided.

This notice provides information concerning possible impact on your insurance coverage due to directives issued by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

**Please read this Notice carefully.**

OFAC administers and enforces sanctions policy based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons." This list can be located on the United States Treasury's web site – http://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC restrictions. When an insurance policy is considered to be such a blocked or frozen contract, no payments or premium refunds may be made without authorization from OFAC. Other limitations on premiums and payments also apply.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**ZURICH**

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY.**
**THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE OF PREMIUM
# (RELATING TO DISPOSITION OF TRIA)

**SCHEDULE***

---

**(1)** Premium attributable to risk of loss from certified acts of terrorism through the end of the policy period based on the extension of the Terrorism Risk Insurance Act of 2002, as amended by the Terrorism Risk Insurance Extension Act of 2005, ("TRIA") for lines subject to TRIA and the Terrorism Risk Insurance Program Reauthorization Act of 2007 (TRIPRA):

**$3,700**

If TRIA terminates, the portion of this premium attributable to the remaining part of the policy period, as modified by any change shown in **(2)** of this Schedule, applies to the risk of loss from terrorism after the termination of TRIA.

**(2)** Premium change upon termination of TRIA or upon applicability of a Conditional Endorsement:

No change unless one of the following is completed -

Return Premium: **N/A**

Additional Premium: **N/A**

If we notify you of an additional premium charge, the additional premium will be due as specified in such notice.

---

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure of Premium**

In accordance with the TRIA, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the risk of loss from terrorist acts certified under that Act for lines subject to TRIA. That portion of your premium attributable is shown in the Schedule of this endorsement or in the Declarations.

**B. Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. The Act currently provides for no insurance industry or United States government participation in terrorism losses that exceed $100 billion in any one calendar year. The federal program established by the Act is scheduled to terminate at the end of December 31, 2014 unless extended by the federal government.

**C. Possibility of Additional or Return Premium**

The premium attributable to the risk of loss from certified acts of terrorism coverage is calculated based on the coverage (if any) in effect at the beginning of your policy for certified acts of terrorism. If your policy contains a Conditional Endorsement, the termination of TRIA or extension of the federal program with certain modifications (as explained in that endorsement) may modify the extent of coverage (if any) your policy provides for terrorism. If TRIA terminates or the Conditional Endorsement becomes applicable to your policy, the return premium (if any) or additional premium (if any) shown in **(2)** of the Schedule will apply. If the level or terms of federal participation change, the premium shown in **(1)** of the Schedule attributable to that part of the policy period extending beyond such a change may not be appropriate and we will notify you of any changes in your premium.

Includes copyrighted material of ISO Properties, Inc. with its permission.
Copyright Zurich American Insurance Company 2013



# Massachusetts Company Identification Form

**Insurance is provided by:**

Zurich American Insurance Company

Administrative Offices:

Zurich Towers
1400 American Lane
Schaumburg, Illinois 60196-7348

U-GU-745-A MA  (11/06)

# Important Notice – In Witness Clause



In return for the payment of premium, and subject to the terms of this policy, coverage is provided as stated in this policy.

IN WITNESS WHEREOF, this Company has executed and attested these presents and, where required by law, has caused this policy to be countersigned by its duly Authorized Representative(s).

President

Corporate Secretary

---

**QUESTIONS ABOUT YOUR INSURANCE?** Your agent or broker is best equipped to provide information about your insurance. Should you require additional information or assistance in resolving a complaint, call or write to the following (please have your policy or claim number ready):

Zurich in North America
Customer Inquiry Center
1400 American Lane
Schaumburg, Illinois  60196-1056
**1-800-382-2150** (Business Hours:  8am - 4pm [CT])
**Email:** info.source@zurichna.com

---

# Zurich Excess Select Insurance Policy

**Declarations**

**ZURICH**®

Insurance is provided by:

**ZURICH AMERICAN INSURANCE COMPANY**
1400 American Lane
Schaumburg, Illinois 60196-1056
(The "Underwriter")

**THIS POLICY FOLLOWS TO THE TERMS, CONDITIONS, AND LIMITATIONS OF THE FOLLOWED POLICY. COVERAGE IS LIMITED TO LOSS FROM CLAIMS AGAINST THE POLICYHOLDER DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD, IF EXERCISED, AND REPORTED TO THE UNDERWRITER PURSUANT TO SUBSECTION III.A. THE LIMIT OF LIABILITY SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS AND/OR CLAIMS EXPENSES, IF APPLICABLE. PLEASE READ THIS POLICY CAREFULLY. DEFINED TERMS APPEAR IN BOLD AND HAVE THE MEANING SET FORTH IN THE DECLARATIONS.**

Policy Number:   IPR 3792308-03

Item 1.  **Policyholder** and Mailing Address:     President and Fellows of Harvard College

1033 Massachusetts Avenue, Suite 360

Cambridge, MA 02138-3846

Item 2.  Aggregate Limit of Liability:          $15,000,000

Item 3.  **Underlying Insurance:**

| A. | Followed Policy | Policy Type | Policy Number | Limit of Liability | Attachment |
|----|-----------------|-------------|---------------|--------------------|------------|
| | National Union Fire Insurance Company of Pittsburgh, PA | Primary | 01-817-25-28 | $25,000,000 | $2,500,000 |

| B. | Other Underlying Insurance | Policy Number | Limit of Liability | Attachment |
|----|----------------------------|---------------|--------------------|------------|
| | N/A | N/A | N/A | N/A |
| | N/A | N/A | N/A | N/A |
| | N/A | N/A | N/A | N/A |

Item 4.  **Policy Period**: From: 12:01 A.M. on 11/01/2014 To: 12:01 A.M. on 11/01/2015
Policy incepts and expires at the local time at the address shown in Item 1.

Item 5.  Notice to Underwriter:

A.  Address for Notice of Claim or Potential Claim
   Attn:   Zurich North America
   Management Solutions Claims
   P.O. Box 968041
   Schaumburg, Illinois 60196-8041
   Fax #: (866) 255-2962
   Email: msgclms@zurichna.com

B.  Address for All Other Notices:
   Attn:   Zurich American Insurance Company -
   Strategic Risk Solutions Group
   1 Liberty Plaza, 32nd Floor
   New York, NY 10006

Item 6.  Premium:      $370,000

Item 7.  Endorsements Effective at Inception:  See Attached Schedule of Forms and Endorsements

# Zurich Excess Select Insurance Policy



The Underwriter issues this policy in reliance upon the statements made in the application, warranty, if permitted, representations or statements made by the **Policyholder** to the Underwriter, in the application to the insurers of the **Underlying Insurance** and any binder of **Underlying Insurance**. All terms in bold below shall have the meaning provided in the Declarations. In consideration of payment of the premium and subject to the Declarations and the definitions, limitations, conditions, provisions and other terms of this policy and any endorsements hereto, the Underwriter and the **Policyholder** agree as follows:

I.   INSURING CLAUSE – The Underwriter shall provide the **Policyholder** with insurance coverage during the **Policy Period** excess of the **Underlying Insurance**. The **Policyholder** may have the right to purchase an extended reporting period for purposes of reporting claims during the extended reporting period. Coverage under this policy shall attach only after:

   A.   all the Limits of Liability of the **Underlying Insurance** have been exhausted solely as a result of the actual payment of covered loss(es); or

   B.   the **Policyholder** and/or any other insurer(s), entity, or individual on behalf of the **Policyholder** has paid up to the full limits of liability for such loss, and satisfied any deductible(s) or retention amount(s) of the **Underlying Insurance** on behalf of the insurer(s) of any **Underlying Insurance**, including coverage provided pursuant to a difference in conditions policy.

Coverage under this policy shall then apply in conformance with and subject to the warranties, if permitted, limitations, conditions, provisions, and other terms of the **Followed Policy**, together with the warranties, if permitted, and limitations of any other **Underlying Insurance**. In no event shall coverage under this policy be broader than coverage under any **Underlying Insurance**. In the event of reduction or exhaustion of all the Limits of Liability of the **Underlying Insurance** solely as a result of the payment of covered loss(es), this policy shall: (1) in the event of reduction, pay excess of the reduced Limit(s) of Liability of the **Underlying Insurance**, or (2) in the event of exhaustion, continue in force as primary or governing insurance excess of the applicable deductible(s) or retention amount(s) in the **Followed Policy**, which deductible(s) or retention(s) shall be applied to any subsequent covered loss as specified in the **Followed Policy**.

II.  LIMIT OF LIABILITY

The amount set forth in Item 2. of the Declarations shall be the Underwriter's maximum aggregate liability under this policy with respect to all claims. Defense costs and/or claims expenses, if applicable, are part of and not in addition to the Limit of Liability and the payment by the Underwriter of such defense costs and/or claims expenses, if applicable, reduce the Limit of Liability.

Any coverage under the **Followed Policy** that provides for a maximum Limit of Liability that is less than the Limit of Liability stated in Item 3. of the Declarations for such **Underlying Insurance** ("Sublimit of Liability") shall not be provided by this policy. Provided, however, any actual payment of covered loss(es) made under the **Followed Policy** or other **Underlying Insurance** on account of any claim, for which coverage is subject to a Sublimit of Liability, shall be recognized by the Underwriter as contributing to the reduction or exhaustion of the Limit(s) of Liability designated in Item 2. of the Declarations.

III. CONDITIONS

   A.   Reporting and Notice – As a condition precedent to exercising any rights under this policy, the **Policyholder** shall give the Underwriter written notice of any claim or any potential claim under this policy or any **Underlying Insurance** in the same manner required by the terms and conditions of the **Followed Policy**. Notwithstanding the foregoing, notice to the insurer(s) of the **Followed Policy** or other **Underlying Insurance** does not constitute notice to the Underwriter. Written notice of any claim or potential claim shall be provided to the Underwriter at the address set forth in Item 5.A. of the Declarations.

The Underwriter shall be given notice in writing to the address set forth in Item 5.B. of the Declarations as soon as practicable in the event of (1) termination of any **Underlying Insurance**, (2) any additional or return premiums charged or allowed in connection with any **Underlying Insurance**, or (3) any change to any of the **Underlying Insurance**.

B.  Alteration – No change in, modification of, or assignment of interest under this policy or **Underlying Insurance** shall be effective except when made by a written agreement or endorsement to this policy by an authorized representative of the Underwriter. To the extent such **Underlying Insurance** is modified or altered, the Underwriter shall not recognize any new or modified coverage to which it has not consented.

C.  Maintenance of Underlying Insurance – As a condition precedent to coverage under this policy, the **Policyholder** agrees to maintain the **Underlying Insurance** during the **Policy Period** in full effect with solvent insurers. To the extent such **Underlying Insurance** is not maintained, then the **Policyholder** shall be deemed self-insured for the amount of the Limit(s) of Liability of any such **Underlying Insurance**.

# Form and Endorsement Schedule



**ZURICH**

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| IPR 3792308-03 | 11/01/2014 | 11/01/2015 | 11/01/2014 | --------- | --------- |

**Policyholder:** President and Fellows of Harvard College

| Form Name | Form Number | Edition Date | Endorsement No. |
|---|---|---|---|
| Disclosure Statement | U-GU-873-A | 06/2011 | |
| Disclosure Statement | U-GU-874-A | 06/2011 | |
| Advisory notice to policyholders regarding the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") regulations | U-GU-1041-A CW | 03/2011 | |
| Disclosure of Premium (Relating to Disposition of TRIA) | U-GU-692-C CW | 06/2013 | |
| Massachusetts Company Identification Form | U-GU-745-A | 11/2006 | |
| In-Witness Clause & Corporate Signatures | U-GU-319-F | 01/2009 | |
| Policy Declarations | U-FLXS-D100-A CW | 08/2011 | |
| Zurich Excess Select Insurance Policy | U-FLXS-100-A CW | 08/2011 | |
| Forms and Endorsement Schedule | U-FLXS-101-A CW | 02/2012 | |
| Inter-line Cap on Losses from Certified Acts of Terrorism Endorsement | U-GU-767-A CW | 01/2008 | 1 |
| Non-Follow Form Endorsement | U-FLXS-205-A | 08/2011 | 2 |
| Pending or Prior Exclusion Endorsement | U-FLXS-207-A CW | 08/2011 | 3 |
| | | | |
| | | | |
| | | | |
| | | | |



# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

| Insureds Name | Policy Number | Effective Date | Endorsement Number |
|---|---|---|---|
| President and Fellows of Harvard College | IPR 3792308-03 | 11/01/2014 | 1 |

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies your insurance:

Zurich American Insurance Company

**Employment Practices Liability Excess Policy**

**A.** **Cap on Losses From Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act ("TRIA"). The Terrorism Risk Insurance Act provides that the Secretary of Treasury shall certify an act of terrorism:

1. to be an act of terrorism;

2. to be a violent act or an act that is dangerous to human life, property or infrastructure;

3. to have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and

4. to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

No act may be certified as an act of terrorism if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.

If aggregate insured losses attributable to one or more "certified acts of terrorism" exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**B.** **Application of Other Exclusions**

The terms and limitations of a terrorism exclusion or any other exclusion, or the inapplicability or omission of a terrorism exclusion or any other exclusion, do not serve to create coverage which would otherwise be excluded, limited or restricted under this policy.

Copyright © 2008 Zurich American Insurance Company
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Endorsement # 2

# Non-Follow Form Endorsement



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| IPR 3792308-03 | 11/01/2014 | 11/01/2015 | 11/01/2014 | N/A | N/A |

**Policyholder:** President and Fellows of Harvard College

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Zurich Excess Select Insurance Policy**

It is agreed that:

The following section is added to the policy:

EXCLUSIONS:

This policy does not provide the **Policyholder** with insurance coverage for any claim made against or loss incurred by any insured that is subject to the types of coverage(s) afforded under the **Followed Policy** as set forth in the SCHEDULE below. Any payment made by the insurer of the **Followed Policy** for loss for such coverage shall reduce or exhaust the limits of liability of the **Followed Policy** for purposes of ascertaining the attachment for coverage under this policy.

| NON-FOLLOWED COVERAGE(S) SCHEDULE |
|---|
| Security, Privacy and Media Content Liability Insurance Coverage afforded under Coverage Part A of the Followed Policy |
| Media Claim (as defined by the Followed Policy) |
| Security/Privacy Claim (as defined by the Followed Policy) |

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY SHALL APPLY AND REMAIN UNCHANGED.**

Endorsement # 3

# Prior or Pending Exclusion Endorsement


**ZURICH**

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| IPR 3792308-03 | 11/01/2014 | 11/01/2015 | 11/01/2014 | NA | NA |

**Policyholder:** President and Fellows of Harvard College

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Zurich Excess Select Insurance Policy**

It is agreed that:

The following section is added to the policy:

EXCLUSIONS:

The Underwriter shall not be liable for loss on account of, based upon, arising out of, or attributable to any written demand, suit or proceeding pending, or order, decree or judgment entered against any insured on or prior to

May 31, 2010 with respect to any Professional Services Claim, Investment Advisory Services Claims, or Fiduciary Liability Claims, or all other Claims as defined in the Followed Policy

July 1, 2006 with respect to any other Claim as defined in the Followed Policy for the Limit of Liability of $5,000,000 in excess of $25,000,000

July 1, 2007 with respect to any other Claim as defined in the Followed Policy for the Limit of Liability of $10,000,000 in excess of $30,000,000;

or the same or substantially the same wrongful act or interrelated wrongful acts, fact, circumstance or situation underlying or alleged therein.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY SHALL APPLY AND REMAIN UNCHANGED.**

# Exhibit D

**Frazier, Mark**

| | |
|---|---|
| **From:** | Henry Chun <henry.chun@zurichna.com> |
| **Sent:** | Wednesday, August 30, 2017 2:56 PM |
| **To:** | Frazier, Mark |
| **Cc:** | douglas.j.willis@marsh.com |
| **Subject:** | President and Fellows of Harvard College/Students for Fair Admissions, Inc., Zurich Claim No. 9410562971 |
| **Attachments:** | 2017-08-30.Harvard.SFA.Frazier.pdf |

Dear Mr. Frazier:

Attached is Zurich American Insurance Company's coverage letter regarding the referenced matter.  Please call me if you have any questions.

Very truly yours,

Henry Chun
Senior Claims Counsel
Zurich North America - Management Solutions Group
P.O. Box 968041
Schaumburg, IL 60196-8041
T (808) 626-6700
F (866) 255-2962
E henry.chun@zurichna.com

****************** PLEASE NOTE ******************
This message, along with any attachments, is for the designated recipient(s) only and may contain privileged, proprietary, or otherwise confidential information. If this message has reached you in error, kindly destroy it without review and notify the sender immediately. Any other use of such misdirected e-mail by you is prohibited. Where allowed by local law, electronic communications with Zurich and its affiliates, including e-mail and instant messaging (including content), may be scanned for the purposes of information security and assessment of internal compliance with company policy.

1



**ZURICH**

August 30, 2017

<u>**VIA ELECTRONIC MAIL ONLY**</u>

Mr. Mark Frazier
Harvard University
1033 Massachusetts Avenue
Suite 360
Cambridge, MA  02138
mark_frazier@harvard.edu

<div style="float:left">

**Zurich**
**Specialty Claims**

**Henry Chun**
**Senior Claims Counsel**

P.O. Box 968041
Schaumburg, IL  60196-8041

Telephone  (808) 626-6700
Fax  (866) 255-2962
E-mail:  henry.chun@zurichna.com

</div>

Re:   Insured:      President and Fellows of Harvard College
        Insurer:       Zurich American Insurance Company
        Policy No.:    IPR 3792308 03
        Matter:        <u>Students for Fair Admissions, Inc.</u>
        Claim No.:    9410562971

Dear Mr. Frazier:

On behalf of Zurich American Insurance Company ("Zurich"), this letter follows up on our prior correspondence to you acknowledging receipt of claim information regarding the referenced matter, a lawsuit pending in the federal district court for the District of Massachusetts captioned:

> <u>Students for Fair Admissions, Inc. v. Presidents and Fellows of</u>
> <u>Harvard College (Harvard Corporation), et al.</u>, U.S.D.C., D. Mass.,
> Case No. 1:14-v-14176 (filed on or around 11/17/14).

We are directing this letter to you as the authorized representative of President and Fellows of Harvard College ("Harvard" or the "**Policyholder**") for insurance matters.  If you are not acting on behalf of Harvard in that capacity, please forward a copy of this letter to Harvard's authorized insurance representatives for their information, and forward us the correct contact information.

A.     The Excess Policy

Zurich issued to Harvard Zurich Excess Select Insurance Policy number IPR 3792308 03 (the "Excess Policy"), effective for the period November 1, 2014

Mr. Mark Frazier
August 30, 2017
Page 2

to November 1, 2015 (the "**Policy Period**").  The Zurich Excess Policy is
written on a claims-made basis.

The Excess Policy affords an aggregate Limit of Liability of $15 million
excess of any applicable self-insured retention or deductible and $25 million in
**Underlying Insurance** coverage provided by the following:

| Insurer | Limit of Liability | Layer |
|---|---|---|
| National Union Fire Insurance Co. Of Pittsburgh, Pa. Policy No. 01-817-25-28 | $25 million | Primary |

The coverage afforded under the Zurich Excess Policy, if any, shall attach only
after all the Limits of Liability of the **Underlying Insurance** have been
exhausted solely as a result of the actual payment of covered loss(es) or the
**Policyholder** and/or any other insurer(s), entity, or individual on behalf of the
**Policyholder** has paid up to the full limits of liability for such loss, and
satisfied any deductible(s) or retention amount(s) of the **Underlying
Insurance** on behalf of the insurer(s) of the **Underlying Insurance**, including
coverage provided pursuant to a difference in conditions policy.

Defense costs are part of and not in addition to the Limit of Liability, and the
payment by the Underwriter (i.e., Zurich) of defense costs reduces such Limit
of Liability.

Except as otherwise stated therein, assuming coverage under the Zurich Excess
Policy attaches, coverage under this policy shall then apply in conformance
with and subject to the warranties, if permitted, limitations, conditions,
provisions, and other terms of the **Followed Policy**, together with the
warranties, if permitted, and limitations of any other **Underlying Insurance**.
In the event of reduction or exhaustion of all the Limits of Liability of the
**Underlying Insurance** solely as a result of the payment of covered loss(es),
this policy shall: (1) in the event of reduction, pay excess of the reduced
Limit(s) of Liability of the **Underlying Insurance**, or (2) in the event of
exhaustion, continue in force as primary or governing insurance excess of the
applicable deductible(s) or retention amount(s) in the **Followed Policy**, which
deductible(s) or retention(s) shall be applied to any subsequent covered loss as
specified in the **Followed Policy**.

Mr. Mark Frazier
August 30, 2017
Page 3


B.      Coverage Issues

We are in receipt of the letter dated August 4, 2015 from Talis Knets of AIG to
you setting forth the coverage position of National Union for this matter under
National Union policy number 01-817-25-28.  We have reviewed Ms. Knets'
letter and considered her comments therein.

While we generally agree with Ms. Knets' comments, we would be remiss if
we failed to note that although the complaint in this matter was filed in
November 2014, Zurich did not receive notice of it until May 2017.  If notice
was submitted previously, please forward the original notice materials to us as
soon as possible for our review.  Under the circumstances, however, Zurich
must reserve its right to deny coverage for this matter on the ground notice was
not timely submitted to Zurich.

C.      Reservation of Rights

Zurich fully reserves all of its rights and defenses under the Zurich Excess
Policy, the **Underlying Insurance**, and available at law or in equity with
respect to this matter, and recognizes that the **Insureds** similarly reserve their
rights.

If there is any additional information of which you believe Zurich should be
aware, please do not hesitate to call me.  Thank you.


Very truly yours,

ZURICH AMERICAN INSURANCE COMPANY


By:

Henry Chun
Senior Claims Counsel
Management Solutions Group
Zurich – Specialties Claims


2017-08-30.Harvard.SFA.Frazier

Mr. Mark Frazier
August 30, 2017
Page 4


cc:      (via electronic mail only)

         Mr. Douglas Willis
         Senior Claim Advisor
         Marsh USA Inc.
         20 Church Street
         Hartford, CT  06103
         douglas.j.willis@marsh.com
         Marsh File No.: 14BOST146697

# Exhibit E


**ZURICH**

October 25, 2017

**VIA ELECTRONIC MAIL ONLY**

Mr. Mark Frazier
Harvard University
1033 Massachusetts Avenue
Suite 360
Cambridge, MA  02138
<u>mark_frazier@harvard.edu</u>

**Zurich**
**Specialty Claims**

**Henry Chun**
**Senior Claims Counsel**

P.O. Box 968041
Schaumburg, IL  60196-8041

Telephone (808) 626-6700
Fax (866) 255-2962
E-mail:  henry.chun@zurichna.com

Re:  Insured:       President and Fellows of Harvard College
     Insurer:        Zurich American Insurance Company
     Policy No.:      IPR 3792308 03
     Matter:          <u>Students for Fair Admissions, Inc.</u>
     Claim No.:       9410562971

Dear Mr. Frazier:

On behalf of Zurich American Insurance Company ("Zurich"), this letter
follows up on our prior correspondence to you regarding the referenced matter,
including our letter of August 30, 2017.

We are directing this letter to you as the authorized representative of President
and Fellows of Harvard College ("Harvard" or the **"Policyholder"**) for
insurance matters.  If you are not acting on behalf of Harvard in that capacity,
please forward a copy of this letter to Harvard's authorized insurance
representatives for their information, and forward us the correct contact
information.

At this time, we must advise you that it appears there is no coverage for this
matter under the Zurich Excess Policy for the reasons that follow.

As you may recall, in our letter of August 30 we noted that the lawsuit in this
matter was filed in November 2014 but Zurich did not receive notice of it until
May 2017.  We therefore invited you to tell us whether notice was submitted
earlier and, if so, to provide us those notice materials.  To date, we have not
received a response.

Mr. Mark Frazier
October 25, 2017
Page 2

The Zurich Excess Policy provides in subsection III that as a condition precedent to exercising any rights under the Excess Policy, the **Policyholder** shall give Zurich written notice of any claim or any potential claim under the Excess Policy or any **Underlying Insurance** in the same manner required by the terms and conditions of the **Followed Policy**. Furthermore, notice to the insurer(s) of the **Followed Policy** or other **Underlying Insurance** does not constitute notice to Zurich.

The **Followed Policy** is National Union policy number 01-817-25-28. In pertinent part, the **Followed Policy** requires that all **Claims** must be reported no later than 90 days after the end of the **Policy Period**. The **Policy Period** for both the **Followed Policy** and the Zurich Excess Policy expired on November 1, 2015.

Since Zurich did not receive notice of this matter until May 2017, it appears Harvard failed to provide timely notice of this matter to Zurich in the manner required under the terms and conditions of the **Followed Policy**. For this reason, we must at this time deny coverage for this matter.

Zurich fully reserves all of its rights and defenses under the Zurich Excess Policy, the **Underlying Insurance**, and available at law or in equity with respect to this matter, and recognizes that the **Insureds** similarly reserve their rights.

If there is any additional information of which you believe Zurich should be aware, please do not hesitate to call me. Thank you.


Very truly yours,

ZURICH AMERICAN INSURANCE COMPANY


By:

Henry Chun
Senior Claims Counsel
Management Solutions Group
Zurich – Specialties Claims

Mr. Mark Frazier
October 25, 2017
Page 3


cc:     (via electronic mail only)

        Mr. Douglas Willis
        Senior Claim Advisor
        Marsh USA Inc.
        20 Church Street
        Hartford, CT  06103
        douglas.j.willis@marsh.com
        Marsh File No.: 14BOST146697

# Exhibit F

# TOLLING AGREEMENT

**THIS TOLLING AGREEMENT** (the "Agreement") is made and entered into as of the effective date specified below, by and between the President and Fellows of Harvard College and its affiliates ("Harvard") and Marsh USA Inc. ("Marsh") (Harvard and Marsh together, the "Parties," or singularly, a "Party.")

**WHEREAS**, Harvard engaged Marsh to provide certain insurance brokerage services; and

**WHEREAS**, acting on Harvard's behalf, Marsh placed with National Union Fire Insurance Company of Pittsburgh, Pa. ("AIG")  an "Educational Institution Risk Protector" insurance policy, Policy No. 01-817-25-28, with the policy period of November 1, 2014 to November 1, 2015 (the "Primary Policy"); and

**WHEREAS**, acting on Harvard's behalf, Marsh placed with Zurich American Insurance Company ("Zurich") an "Excess Select Insurance Policy," Policy No. IPR 3792308-03, with the policy period of November 1, 2014 to November 1, 2015 (the "Excess Policy"); and

**WHEREAS**, on or about November 17, 2014, a lawsuit was filed against Harvard in the U.S. District Court for the District of Massachusetts styled *Students for Fair Admissions, Inc. v. President of Harvard College (Harvard Corporation), et al.*, No. 1:14-cv-14176-ADB, (the "SFFA Litigation"); and

**WHEREAS**, AIG has agreed to defend Harvard against the SFFA Litigation under the Primary Policy; and

**WHEREAS**, Zurich has asserted a defense of late notice of the SFFA Litigation and denied Harvard's claim for coverage of the SFFA Litigation under the Excess Policy; and

docs-100269454.2
114811493.1

**WHEREAS**, on or about September 17, 2021, Harvard filed an action against Zurich in the U.S. District Court for the District of Massachusetts styled *President & Fellows of Harvard Coll. v. Zurich Am. Ins. Co.,* No. 21-cv-11530-ADB, in which Harvard sought to challenge Zurich's denial of coverage under the Excess Policy for the SFFA Litigation (the "Coverage Litigation"); and

**WHEREAS**, on or about November 2, 2022 the Court granted Zurich's motion for summary judgment in the Coverage Litigation and entered final judgment for Zurich; and

**WHEREAS**, Harvard's appeal of the judgment entered in the Coverage Litigation is currently pending before the U.S. Court of Appeals for the First Circuit; and

**WHEREAS**, depending on the final outcome of the Coverage Litigation, Harvard may wish to assert claims in litigation against Marsh for, among other things, alleged errors, omissions, and negligence in connection with the timing of notification of the SFFA Litigation to Zurich, and services and omissions related to the Excess Policy (the "Potential Claims"); and

**WHEREAS**, Harvard wishes to pursue the Coverage Litigation while preserving and protecting its rights to prosecute any and all claims it may have against Marsh in connection with the SFFA Litigation; and

**WHEREAS**, Marsh denies liability for any and all such claims; and

**WHEREAS**, Marsh, by signing this Agreement, does not admit liability or responsibility for any such claims, and each Party acknowledges that nothing contained herein shall operate so as to create or expand any rights, remedies, or liabilities of the Parties, except as provided herein to toll statutes of limitations and all other time-related defenses; and

**WHEREAS**, the Parties agree that it is in their mutual interest not to incur the costs of litigation in connection with the Potential Claims; and

docs-100269454.2
114811493.1

**NOW, THEREFORE**, in consideration of, and in reliance upon, the mutual covenants, promises, and other obligations provided in the Agreement, and intending to be legally bound hereby, the Parties mutually agree as follows:

1.      **Effective Date**.  The "Effective Date" of this Agreement is April 28, 2023.

2.      **Tolling Period**.  The "Tolling Period" is the time period from the Effective Date until the Termination Date.

3.      **Timing Defenses**.  Any and all applicable limitation periods, including state and federal statutes of limitations, statutes of repose, and all other time-related defenses (including, but not limited to, waiver, laches or estoppel) with respect to the Potential Claims (collectively, "Timing Defenses") are hereby tolled as of the Effective Date until the earlier of (a) 180 days from the Effective Date, or (b) 60 days after written notice of termination is sent by one Party to the other (the "Termination Date").

4.      **Suspension of Claims**.  So long as this Agreement remains in effect, neither Party nor any of its respective representatives, heirs, successors, or assigns shall commence, file, join in, assert, or otherwise pursue against the other Party any Potential Claims; provided, nothing in the Agreement shall bar any Party from asserting any defenses, counterclaims, and/or third party claims against the other Party in any action commenced by any entity other than one of the Parties.

5.      **Running time**.  The Tolling Period (as defined in paragraph 2 above) shall not be used to compute the running time for any Timing Defenses that may be asserted by any Party as to any Potential Claims.  The running of all applicable statutes of limitation shall

commence again on the termination of this Agreement unless there is an extension of this Agreement executed in writing by and on behalf of the Parties.

6. **Notice of Termination**. Notice of termination shall be given by depositing the notice in the United States Mail, certified mail return receipt requested, with adequate postage and emailing the notice on the same day as mailing to:

**Harvard**

Bradley E. Abruzzi, Esq.
Office of the General Counsel
Harvard University
1350 Massachusetts Avenue, Suite 980
Cambridge, MA 02138
(617)495-0876
bradley_abruzzi@harvard.edu

c/o Marshall Gilinsky, Esq.
Anderson Kill P.C.
1251 Avenue of the Americas
New York, NY 10020
(212) 278-1000
(212) 278-1733
mgilinsky@andersonkill.com

**Marsh**

Christopher J. Troisi, Esq.
Marsh USA Inc.
Senior Assistant General Counsel, Marsh Litigation
1166 Avenue of the Americas
New York, NY 10036
(212) 345-2757
Christopher.troisi@mmc.com

7. **Non-Admission as to Liability**. This Agreement shall not be interpreted or construed to be an admission or concession by any Party that it bears any actual or potential liability to the other Party or any other person or entity on any claim whatsoever, including any Potential Claims. By entering into this Agreement, neither Party shall be deemed to have: (a) made any admissions against its respective interest; or (b) admitted any alleged liability, wrongdoing, or violation of any rule, regulation or statute; or (c) waived any claims or defenses, however denominated, other than the defenses expressly affected by this Agreement.

8.      **Non-Admission as to Timing Defenses**.  Nothing in this Agreement shall be taken as an admission by any Party as to the applicability, running, expiration, or non-expiration of any Timing Defenses prior to the Effective Date.

9.      **No revival of Potential Claims**.  Nothing in this Agreement shall have the effect of reviving any Potential Claims that otherwise are barred by any Timing Defenses as of the Effective Date.

10.     **Limited Use of Agreement**.  This Agreement shall not be used in any suit or proceeding except to enforce the terms of the Agreement, or by a Party to establish, if the matter is contested, the timeliness of the filing of any Potential Claims against the other Party.

11.     **Choice of Law**.  This Agreement shall be governed by and construed in accordance with laws of the Commonwealth of Massachusetts, without reference to conflicts of law provisions.

12.     **Entire Agreement**.  This Agreement sets forth the entire understanding between the Parties and supersedes all previous discussions, understandings, representations, negotiations, and agreements with respect to the matter included in this Agreement. Additionally, the consideration recited herein is the full, complete, and entire consideration for this Agreement.

13.     **Amendment of Agreement**.  This Agreement may be modified only by a writing signed by or on behalf of both Parties.

14.     **Acknowledgment**.  The Parties are entering into this Agreement with full understanding of all the terms hereto and fully understand and voluntarily accept the terms of this Agreement.

docs-100269454.2
114811493.1

15.     **Binding Terms.**  The terms of this Agreement are binding as to each Party hereto, and its respective subsidiaries, affiliates, successors, assigns, employees, officers and directors.

16.     **Authority of Persons Signing.**  Each person signing this Agreement represents and warrants that he or she is authorized to bind to this Agreement the Party for whom he or she has signed.

17.     **Counterparts.**  This Agreement may be executed in any number of counterparts and by facsimile or by e-mailing a scanned version, each of which when executed and delivered shall be deemed an original, but all such counterparts shall constitute one and the same instrument.

docs-100269454.2
114811493.1

**IN WITNESS THEREOF**, the Parties have caused this Agreement to be executed by and through their respective representatives identified below.

**PRESIDENT AND FELLOWS OF HARVARD COLLEGE**

By:

Name: JAVIER M GUZMAN

Title: DEPUTY GENERAL COUNSEL

Dated: 5/1/23

**MARSH USA INC.**

By:

DocuSigned by:

*Christopher J. Troisi*

Name: Christopher J. Troisi

Title: Senior Assistant General Counsel

Dated: May 1, 2023

7

Date Filed 11/29/2023 5:10 PM Case 1:23-cv-13017-ADB   Document 9   Filed 01/04/24   Page 229 of 231
Superior Court - Suffolk
Docket Number 2384CV02406

7

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                                    SUPERIOR COURT DEPARTMENT
                                                                      OF THE TRIAL COURT

_____
                                                              )
PRESIDENT AND FELLOWS OF                                       )
HARVARD COLLEGE,                                               )
                                                              )
                              Plaintiff,                       )
v.                                                            )        Civil Action No. 2384CV02406-BLS1
                                                              )
MARSH USA INC.,                                               )
                                                              )
                              Defendant.                      )
_____)

## STIPULATION OF EXTENSION OF TIME

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned,
pursuant to Rule 6(b) of the Massachusetts Rules of Civil Procedure, that the time for Defendant
Marsh USA Inc., to move, answer, or otherwise respond to the Complaint filed in this action on
or around October 25, 2023 is hereby extended through and including January 5, 2024.

Dated: November 29, 2023

PLAINTIFF PRESIDENT AND                             DEFENDANT MARSH USA INC.
FELLOWS OF HARVARD COLLEGE


_/s/ Robert J. Gilbert_____               _/s/ Candace J. Hensley_____
Robert J. Gilbert (BBO# 565466)                     Jonathan I. Handler (BBO# 561475)
Daniel W. Sack (BBO# 699290)                        Candace J. Hensley (BBO# 706150)
Haley P. Denler (BBO# 710906)                       DAY PITNEY LLP
LATHAM & WATKINS LLP                                One Federal Street, 29th Floor
John Hancock Tower, 27th Floor                      Boston, MA 02110
200 Clarendon Street                                Telephone: (617) 345-4600
Boston, MA 02116                                    Facsimile: (617) 345-4745
Telephone: (617) 948-6000                           jihandler@daypitney.com
Facsimile: (617) 948-6001                           chensley@daypitney.com
robert.gilbert@lw.com
daniel.sack@lw.com
haley.denler@lw.com

## **CERTIFICATE OF SERVICE**

I, Candace J. Hensley, hereby certify that on this 29th day of November, 2023, I served a copy of the foregoing *Stipulation of Extension of Time* via e-mail on counsel for the Plaintiff as follows:

Robert J. Gilbert, *robert.gilbert@lw.com*
Daniel W. Sack, *daniel.sack@lw.com*
Haley P. Denler, *haley.denler@lw.com*
LATHAM & WATKINS LLP
John Hancock Tower, 27th Floor
200 Clarendon Street
Boston, MA 02116

*/s/ Candace J. Hensley*
Candace J. Hensley

-2-

## <u>CERTIFICATE OF SERVICE</u>

I, Candace J. Hensley, hereby certify that on January 4, 2024, I served a true and correct copy of the foregoing upon Plaintiff's attorney of record via the Court's electronic filing system and in accordance with Fed. R. Civ. P. 5(b).

*/s/ Candace J. Hensley*
Candace J. Hensley